# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MINNEAPOLIS BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

Plaintiff,

v.

CITY OF MINNEAPOLIS and OFFICERS JOHN DOES 1–20,

Defendants.

_____ Civ.___________(______)

COMPLAINT

Jury Trial Demanded

## INTRODUCTION

1. Plaintiff Minneapolis Branch of the National Association for the Advancement of Colored People ("Minneapolis NAACP," "NAACP," or "Plaintiff") brings this civil rights action to seek redress for the violation of its members' constitutional and statutory rights to be free from racial discrimination and selective enforcement by the Minneapolis Police Department ("MPD").

2. Plaintiff seeks redress for MPD officers' use of covert social media accounts to surveil, target, contact, and falsely engage with Minneapolis NAACP members for over a decade, unrelated to any actual or alleged criminal activity and without any public safety objective or investigative purpose.

3. Plaintiff further seeks redress from the City of Minneapolis for maintaining a decade-long policy, custom, and/or usage of singling out the NAACP and its members for surveillance on the basis of race, and/or failing to train, supervise, and discipline its officers, agents, and employees resulting in "deliberate indifference" to the rights of people targeted by MPD

officers using covert social media accounts, including the NAACP and its members.

4. The Minnesota Department of Human Rights ("MDHR"), the State's civil rights enforcement agency, investigated and confirmed MPD's unconstitutional practices via a report made public on April 27, 2022.

5. Following the murder of George Floyd on May 25, 2020, and subsequent calls to investigate MPD for racially discriminatory policing, MDHR conducted a sweeping investigation into MPD policies and practices. This investigation confirmed that, for over a decade from 2010 through 2021, MPD maintained and fostered numerous policies of racialized policing.

6. These policies disproportionately targeted Black Minneapolitans.

7. Among its findings, MDHR concluded that "MPD officers using covert social media to target and surveil Black community members demonstrates a pattern or practice of discriminatory, race-based policing."[1]

8. The surveillance conducted by MPD officers of the Minneapolis NAACP violated Plaintiff's First and Fourteenth Amendment rights and discriminated against Plaintiff in violation of federal and Minnesota law. Plaintiff brings this civil rights action to secure (1) a declaratory judgment that the surveillance that occurred in this case was unconstitutional and a violation of federal and Minnesota law; (2) compensatory damages for the injuries caused by Defendants' unlawful conduct; and (3) punitive damages assessed to deter such intentional or reckless deviations from well settled constitutional law.

[1] MINNESOTA DEPARTMENT OF HUMAN RIGHTS, INVESTIGATION INTO THE CITY OF MINNEAPOLIS AND THE MINNEAPOLIS POLICE DEPARTMENT: FINDINGS FROM THE MINNESOTA HUMAN RIGHTS DEPARTMENT 35 (2022) (available at https://mn.gov/mdhr/assets/Investigation%20into%20the%20City%20of%20Minneapolis%20and%20the%20Minneapolis%20Police%20Department_tcm1061-526417.pdf).

## JURISDICTION AND VENUE

9. This action arises under the First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983; Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et. seq.; and Minnesota state law.

10. This Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343, and 1367.

11. This Court is the proper venue pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in the District of Minnesota.

## PARTIES

### I. Plaintiff

12. Plaintiff Minneapolis NAACP is a civil rights organization based in Minneapolis, Minnesota. The Minneapolis NAACP is a local chapter of the National Association for the Advancement of Colored People, Inc. ("NAACP"), one of the nation's oldest civil rights organizations.

13. The Minneapolis NAACP is a pillar of the Minneapolis community and one of the most significant civil rights organizations in Minneapolis. The organization works to ensure the political, educational, social, and economic equality of Black Minneapolitans.

14. The organization's mission is "to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination."[2] The organization has committees focused on economic development, behavioral health and wellness, child protection, and more.[3] It has also championed efforts to raise funds for public safety causes,[4]

---

[2] *Our Mission*, MINNEAPOLIS NAACP, https://www.mplsnaacp.org/mission (last visited Mar. 3, 2023).
[3] *Committees*, MINNEAPOLIS NAACP, https://www.mplsnaacp.org/committees (last visited Mar. 29, 2023).
[4] Minneapolis NAACP, *Good Evening, Community - Please Come Out to Support the Mothers Against Community Gun Violence Walkathon Fundraiser on Saturday, 11th from 9:30-11am at Lake Nokomis. Please Visit https://www.macgvnb.com/June-Walkathon. Let's Take Back Our Communities and Come Together to End Senseless*

support Black educators,[5] and to preserve Minnesota history.[6]

15. The Minneapolis NAACP is comprised of Black Minneapolis community members. Its Executive Board is made up of volunteers who donate their time and effort to support the organization, its members, and its mission. The Minneapolis NAACP has hundreds of members.

16. Cynthia Wilson is a member of the Minneapolis NAACP and its current President. She has been the President since December 2021. Angela Rose Myers is a member of the Minneapolis NAACP, and recently, one of the organization's Vice Presidents and the Political Action Chair. Ms. Myers was previously President from November 2020 to November 2022 and one of the NAACP's social media managers from 2019 to 2022. Nekima Levy Armstrong is a member of the Minneapolis NAACP and the former President of the organization from May 2015 to November 2016. Wilson, Myers, and Armstrong have been active in the organization's efforts to combat racial discrimination, including in public safety.

17. One of the central goals of the Minneapolis NAACP is to eliminate racial discrimination in policing. Toward that end, the Minneapolis NAACP has historically maintained a working relationship with the City of Minneapolis and the Minneapolis Police Department. This has included periods of regular, formal meetings and informal consulting with both entities on public safety matters.

18. The Minneapolis NAACP has invited police officers to participate in certain membership meetings. Some Black MPD officers have been members of the Minneapolis NAACP.

---

*Gun Violence.*, FACEBOOK (May 9, 2022), https://www.facebook.com/naacpmpls/photos/a.1438555223132322/3178599589127868.

[5] Minneapolis NAACP, *Good Evening Community - The Minneapolis NAACP and Coalition for Truth Is Co-hosting a Press Conference at the Minneapolis Federation of Teachers at 67 8thAve NE Minneapolis, MN. 55413 at 4:00-4:30pm on Thursday April 21, 2022. Please Come Out to Support if You're Available. We Hope to See You There!*, FACEBOOK (Apr. 20, 2022), https://www.facebook.com/naacpmpls/photos/a.1438555223132322/3164061183915042

[6] *See, e.g.*, Minneapolis NAACP, *WATCH: MN HISTORY: Former South African President Nelson Mandela Delivers a Speech at the Hilton in Minneapolis for Minneapolis NAACP Freedom Fund 2001*, FACEBOOK, (Mar. 29, 2022), https://www.facebook.com/naacpmpls/.

Notwithstanding the Minneapolis NAACP's efforts to work with the MPD to address racialized policing, unbeknownst to the NAACP, MPD police officers simultaneously used covert social media accounts to surveil the organization.[7]

**II. Defendants**

19. Defendant City of Minneapolis ("Minneapolis," the "City of Minneapolis," or the "City") is a municipality organized and existing under the laws of the State of Minnesota.

20. The City of Minneapolis receives federal financial assistance for its programs, services, and activities, including law enforcement.

21. The City of Minneapolis, acting through the Minneapolis Police Department ("MPD"), is responsible for MPD policies, customs, and practices, and the training, supervision, and conduct of all MPD officers.

22. In addition, the City of Minneapolis is responsible for enforcing the rules and directives of MPD and ensuring that MPD personnel obey the laws of the United States and the State of Minnesota.

23. At all times relevant to this Complaint, each of the City of Minneapolis officials referenced below was a policymaker for the City of Minneapolis with respect to police matters, including Mayor Jacob Frey, former Mayor Betsy Hodges, former Mayor R. T. Rybak, former Police Chief Medaria Arradondo, former Police Chief Janeé Harteau, and former Police Chief Tim Dolan.

24. To the extent any of these or other unnamed officials is not deemed a policymaker under relevant law, each official had policymaker authority delegated to them with respect to the

[7] Minneapolis NAACP, *Today's MDHR Report Shows That Although We Were Working with MPD for Meaningful Police Reform, They Were Surveilling Our Organization. They Used Taxpayer Money and 'Valuable' Officer Time to Surveil and Troll the Minneapolis NAACP When We Were Trying to End Police Misconduct...*, TWITTER (Apr. 27, 2022), https://twitter.com/NAACPmpls/status/1519349527987294211?s=20.

matters alleged in this Complaint.

25. Defendants Officers John Does 1–20, (collectively, "Defendant Officers" or "Officers") are police officers employed by the City of Minneapolis and/or other law enforcement agencies who, acting under the direction of and/or in concert and conspiracy with the City of Minneapolis, were involved in using or directed the use of social media accounts to surveil members of the Minneapolis NAACP between 2010 and 2021.

26. The identities of these defendants are not presently known, and Plaintiff will amend this Complaint to properly name all defendants after preliminary discovery.

## FACTS

### III. The Minneapolis Police Department has a History of Racialized Policing

27. Over the decades, MPD has been routinely investigated for racially discriminatory police practices by local, state, federal, and international authorities.

28. Each of these investigations has confirmed the existence of a wide range of racially discriminatory policing practices.

29. The United States Department of Justice ("DOJ") has an extended history of investigating MPD for racially discriminatory practices.

30. In 2003, the DOJ investigated MPD and both parties entered into a formal mediation agreement to address issues relating to use of force, officer diversity, and race relations.[8] The Minneapolis NAACP participated in the 2003 mediation process.[9]

31. The DOJ also investigated MPD in 2015, following an inquiry into MPD officer

[8] Libor Jany, *Even Before Latest Probe, Feds Deeply Familiar with Minneapolis Police*, PBS FRONTLINE (May 24, 2021), https://www.pbs.org/wgbh/frontline/article/feds-probe-minneapolis-police.
[9] Art Hughes, *Minneapolis Police, Community Reach Accord on Reducing Tension*, MINN. PUB. RADIO (Dec. 4, 2003), http://news.minnesota.publicradio.org/features/2003/12/04_hughesa_mplsmediate.

complaints and community relations. The DOJ then recommended numerous reforms, including expanding racial sensitivity training.[10]

32. In addition, the City of Minneapolis has investigated MPD for racially discriminatory practices. In 2003, the City of Minneapolis conducted an audit of traffic stops conducted by MPD in 2002. The audit found that MPD officers were more likely to stop and search drivers of color than white drivers.[11]

33. MPD has also been investigated for its history of disproportionately using deadly force against Black, Latinx, Indigenous, and Asian American persons. Since 2000, 33 of the 38 people killed by MPD have been Black, Indigenous, or people of color, including Fong Lee in 2006, Jamar Clark in 2015, and George Floyd in 2020.[12] DOJ was in the midst of investigating MPD at the time Jamar Clark was killed in 2015.

34. In 2020, George Floyd's murder and the resulting demands from the public to investigate the MPD sparked investigations of MPD's pattern of racially discriminatory practices by MDHR, DOJ, and the United Nations ("UN").

35. DOJ once again returned to scrutinize and investigate MPD. The ongoing investigation focuses on MPD's racially discriminatory practices. The investigation is reportedly analyzing MPD conduct going back decades.[13] The investigation is expected to result in a consent decree between the federal government and the City.

36. MPD's racially discriminatory policing has also been the subject of international

---

[10] Libor Jany, *Feds: Minneapolis Police Must Overhaul System for Dealing with Problem Officers*, STAR TRIB. (Jan. 29, 2015), https://www.startribune.com/feds-minneapolis-police-must-overhaul-system-for-dealing-with-problem-officers/290151541/.
[11] Brandt Williams, Minneapolis to Take Closer Look at Racial Profiling, MINN. PUB. RADIO (Nov. 25, 2003), http://news.minnesota.publicradio.org/features/2003/11/25_williamsb_racialprofiling/
[12] *Every Police-Involved Death in Minnesota Since 2000*, STAR TRIB. (Jan. 12, 2023), https://www.startribune.com/every-police-involved-death-in-minnesota-since-2000/502088871.
[13] Libor Jany, *Even Before Latest Probe, Feds Deeply Familiar with Minneapolis Police*, PBS FRONTLINE (May 24, 2021), https://www.pbs.org/wgbh/frontline/article/feds-probe-minneapolis-police/.

scrutiny. The United Nations Expert Mechanism to Advance Racial Justice and Equality in Law Enforcement ("EMLER") will be investigating MPD's conduct during an upcoming visit to the United States in May 2023. EMLER will visit Minneapolis to examine racialized police practices in America, including how MPD has disproportionately targeted the Black community.[14]

37. In addition, and most relevant here, MDHR filed a charge of discrimination against MPD, thus initiating a civil rights investigation to determine if MPD engaged in a pattern or practice of race discrimination between 2010 and 2020.[15] The Department released its findings and conclusions on April 27, 2022.

## IV. The Minnesota Department of Human Rights Report Found Numerous Policies of Racialized Policing

38. According to MDHR's *Investigation into the City of Minneapolis and the Minneapolis Police Department* ("Investigation" or "Report"), MPD has engaged in a pattern and practice of racial discrimination. MPD has also maintained an internal culture of racism and discrimination.

39. The Report found that MPD had a pattern of disproportionately targeting Black individuals in nearly all categories of data it analyzed. Despite only comprising 19% of the Minneapolis population, Black motorists comprised 54% of all of MPD's traffic stops.[16] White individuals, making up 63% of the population, were only one-third of the stops.[17]

40. The Black community referred to the corresponding fines, which are disproportionately levied against Black motorists, as the "Black tax."[18]

---

[14] United Nations Human Rights Office of the High Commissioner, *Independent Expert Mechanism on Racism and Law Enforcement to Visit the United* States, U.N. (Apr, 21, 2023), https://www.ohchr.org/en/media-advisories/2023/04/independent-expert-mechanism-racism-and-law-enforcement-visit-united (including Minneapolis in list of five cities to be examined).
[15] MINNESOTA DEPARTMENT OF HUMAN RIGHTS, *supra* note 1.
[16] *Id.* at 20.
[17] *Id.*
[18] *Id.* at 33.

41. The Report found that MPD was more forceful with Black individuals than with white people. Black Minneapolitans were victims of 63% of all use of force incidents by MPD.[19] MPD officers were almost twice as likely to use certain restraints on Black individuals than white individuals.[20] Further, MPD was more likely to use "soft" tactics when arresting white individuals, while more likely to use chemical irritants while arresting Black individuals.[21]

42. The Report found that the disproportionate use of force was coupled with an overtly racist culture within MPD. Supervisors and officers openly used racial slurs to refer to Black people in Minneapolis.[22] This culture was so pervasive that Black MPD officers were also the target of slurs by their colleagues.[23] This racist behavior was rarely disciplined.[24] Black officers feared retaliation for reporting racist behavior to their superiors.[25] Officer training programs reinforced the racist culture and its disproportionate impact on Black Minneapolitans.[26]

## V. The Minneapolis Police Department Had a Racially Discriminatory Policy of Surveilling Black Individuals and Organizations, Including the Minneapolis NAACP

43. The Report also concluded that MPD had improperly surveilled Plaintiff Minneapolis NAACP using fake social media accounts. The report concluded that MPD's surveillance targeted the NAACP as part of a pattern of racially discriminatory surveillance.[27] The surveillance of the Minneapolis NAACP was undertaken without a criminal investigative purpose in violation of MPD policy.[28]

---

[19] *Id.* at 11.
[20] *Id.* at 12.
[21] *Id.* at 16.
[22] *Id.* at 38.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.* at 39–40.
[27] *Id.* at 35–36.
[28] *Id.* at 36–37.

44. MPD used the accounts to attempt to gain access to the NAACP.[29] MPD officers used fake social media accounts to surveil and engage with Black individuals, Black organizations, and elected officials, including the Minneapolis NAACP.[30]

45. Surveillance actions included sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles.[31]

46. One account, posing as a Black individual, was used to publicly criticize the NAACP.[32] The accounts were also used to push racist stereotypes about Black people, specifically Black women.[33]

47. MPD also used a covert account to "pose[] as a community member and RSVP[] to attend the birthday party of a prominent Black civil rights lawyer and activist."[34] That activist was Nekima Levy Armstrong. At the time of the birthday party in June 2017, Ms. Armstrong was a mayoral candidate in the City of Minneapolis openly running on a police accountability platform. She recalled several MPD officers showing up in uniform to the event and ultimately shutting down the party early as a result of the officers' presence.[35]

48. During the period that MPD improperly surveilled the Minneapolis NAACP and other Black individuals and groups, MPD did not similarly surveil white individuals.[36] As of December 2020, MPD did not use covert accounts to track the actions of white supremacist or white nationalist groups.[37]

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.* at 35.
[35] *See* Nekima Levy Armstrong, *We Been Knew!: Reflections on MDHR Report and Findings of Racial Discrimination by the Minneapolis Police Department and the City of Minneapolis*, FACEBOOK (Apr. 28, 2022), https://fb.watch/jVc881AV7r/ (testimony beginning at 14:00).
[36] MINNESOTA DEPARTMENT OF HUMAN RIGHTS, *supra* note 1, at 35.
[37] *Id.* The Report states that the social media accounts used to surveil the Minneapolis NAACP were deactivated in the winter of 2021. *Id.* at 35 n.55.

49. On March 31, 2023, the City of Minneapolis and MDHR held a press conference to announce a settlement agreement between MDHR and the City. At that press conference, Rebecca Lucero, the MDHR Commissioner, confirmed the Report's conclusion that MPD targeted and surveilled Black leaders, officials, and organizations "without a public safety objective." Lucero described MPD's surveillance as involving the use of covert social media accounts "to track, follow [and] engage with" Black individuals.[38]

**FIRST CLAIM**

*Civil Action for Violation of 42 U.S.C § 1983, Deprivation of Fourteenth Amendment Rights— Against John Does 1–20*

50. Plaintiff hereby incorporates the preceding allegations as if fully rewritten herein.

51. Officers John Does 1–20's actions violated Plaintiff's clearly established rights under the Equal Protection Clause of the Fourteenth Amendment to be free from racially discriminatory policing, including selective investigation, harassment, and unlawful surveillance.

52. The United States Constitution prohibits selective enforcement of the law based on considerations such as race.

53. Law enforcement officers may not use race as a basis to investigate individuals. Racially motivated investigations are irreconcilable with and inherently in violation of the Equal Protection Clause.

54. When law enforcement officers investigate individuals who are members of a protected class but do not investigate similarly situated individuals who are not members of a protected class, the investigation likely runs afoul of the Equal Protection Clause.

55. John Does 1–20 used covert social media accounts to target and surveil— by means

[38] City of Minneapolis, *March 31, 2023 Settlement Agreement with MDHR Press Conference*, YOUTUBE (Mar. 31, 2023), https://www.youtube.com/watch?v=WxD_HzgCe7k (statement of Commissioner Lucero from 52:49–53:35).

of tracking, following, and engaging—the Minneapolis NAACP without a public safety objective, a criminal investigative purpose, nor any articulable facts that would lead an officer to reasonably suspect that criminal activity had been or was about to be committed.

56. The Minneapolis NAACP is a Black-led organization, comprised of predominantly Black members, which advances and is widely understood to be advancing the rights of Black people.

57. John Does 1–20 covertly investigated the Minneapolis NAACP and its members who are, under federal law, members of a protected class. John Does 1–20 did not investigate similarly situated individuals who were not members of a protected class.

58. Defendant Officers' actions and conduct described above ran afoul of the Equal Protection Clause.

59. John Does 1–20 surveilled and investigated the Minneapolis NAACP on the basis of their race.

60. The racial motivation underlying Defendant Officers' conduct is evident in that:

***a.*** John Does 1–20 surveilled the Minneapolis NAACP but did not surveil any similarly situated white groups, nor did they surveil any white supremacist groups or any white nationalist groups; and

***b.*** the investigation was undertaken seemingly without any purpose other than to harass, track, follow, and engage with the Minneapolis NAACP.

61. John Does 1–20's investigation targeted the Minneapolis NAACP as part of a pattern of racially discriminatory surveillance.

62. The Minneapolis NAACP were deprived of their rights under the Fourteenth Amendment to the United States Constitution as a direct and proximate result of the actions, conduct, and/or omissions of John Does 1–20 as described in this Complaint.

## SECOND CLAIM

*Civil Action for Violation of 42 U.S.C § 1983, Deprivation of Fourteenth Amendment Rights—Monell Liability Against City of Minneapolis*

63. Plaintiff restates the allegations contained in the previous paragraphs as if fully set forth herein.

64. According to the MDHR, "[a] review of MPD's covert social media accounts from January 2010 through December 2020, demonstrates that MPD officers used covert, or fake, social media accounts to surveil and engage Black individuals, Black organizations, and elected officials unrelated to criminal activity, without a public safety objective."

65. Defendant City of Minneapolis had a custom between at least 2010 and 2020 of using covert social media accounts to surveil and engage Black individuals and Black organizations, including the Minneapolis NAACP.

66. This custom of using covert social media accounts to surveil the Minneapolis NAACP was unrelated to criminal activity and unrelated to any public safety objective.

67. MPD did not maintain an accurate inventory of the covert accounts operated by MPD officers. For example, the MDHR Investigation found that MPD's inventory of covert accounts did not include at least two dozen covert accounts operated by MPD officers. Moreover, as of April 2022, MPD's Policy and Procedure Manual failed to require MPD leaders to substantively review MPD officers' covert social media activity to ensure that covert accounts were being used for legitimate investigative purposes. In September 2021, MPD amended its covert social media policy to require the Commander of the Strategic Information Center or their designee to conduct yearly audits only to ensure that the covert accounts were still active. The Consent Decree announced by MDHR and the City of Minneapolis on March 31, 2023 states that "MPD will require: authorization for the use of undercover social media accounts; procedures for collecting and/or maintaining any information developed or obtained through those accounts;

regular supervisory review of those accounts; and periodic assessment of the use of undercover social media accounts by MPD's Review Panel."[39] However, enforcement of the Consent Decree has not yet commenced and, on information and belief, MPD still does not require a substantive audit of officers' covert social media activity, including assessments whether the covert accounts are being used for unlawful or discriminatory purposes. As a result, MPD officers operated and continue to operate covert accounts without sufficient supervision, oversight, or accountability.

68. This custom described above caused or contributed to the violation of Plaintiff's rights discussed in this Complaint.

69. Defendant City of Minneapolis also failed to train, supervise, and discipline its officers, agents, and employees to an extent that amounted to "deliberate indifference" to the rights of people targeted by officers using covert social media accounts, including Plaintiff Minneapolis NAACP.

70. This failure to train, supervise, and discipline emboldened MPD officers to act without regard for the rights of the NAACP and its members, constituted unconstitutional misconduct, and caused or contributed to the violation of Plaintiff's rights discussed in this Complaint.

71. Between approximately July 21, 2017, and January 15, 2022, MPD had a custom, sometimes referred to as the "code of silence," which made it obvious to MPD officers that it was highly unlikely they would be disciplined in a meaningful way, much less terminated, for violating the constitutional rights of Black individuals or Black organizations, including Plaintiff Minneapolis NAACP.

72. This "code of silence" demonstrates that the municipality was aware of this

---

[39] Settlement Agreement and Order at 50, *State of Minnesota by Commissioner Rebecca Lucero v. City of Minneapolis* (Minn. Dist. Ct. 4th Jud. Dist., Mar. 31, 2023), available at: https://mn.gov/mdhr/assets/Court%20Enforceable%20Agreement_tcm1061-571942.pdf.

unconstitutional conduct being committed by employees yet turned a blind eye to enforcement of this conduct.

## THIRD CLAIM

*Civil Action for Retaliation in Violation of 42 U.S.C. § 1983, Deprivation of First Amendment Rights – Against John Does 1–20*

73. Plaintiff hereby incorporates the preceding allegations as if fully rewritten herein.

74. Under the First Amendment to the United States Constitution, a person has the right to free expression.

75. John Does 1–20 deprived Plaintiff Minneapolis NAACP of its members' rights under the First Amendment to the Constitution when John Does 1–20 used social media accounts to surveil, target, contact, and falsely engage with Plaintiff's members unrelated to any actual or alleged criminal activity and without a public safety objective.

76. Plaintiff Minneapolis NAACP was engaged in constitutionally protected activity when the NAACP held a birthday party that John Does 1–20 surveilled, and the NAACP assembled general meetings which John Does 1–20 surveilled.

77. The action of surveillance which John Does 1–20 took against the Minneapolis NAACP was not rooted or predicated on suspicion of criminal activity.

78. The actions John Does 1–20 took against the Minneapolis NAACP and its members, as discussed in this Complaint, would chill a person of ordinary firmness from continuing to engage in the protected activity in which they were previously engaged.

79. The Minneapolis NAACP's protected activity was a substantial, motivating, and significant factor in the conduct of John Does 1–20 described above.

80. John Does 1–20 acted under color of law.

81. The actions of John Does 1–20 constituted unlawful retaliation in violation of

Plaintiff Minneapolis NAACP's First Amendment rights.

82. John Does 1–20 willfully engaged in this unconstitutional conduct.

83. As a direct and proximate result of this violation of Plaintiff's constitutional rights, Plaintiff suffered harm.

## FOURTH CLAIM

*Civil Action for Violation of 42 U.S.C § 1985, Conspiracy to Interfere with Civil Rights—Against All Defendants*

84. Plaintiff hereby incorporates the preceding allegations as if fully rewritten herein.

85. Conspiracies, both public and private, to deny any person enjoyment of "equal protection of the laws" and/or "equal privileges and immunities under the laws" violate the first clause of 42 U.S.C. § 1985(3).

86. The Minneapolis NAACP is a Black-led organization, comprised of predominantly Black members, which advances and is widely understood to be advancing the rights of Black people.

87. Plaintiff is comprised of members of a protected class.

88. The City and MPD acted in furtherance of a conspiracy to violate a clearly established constitutional right to Equal Protection of the laws under the Fourteenth Amendment.

89. Specifically, John Does 1–20 targeted Plaintiff Minneapolis NAACP in the manner articulated throughout the First and Second Claims, while not targeting similarly situated white people during the same time period.

90. The conspiracy to engage in racially discriminatory conduct, described above, resulted in the deprivation of Plaintiff's rights; a cognizable harm under 42 U.S.C. § 1985(3).

## FIFTH CLAIM

*42 U.S.C. §2000d et seq., Title VI—Against City of Minneapolis*

91. Plaintiff hereby incorporates the preceding allegations as if fully rewritten herein.

92. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

93. Title VI allows for a private right of action.

94. The City of Minneapolis is a municipality that receives federal financial assistance for its programs, services, and activities, including law enforcement.

95. As a recipient of federal funding, the City of Minneapolis and the Minneapolis Police Department are prohibited from discriminating against Plaintiff Minneapolis NAACP, including providing unequal policing services based on race or color.

96. Federal regulations promulgated under Title VI forbid the City of Minneapolis from utilizing methods of policing that subject individuals to discrimination because of race or color that have the effect of defeating or substantially impairing the accomplishment of the objectives of the program with respect to individuals of a particular race or color. *See*, *e.g.*, 34 C.F.R. §§ 100.3.

97. Defendants failed in their duty to provide nondiscriminatory policing for the members of the Minneapolis NAACP.

98. As a result of the City's and John Does 1–20's aforementioned actions, the City of Minneapolis has created a racially hostile policing environment in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq*.

99. The City of Minneapolis endorsed discriminatory actions of its employees and created a racially hostile policing environment by not taking appropriate remedial actions to prevent

or stop unlawful surveillance of the Minneapolis NAACP and its members.

100. The City of Minneapolis has acted intentionally or with deliberate indifference in discriminating against Plaintiff.

101. Title VI creates a private right of action for Plaintiff Minneapolis NAACP to seek redress for the City's violation of Plaintiff's right to be free from policing based on race and color.

## SIXTH CLAIM

*Minn. Stat.§ 363A.12, Unfair Discriminatory Practices, Public Services—Against All Defendants*

102. Plaintiff hereby incorporates the preceding allegations as if fully rewritten herein.

103. The actions of all Defendants violated the Minneapolis NAACP's rights under the Minnesota Human Rights Act to not be discriminated against in the access to, admission to, full utilization of, and/or benefit from any public service because of race.

104. Plaintiff Minneapolis NAACP is comprised of members of a protected class. The NAACP is a Black-led organization, comprised of predominantly Black members, which advances and is widely understood to be advancing the rights of Black people.

105. Defendants are or provide public services for the purposes of Minn. Stat. § 363A.12.

106. Discriminatory treatment of citizens by police constitutes a deprivation of the full utilization of and benefit from police services.

107. If law enforcement officers investigate individuals who are members of a protected class but do not investigate similarly situated individuals who are not members of a protected class, the investigation is likely motivated by discriminatory intent. Similarly, if a law enforcement investigation is so at variance with what would reasonably be anticipated absent discrimination, then discrimination is the probable explanation for the investigation.

108. Defendants surveilled the Minneapolis NAACP and its members because of their race. The racial motivation for the Defendants' conduct is evident in that:

***a.*** Defendants' investigation was undertaken without a criminal investigative purpose or seemingly any purpose, and thus was so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation; and

***b.*** While Defendants surveilled the Minneapolis NAACP, they did not surveil similarly situated white groups, or white supremacist or white nationalist groups.

109. The MDHR report concluded that Defendants' investigation targeted the Minneapolis NAACP as part of a pattern of racially discriminatory surveillance.

110. As a direct and proximate result of the actions, conduct and/or omissions of Defendants as described in this Complaint, Plaintiff was deprived of its rights under the Minnesota Human Rights Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment against Defendants, granting Plaintiff the following relief:

1. To enter a judgment declaring that the Defendants' actions violated Plaintiff's rights, as protected by the First and Fourteenth Amendments to the Constitution of the United States, other applicable federal statutes, and Minn. Stat. § 363A.12.

2. To award Plaintiff compensatory damages in an amount to be determined at trial, plus prejudgment interest.

3. To award Plaintiff punitive damages against the Officers in their individual capacities in an amount to be determined at trial, plus prejudgment interest.

4. Issue an order requiring Defendants to pay Plaintiff's costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and Minn. Stat. § 363A.33, subd. 7.

5. Such other relief as Plaintiff requests or the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: April 26, 2023

/s/ *Liliana Zaragoza*

Liliana Zaragoza* (#402417)
*Associate Professor of Clinical Law & Director*
Brandon Redmon^
Evan Dale^
Lucy Chin^
Simon Earle^
Racial Justice Law Clinic
University of Minnesota Law School
229 19th Avenue South
Minneapolis, MN 55455
Phone: (612) 626-1007
Email: zaragoza@umn.edu

s/*Tim Phillips*

Tim Phillips (#390907)
Law Office of Tim Phillips
331 Second Avenue South, Suite 400
TriTech Center
Minneapolis, Minnesota 55401
Phone: (612) 470-7179
Email: tim@timphillipslaw.com

* *Petition for Admission to District of Minnesota Pending*

^ *Certified Student Attorney*

ATTORNEYS FOR PLAINTIFF