UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Minneapolis Branch of the National Association for the Advancement Of Colored People,

Plaintiff,

v.

City of Minneapolis and Officers John Does 1-20,

Defendants.

Case No. 23-cv-01175 (NEB/DTS)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CITY OF MINNEAPOLIS' MOTION TO DISMISS**

---

Plaintiff, Minneapolis Branch of the National Association for the Advancement of Colored People ("NAACP") alleges that its members were "surveilled" by unnamed John Doe Minneapolis Police Department ("MPD") officers from a period of 2010-2021. Plaintiff's Complaint fails to establish that Plaintiff has standing as an organization, fails to allege an injury in fact, and fails to allege sufficient facts to hold Defendant City of Minneapolis ("City") liable under a *Monell* claim or under Title VI. Moreover, the state law discrimination claim is barred by the statute of limitations. Therefore, the City respectfully moves the Court to dismiss this lawsuit in its entirety.

## FACTS

The City accepts as true the Complaint's allegations solely for the purpose

of this motion.

Plaintiff alleges that it is an organization whose mission is "'to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination.' The organization has committees focused on economic development, behavioral health and wellness, child protection, and more. It has also championed efforts to raise funds for public safety causes, support Black educators, and to preserve Minnesota history." (ECF Doc. 1 "Compl." at ¶ 14.) Additionally, "[o]ne of the central goals of the Minneapolis NAACP is to eliminate racial discrimination in policing." (*Id.* at ¶ 17.) Plaintiff alleges that "[t]he Minneapolis NAACP is comprised of Black Minneapolis community members." (*Id.* at ¶ 15.)

Plaintiff alleges that the MPD was subject to an investigation by the Minnesota Department of Human Rights ("MDHR") starting in 2020 and the MDHR released a report following its investigation on April 27, 2022. (*Id.* ¶¶ 5, 37.) The report states:

> A review of MPD's covert social media accounts from January 2010, through December 2020, demonstrates that MPD officers used covert, or fake, social media accounts to surveil and engage Black individuals, Black organizations, and elected officials unrelated to criminal activity, without a public safety objective. In contrast, MPD officers did not similarly track and surveil white people unrelated to criminal activity using MPD covert social media accounts. In fact, as of December 2020, MPD did not operate its own covert social media accounts to track white supremacist or white nationalist groups.

(*See id.* ¶¶ 43, 44, 48; Robertson Decl. Ex. A ("MDHR Report") at 35.) The "surveillance" actions included "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles." (*Id.* ¶ 45.) The MDHR later clarified that "surveillance" did not include "hacking" or "wiretapping":

> With respect to MDHR's Findings about MPD's covert social media use, when MDHR described MPD as "surveilling" individuals and groups through social media, MDHR did not use that term to indicate "hacking into" accounts or private messaging systems or "wiretapping" those individuals or groups. What was meant by "surveillance" was that MPD officers used covert social media accounts to "follow" and "engage with" individuals and groups through their social media accounts. It is common practice for law enforcement agencies to "follow" and "engage with" individuals and groups through their social media accounts to establish a credible undercover social media profile.

(Robertson Decl. Ex. B at 3.)

The only examples of problematic "surveillance" of Black individuals or the NAACP alleged in the report are repeated in the Complaint:

- The accounts used language that furthered racial stereotypes associated with Black people, specifically Black women. (Compl. at ¶ 46; Ex. B at 1.) (no specific examples of objectionable language were provided).)

- One covert account user posed as a Black individual to send a message criticizing the NAACP. (*Id.*)

- One covert account user posed as a community member and RSVP'd to attend the birthday party of a prominent Black civil rights lawyer and activist. (*Id.* at ¶ 47; Ex. B at 1.)

Nekima Levy Armstrong is a prominent Black civil rights lawyer and activist, a member of the Minneapolis NAACP, and the former President of the organization from May 2015 to November 2016. (Compl. at ¶¶ 16, 47.) Ms. Armstrong believes that she was the individual referenced in the report. (*Id.* at 47.)

At the time of Armstrong's June 2017 birthday party, she was a mayoral candidate in the City of Minneapolis running on a police accountability platform. (*Id.* at ¶ 47.) That year, she decided to hold a combination birthday party/campaign event at the Lotus restaurant in uptown. (*Id.* at ¶ 47 n.35; Robertson Decl. Ex. C at 1:29-34.) Armstrong stated that she invited people from the public, activists, community members to come and celebrate her birthday and her campaign for mayor. (*See* Compl. n.35; Robertson Decl. Ex. C at 2:35-36.) While the event was taking place in the public restaurant, she noticed a group of MPD officers sitting down and eating dinner. (*Id.* at 2:41-42.) She did not believe their presence was a coincidence. (*Id.* at 2:43-44.) She brought the issue of the police officers' presence to the attention of the owners of the restaurant, but they did not take any action to remove the officers and instead, according to Armstrong, seemed to "side with the police." (*Id.* at 2:48-49.) The restaurant then began treating her party differently, asking them to turn down the music periodically, and then asking them to wrap up the party early. (*Id.* at 2:49-52.) She believed

that the officers' presence was an attempt to harass and intimidate her and she later complained to the restaurant and to the then-Chief of Police Janee Harteau. (*Id.* at 2:45-46, 2:58-62, 2:64-65.)

Armstrong also stated that she has been aware of police officers engaging in surveillance of Black leaders and C she was fighting charges related to a demonstration she allegedly helped organize at the Mall of America. (*Id.* at 1:1-6.) She stated that "through that process, we learned about police officers engaging in surveillance of Black activists . . . and Black leaders." (*Id.* at 1:16-17.) The order dismissing the case against Armstrong makes a factual finding that the Mall of America was originally alerted to the planned protest by the MPD. (Robertson Decl. Ex. D.)

Plaintiff alleges that "surveillance of the Minneapolis NAACP was undertaken without a criminal investigative purpose in violation of MPD policy." (Compl. ¶ 43.) The MDHR report, which Plaintiff relies on, notes that,

> Since at least 2013, MPD has maintained a policy outlining its use of covert social media accounts for the purpose of investigating criminal activity on social networking sites, like Facebook, Twitter, Instagram, and others. If a clear investigative purpose to advance public safety exists, MPD, like many other law enforcement agencies, may create and use covert or fake social media accounts to gather evidence and investigate suspected criminal activity. MPD's policy requires a supervisor to approve the creation of a covert social media account.

(MDHR report at 36-37; *See* Compl. ¶ 43 n.28). The MPD policy referred to specifically states that a covert social media profile is "for the purpose of

investigating criminal activity." (Robertson Decl. Ex. E at 1, 4, 10.) The MPD policy on covert social media accounts requires, "(i) approval by a supervisor to create a covert account, (ii) mandated registration of covert social networking profiles with the commander of the Strategic Information Center; (iii) a prohibition of any post that promotes violence or criminal activity; and (iv) required deletion of the profile when it is no longer needed." (MDHR report at 37 n.57.)

Plaintiff also alleges that the MPD did not adequately track the use of the covert social media accounts as the MPD was unaware of some two dozen accounts and there is no policy that requires "MPD leaders to substantively review MPD officers' covert social media activity to ensure that covert accounts were being used for legitimate investigative purposes." (Compl. ¶ 67.)

Plaintiff brought suit on April 26, 2023, alleging: (1) John Doe officers violated its Fourteenth Amendment Rights to Equal Protection of the Law.; (2) The City violated Plaintiff's Fourteenth Amendment Rights; (3) John Doe officers committed First Amendment retaliation; (4) The City violated Title VI of the Civil Rights Act of 1964; (5) All Defendants violated Minn. Stat. § 363A.12. (Compl.) Plaintiff voluntarily dismissed its 42 U.S.C. § 1985 claim. (ECF Doc. 14.)

## ARGUMENT

Plaintiff's Complaint is deficient in the following respects: (1) it fails to establish that Plaintiff has standing, either on behalf of its members or in its own

right as an organization; (2) it fails to allege an Equal Protection claim or a First Amendment retaliation claim; (3) John Doe officers using undercover social media accounts have qualified immunity; (4) Plaintiff has failed to allege a *Monell* claim against the City; (5) Plaintiff has failed to allege a Title VI claim against the City; (6) Plaintiff's state law claims are barred by the statute of limitations.

## I. STANDARD OF REVIEW

Whether a plaintiff has standing is an issue of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 980 (8th Cir. 2009) (internal citations omitted) ("[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction."). "A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) which is limited to a facial attack on the pleadings is subject to the same standard as a motion brought under Rule 12(b)(6)." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003) (citing *Osborn v. U.S.*, 918 F.2d 724, 729 n. 6 (8th Cir. 1990)). A plaintiff has standing only if it can "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (citations omitted).

A motion to dismiss under Rule 12(b)(6) tests whether the plaintiff has pleaded a cognizable claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Wartman v. United Food & Commercial Workers Local 653*, 871 F.3d 638, 640 (8th Cir. 2017). A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009).

"[A] Complaint need not contain 'detailed factual allegations,' but 'it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'" *Minnesota Majority v. Mansky*, 708 F.3d 1051, 1055 (8th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Indeed, the court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002).

In deciding Rule 12(b)(6) motions, courts are not strictly limited to the four corners of complaints. *Outdoor Cent., Inc. v. GreatLodge.com, Inc.*, 643 F.3d 1115, 1120 (8th Cir. 2011). Courts also may consider matters of public record, materials embraced by the complaint, and exhibits attached to the complaint. *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir. 1999)). Therefore, in deciding this motion to dismiss, the Court may consider the statements of Armstrong that were

relied on in footnote 35 of Plaintiff's Complaint, the public FAQs from the MDHR's website, and the U.S. Department of Justice's report on the use of social media in policing.

## II. THE COMPLAINT FAILS TO ALLEGE FACTS ESTABLISHING THAT PLAINTIFF HAS STANDING TO BRING THIS SUIT

Standing requires that: (1) a plaintiff has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In this case, Plaintiff is an organization. An organization may have standing when it alleges an injury to itself, or it may have standing as the representative of its members if certain conditions are met. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Here, the NAACP does not allege sufficient facts to establish standing either on behalf of its members or on its own behalf.

### A. NAACP does not have associational standing to bring claims on behalf of its members

An organization must meet a three-part test in order to establish standing to bring claims on behalf of its members: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual

members." *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 602 F. Supp. 1361, 1368 (D. Minn. 1985), *aff'd,* 780 F.2d 1389 (8th Cir. 1985) (citing *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 342–43 (1977)). Plaintiff states that it has brought suit "to seek redress for the [MPD's] violation of its members' constitutional and statutory rights" by use of covert social media accounts (Compl. ¶¶ 1-3) and that it is seeking both punitive and compensatory damages. (Compl. at 19.) The nature of the claim and the nature of the relief sought here fail to establish standing for the NAACP on behalf of its members under the third prong, as the claims asserted would require individual member participation.

Generally, any claim for damages for individuals defeats associational standing because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Warth*, 422 U.S. at 515–16; *Cmty. Stabilization Project v. Cuomo*, 199 F.R.D. 327, 333 (D. Minn. 2001). Even where individual damages on behalf of members is not requested, if the need for individualized proof "so pervades the claims asserted" then associational standing is inappropriate. *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 471 (8th Cir. 1985).

Here, Plaintiff has requested damages, which would require the individual members to prove what damages asserted on their behalf they may be entitled to. This bars Plaintiff from having associational standing. Additionally, the types of

claims here—that the MPD surveilled Plaintiff's members based on their race and membership in the NAACP without a criminal investigative purpose in violation of the First Amendment, the Fourteenth Amendment, and other law—are highly individualized claims. The alleged circumstances of any individuals who were allegedly "surveilled"[1] would each involve different factual allegations. For example, any one of the individuals may have been sent a friend request or message for reasons unconnected to their membership in the NAACP. It could be that they or a person they knew was a victim or perpetrator of a crime and the friend request was a necessary part of an investigation. The need for individualized proof, both to establish the fact of constitutional injury and what damages that injury caused, so pervades this case that associational standing is inappropriate. *Id.* (disallowing associational standing where each individual purchase of subdivision lot would need to be separately evaluated with separate proof to establish each violation); *Cmty. Stabilization Project v. Cuomo*, 199 F.R.D. 327, 333 (D. Minn. 2001) (associational standing inappropriate where individual information about each allegedly wrongfully withheld Section 8 voucher would be necessary). Plaintiff cannot establish associational standing and, as such, any

[1] The Complaint, relying on the MDHR report, states that "surveillance" was actually "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles." (Compl. ¶ 45; MDHR report 35.)

claims of violation of Plaintiff's members' rights must be dismissed.

### B. Plaintiff NAACP does not have standing as it has not alleged an injury in fact

To determine whether Plaintiff as an organization has standing the Court conducts "the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (internal quotation omitted). Here Plaintiff has not alleged any injuries to itself as an organization. (*See* Compl.) It is insufficient to establish standing to allege that an action is simply "a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). For example, in *Havens*, the plaintiff was an organization that attempted to make equal opportunity housing attainable by operating a housing counseling service and investigating and referring complaints concerning housing discrimination. *Id.* at 369. The plaintiff organization alleged that because the defendant, an apartment complex, would lie to Black applicants about the availability of apartments, the defendant had "frustrated the organization's counseling and referral services, with a consequent drain on resources." *Id.* The Court found that this was a sufficient injury to the organization by "perceptibly impair[ing the plaintiff's] ability to provide counseling and referral services for low-and moderate-income homeseekers[.]" *Id.*

At 379. A "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources" is a sufficient allegation of injury.

In contrast, here, Plaintiff has made no allegation of injury to itself as an organization. Plaintiff does not allege, for example, that the fact that it has been "followed," friended, or communicated to on social media by MPD undercover social media accounts has resulted in any lessening of membership or interest, any need to divert resources to deal with the alleged "surveillance," nor any frustration of the NAACP's work "to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination." Without any injury in fact alleged, Plaintiff's claims must be dismissed in their entirety.

## III. THE ALLEGATIONS THAT MPD OFFICERS ENGAGED ON SOCIAL MEDIA USING FAKE PROFILES FAILS TO STATE A CONSTITUTIONAL VIOLATION

Plaintiff has alleged that "surveillance" actions by MPD officers "included sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles." (Compl. ¶ 45.) The MDHR has publicly clarified that, in its report, "[w]hat was meant by 'surveillance' was that MPD officers used covert social media accounts to 'follow' and 'engage with' individuals and groups through their social media accounts. It is common practice

for law enforcement agencies to 'follow' and 'engage with' individuals and groups through their social media accounts to establish a credible undercover social media profile." (Robertson Decl. Ex. B at 3.) Plaintiff further alleges that the MPD did not "use covert accounts to track the actions of white supremacist or white nationalist groups."

Neither Plaintiff's Complaint nor the MDHR report it relies on explains what is meant by surveillance "without a public safety objective" or "without a criminal investigative purpose." Does that include the "common practice" where an officer was trying to create a "a credible undercover social media profile" and was friending individuals or liking or "following" organizations for that purpose, but the specific person or organization they engaged with was not suspected of criminal activity? What is described in the Complaint is similar to an undercover officer walking into a bar in an undercover identity. That the undercover officer engages with patrons of the bar in an effort to build a credible undercover identity does not violate the constitutional rights of the patrons of the bar. The allegations that Black individuals were "surveilled" "without a criminal investigative purpose" are precisely the type of unsupported "threadbare" allegations which are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678, 680.

In *Iqbal*, the plaintiff, who was detained on suspicion of terrorist connections after the September 11 attacks, brought suit both against the head of the FBI and

the Attorney General for discrimination based on his race or ethnicity because most of the thousands of individuals swept up in the investigation of the events of September 11, 2001, were Arab Muslims. *Id.* at 681. The Court, however, found that these allegations, "given more likely explanations, . . . do not plausibly establish this purpose." *Id.* The Court noted that the September 11 attacks were perpetuated by al Qaeda, an Islamic fundamentalist group headed by Osama bin Laden, an Arab Muslim, that was composed of largely Arab Muslim disciples. *Id.* The Court noted it "should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims[.]" *Id.* at 682. The Court went on to find that "between that 'obvious alternative explanation' for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." *Id.* (quoting *Twombly*, 550 U.S. at 567).

Here, the more obvious explanation for the use of undercover social media accounts that "follow" and "engage with" individuals and groups is that officers were attempting to establish a credible social media profile that appeared to have friends and ties in the local community to enhance the ability to use an undercover identity to further their police work. The MDHR report states that online, "officers posed as like-minded individuals and claimed, for example, that they met the

targeted person at a prior demonstration or protest." (MDHR report at 35.) The obvious inference is that the officer positioned themselves to receive information about a planned protest to be prepared to safely police the protest. (Robertson Decl. Ex. F at 41 ("Use of social media should be part of a comprehensive program of police planning for mass demonstrations and other large-scale events.")[2] The more plausible explanation for the alleged specific uses by MPD officers of undercover social media accounts is that they were used for intelligence gathering and for cultivating credible undercover profiles.

Just as in *Iqbal*, the "conclusory nature" of the allegations in this case "disentitles them to the presumption of truth." *Id.* at 681. Plaintiff's factual allegations, stripped of unsupported conclusory statements, fail to state a constitutional violation.

**A. Plaintiff fails to state an equal protection claim as it does not allege that similarly situated individuals or organizations were not "surveilled"**

While Plaintiff claims that MPD officers committed a violation of the Equal Protection clause of the Fourteenth Amendment, it fails to plausibly allege that similarly-situated individuals or organizations were not "surveilled." Courts have implied, in a criminal case, that surveillance based solely on racial considerations

---

[2] Social Media and Tactical Consideration for Law Enforcement, U.S. Department of Justice Community Oriented Policing Services (publicly available at )https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p261-pub.pdf

may constitute a violation of the Equal Protection Clause under a theory of selective enforcement of the law. *U.S. v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005) (citing *U.S. v. Woods*, 213 F.3d 1021, 1022-23 (8th Cir. 2000)). As an initial matter, it is doubtful whether the type of "surveillance" alleged here could be considered selective enforcement. In *Frazier* and *Woods* the surveillance consisted of law enforcement physically following and watching an individual or location with the goal of detecting criminal activity. *Frazier*, 408 F.3d at 1106 (officers following U-Haul they noticed at a drive-thru surveilling for potential drug trafficking); *Woods*, 213 F.3d at 1022 (officers watching greyhound bus station for suspicious activity saw defendant acting furtively). The "surveillance" alleged here, "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles" is not alleging that the individuals the accounts had contacted with were potential targets for the enforcement of criminal laws, therefore it is questionable whether the social media activities are "enforcement" at all and would not trigger an Equal Protection claim.

However, even assuming that the activities alleged could theoretically be considered to be "enforcement," to establish a claim of selective enforcement in a § 1983 claim, Plaintiff must plausibly allege "that '(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race[.]'" *Mack v.*

*Caryotakis*, No. CIV. 13-1838 (JRT/FLN), 2014 WL 1303923, at *7 (D. Minn. Feb. 14, 2014), *report and recommendation adopted,* No. CIV. 13-1838 (JRT/FLN), 2014 WL 1309111 (D. Minn. Mar. 31, 2014) (quoting *Advantage Media, L.L.C. v. City of Hopkins,* 379 F.Supp.2d 1030, 1045–46 (D. Minn. 2005)).

Plaintiff alleges generally that, from 2010-2021, MPD surveilled Black organizations and individuals without a criminal investigative purpose and "MPD did not similarly surveil white individuals." (Compl. ¶ 48.) This is precisely the type of unsupported "threadbare" allegations which are not entitled to an assumption of truth nor sufficient to state a claim. *Iqbal*, 556 U.S. at 678, 680. In *Iqbal*, the Court found that allegations that were nothing more than a "formulaic recitation of the elements of a constitutional discrimination claim" were "conclusory and not entitled to be assumed to be true." *Id.* at 681 (citations omitted). Therefore, this allegation must be disregarded.

All Plaintiff has, arguably, specifically alleged is that the MPD did not similarly "surveil," that is, send friend requests, comment on posts, send private messages, and contribute to discussions using fake profiles, for white nationalist or white supremacist groups. However, these groups are not similarly situated to the NAACP. White nationalist and white supremacist groups are considered domestic terrorism threats. *See* "Domestic Terrorism Prevention Act of 2019" S. 894, 116th Cong., § 2 ("White supremacists and other far-right-wing extremists are

the most significant domestic terrorism threat facing the United States.") The NAACP, on the contrary, has stated that its purpose is to promote political, educational, social, and economic equality and eliminate race-based discrimination. The Complaint alleges no realistic comparators to show how the MPD used undercover social media with other organizations that promote civil rights, racial justice, or police accountability. Without an allegation that Plaintiff is similarly situated to a comparator group, Plaintiff's equal protection claim fails. *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994) (finding inmates of two separate prisons were not similarly situated for an equal protection claim).

**B. Plaintiff fails to state a First Amendment claim as it fails to plausibly allege that protected First Amendment activity was chilled or that the protected speech was the "but for cause" of alleged unconstitutional conduct.**

Plaintiff purports to bring a First Amendment retaliation claim. To successfully allege First Amendment retaliation, a plaintiff must plausibly plead "(1) that she engaged in a protected activity, (2) that the defendant's actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, and (3) that a causal connection exists between the retaliatory animus and the injury." *Stamm v. Cnty. of Cheyenne, Nebraska*, 326 F. Supp. 3d 832, 858–59 (D. Neb. 2018) (citing *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070 (8th Cir. 2017)). Plaintiff again makes only conclusory allegations that the MPD's actions "would chill a person of ordinary firmness from continuing to engage in

the protected activity in which they were previously engaged" and that Plaintiff's "protected activity was a substantial motivating, and significant factor" in the MPD officers' social media conduct. (Compl. ¶¶ 78-79.) This is again insufficient under *Iqbal* as these allegations lack any factual enhancement to make them plausible.

Additionally, the Supreme Court has found that the mere existence of a surveillance program (even a real surveillance program, unlike the social media "liking" and "friending" alleged here) is insufficient to allege a "chilling" of speech. *Laird v. Tatum*, 408 U.S. 1, 12-15 (1972). In *Laird*, the plaintiffs brought a class action seeking to enjoin the Army's alleged "surveillance of lawful and peaceful civilian political activity." *Id.* at 2. The Court determined the plaintiffs had failed to state a claim when they alleged "that the exercise of [their] First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose." *Id.* at 10. The Court found that only litigants that faced actual present or immediately threatened injury could state a claim. *Id.* at 13-14. Speculative fear that the lawfully-obtained information could be misused on some future date was insufficient. *Id.* Similarly, Plaintiff's allegation that the MPD has been obtaining information about them from social media interactions is

insufficient to state a claim for First Amendment retaliation as "surveillance" alone is insufficient and there is not an any other allegation that Plaintiff's, nor any of its members', First Amendment rights have been chilled.

Plaintiff's Complaint is similarly devoid of plausible allegations that Plaintiff's protected expression was the motivation behind the MPD officers' undercover social media engagement with Plaintiff and its members. Under the causation prong of a retaliation claim, Plaintiff must allege that the retaliatory motive was a "but-for cause" of the adverse action, meaning the plaintiff must have been singled out because of the exercise of constitutional rights. *Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir. 2010). Plaintiff alleges that MPD officers engaged on social media with the NAACP and its members and that in one instance an MPD officer using a covert account sent a message criticizing the NAACP, and in another instance a covert account was used to RSVP to a birthday party for Armstrong. Even assuming that one critical message or an RSVP to a birthday party from an unknown person on the internet could in any way chill the free speech of an organization or individual, this does not support any plausible allegation that the motive behind the MPD officers' undercover social media engagement with the NAACP or its members was based on their First Amendment protected activity. Armstrong's contention that MPD officers showed up at the restaurant and ate dinner while she was having her party does not plausibly allege

a speech-based adverse action as there is no allegation that the police officers had any interaction with her or her party. Concluding that these officers appeared at a restaurant open to the public at dinner time because some other unknown employee of the City RSVP'd with an undercover social media account is pure speculation. Without a connection between the allegedly adverse action and the First Amendment activity, the First Amendment retaliation claim fails.

## IV. OFFICERS COULD NOT HAVE BEEN ON NOTICE THAT THEIR BEHAVIOR WAS A VIOLATION OF THE CONSTITUTION

Even if this Court finds the alleged use of the undercover social media accounts to be a constitutional violation, the claims should still be dismissed on the basis of qualified immunity. Qualified immunity is a question of law that the court determines as early as possible to shield appropriate officials from suit. *See Gainor v. Rogers*, 973 F.2d 1379, 1382–83 (8th Cir. 1992). If the Court finds the alleged conduct amounts to a constitutional violation, the Court still must determine whether the right alleged to be violated was clearly established so that a reasonable officer would understand that his conduct was unlawful. *Wilson v. Layne*, 526 U.S. 603, 614–15 (1999). The unlawfulness of the officer's action "must be apparent" in light of pre-existing law. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While there need not be "a case directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

In cases where the constitutional question is not beyond debate, the Court determines whether there was an existing case with similar "material facts." *Riveras-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).

There are no controlling cases in this district or circuit, much less at the Supreme Court, regarding the use of undercover social media accounts and the appropriate uses thereof, or that define their use as violations of the First Amendment or the Fourteenth Amendment. Rather, the most definitive case on the use of actual surveillance (unlike the "following" and "engaging" on social media as here), without any immediate reason to believe that those being surveilled have done anything wrong, was found by the Supreme Court to not offend the First Amendment. *Laird v. Tatum*, 408 U.S. at 12-15. Nor could an officer have been on notice that engaging on social media with Black individuals or organizations of Black individuals in order to build a credible undercover social media profile would offend either the First Amendment or the Equal Protection clause. There are simply no cases that speak to this. The individual officers are entitled to qualified immunity on the face of the Complaint.[3]

[3] Use of social media for police investigations and intelligence gathering has been supported by the DOJ, further undermining any contention that there is settled law making the practice unconstitutional. (*See generally,* Robertson Decl. Ex. F.)

## V. PLAINTIFF FAILED TO ALLEGE AN UNCONSITUTIONAL POLICY, CUSTOM, OR FAILURE TO TRAIN/SUPERVISE AND THEREFORE HAS NOT ESTABLISHED *MONELL* LIABILITY

The City cannot be held liable merely because Plaintiff alleges that the John Doe defendants are employed by the MPD. *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 985 (8th Cir. 2016). First, there can be no Monell liability because there are no valid claims against individual officers. "[F]or municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007); *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* …municipal liability.") On that basis alone the *Monell* claim fails.

Even if the Court assumes that the Complaint sets forth sufficient facts that the MPD John Does' use of undercover social media accounts amounts to unlawful retaliation or discriminatory policing, that alone does not support an allegation of liability by the City. *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406–07 (1997). Rather, the City may only be held liable if its own conduct served as the moving force behind the Plaintiff's alleged constitutional violations. *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 690–91 (1978). "Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent

failure to train or supervise an official or employee." *Bolderson*, 840 F.3d at 985; *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013). To the extent that Plaintiff attempts to keep the City in this suit based on its *Monell* claim, the claim fails.

### A. The City's policies are constitutional

The Complaint fails to establish that a City policy was the moving force behind the purported constitutional violations. A municipality is liable under Section 1983 only where its policy is the moving force behind a constitutional violation. *Slaven v. Engstrom*, 848 F.Supp.2d 994, 1002 (D. Minn. 2012) (citing *Monell*, 436 U.S. at 694–95). A "policy" is an official policy, a deliberate choice of a guiding principle, or procedure made by the municipal official who has final authority regarding such matters. *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

Plaintiff merely alleges that, "as of April 2022, MPD's Policy and Procedure Manual failed to require MPD leaders to substantively review MPD officers' covert social media activity to ensure that covert accounts were being used for legitimate investigative purposes." (ECF 1 at ¶ 67.)

Plaintiff does not allege, nor could it, that the use of covert social media accounts are inherently unconstitutional. The existing policy does not, on its face, require (or permit) officers to use covert social media accounts in a racially

discriminatory manner or to punish First Amendment conduct. A policy that does not affirmatively sanction unconstitutional conduct is not unconstitutional on its face, nor can it be the moving force behind a constitutional violation, and therefore it cannot establish *Monell* liability. *Dick v. Watonwan Cty.*, 738 F.2d 939, 942 (8th Cir. 1984). Even if a circumstance arose where the use of a covert social media account may be unconstitutional, a "policy is not unconstitutional if it might allow for unconstitutional conduct in some instances[;] such a policy is unconstitutional only if it requires its officer to act in such an unconstitutional manner." *Peroceski v. Tarr,* 2009 WL 3202463, at *12 (D. Minn. Sept. 30, 2009) (citations omitted); *Conley v. City of Minneapolis*, 2009 WL 1562756, *4 (D. Minn. June 3, 2009).

Officers are allowed by policy to use covert social media accounts for investigative purposes, and not every post, message, or decision to engage with an individual or organization needs to be vetted with a superior, but is left to the discretion of the officer. Plaintiff alleges some officers used this discretion in an unconstitutional way. Even if this were true, committing some decisions to the discretion of an employee does not establish *Monell* liability. *See Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 392 (8th Cir. 2007) (facially constitutional policy that fails to give detailed guidance that might have averted a constitutional violation by an employee does not give rise to municipal liability); *Dick v. Watonwan Cnty.,* 738 F.2d at 942–43 (giving discretion to subordinates did not

subject the municipality to liability for the subordinates' errors of judgment); *Atkinson*, 709 F.3d at 1216 (the absence of a binding, written policy that "would have prevented an unconstitutional act by an employee otherwise left to his own discretion" is insufficient to impose municipal liability); *Pitts v. Ramsey County*, 2018 WL 3118437, at *9 (D. Minn. May 25, 2018) (granting city's motion to dismiss *Monell* claim based on the absence of a policy, specifically an alleged "failure to have and maintain a . . . policy to protect citizens from police physical abuse").

Because the MPD Policy at issue, former Section 7-119(IV)(C) of the MPD Policy and Procedure Manual authorizing the use of covert social media accounts for criminal investigative purposes, is not unconstitutional on its face, Plaintiff cannot impute liability to the City for the alleged misuse of covert social media accounts asserted in its Complaint.

### B. The Complaint fails to plead sufficient facts to sustain an unlawful custom claim against the City

The complaint does not contain sufficient facts to establish that the City had a custom of using covert social media accounts in an unconstitutional manner. To establish the existence of a municipal "custom," a plaintiff must show:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson County,* 150 F.3d 873, 880 (8th Cir. 1998). Plaintiff's Complaint fails to establish these elements. While Plaintiff makes the conclusory allegation that the "City of Minneapolis had a custom between at least 2010 and 2020 of using covert social media accounts to surveil and engage Black individuals and Black organizations, including [Plaintiff]," this conclusory legal assertion is insufficient to make out a custom claim. *Iqbal*, 556 U.S. at 678; *Wiles*, 280 F.3d at 870 (courts are free to ignore sweeping legal conclusions cast in the form of factual allegations); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

**1. Plaintiff has not alleged a continuing, widespread, and persistent pattern of racially-motivated misuse of covert social media accounts**

Plaintiff asserts that the City "had a custom between at least 2010 and 2020 of using covert social media accounts to surveil and engage Black individuals and Black organizations, including the Minneapolis NAACP." (Compl. ¶ 65.) The only facts Plaintiff alleges is that the MDHR report "concluded that MPD's surveillance targeted the NAACP as part of a pattern of racially discriminatory surveillance." (Compl. ¶ 43.) However, the report does not state there was a pattern of racially discriminatory *surveillance*. It instead concludes that the instances it cites of improperly using covert social media accounts to "target and

surveil Black community members demonstrates a pattern or practice of discriminatory, race-based policing." (MDHR report at 35.) The report does not state how many instances of race-based *surveillance* the MDHR found, merely that the isolated ones that it did find supported MDHR's overall conclusion that there was a pattern or practice of discriminatory policing. (*Id.*) The report gives only three specific examples of purportedly improper use of covert social media accounts, one of using language associated with stereotypes of Black people, one of an account that sent a message to the NAACP criticizing the group and one RSVP'ing to the birthday party of a prominent Black civil rights lawyer and activist. (MDHR report at 35.)

The fact that there are no further specific instances or other facts supporting the bald assertion of a pattern is fatal to a *Monell* claim. For a municipality "to be held liable on the basis of custom, there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (citing *Monell*, 436 U.S. at 691). The prior instances of misconduct must also be factually similar. *See Mettler v. Whitledge*, 165 F.3d at 1205 (dismissing custom claim because plaintiff did not show "that the incidents giving rise to these complaints bear any factual similarity to the January 22, 1994, confrontation with her son"). Therefore, Plaintiff's allegations

regarding non-covert-social-media-related allegedly discriminatory policing are not relevant in determining a pattern. That leaves only three specific allegations of covert social media "surveillance" ("following," and "engaging with" individuals and groups through their social media accounts) targeting Black individuals or organizations. Three occasions of challenged conduct from a review of ten years can hardly be said to show a practice that is "persistent and widespread." Courts have routinely rejected custom claims premised on more frequent conduct. *See, e.g. Mettler*, 165 F.3d at 1204 (fifteen citizen complaints against deputies failed to establish an unofficial custom); *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) (citing favorably to *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (eleven incidents of police misconduct were insufficient to establish an unconstitutional pattern)). Plaintiff's Complaint has not plead facts supporting the existence of sufficient instances of similar misconduct to show a pattern.

**2. Plaintiff has not alleged that City policymakers were deliberately indifferent to the misuse of covert social media accounts, but instead alleges that the City policymakers did not know of the accounts and their content**

Plaintiff must also show that policymakers were deliberately indifferent to or tacitly authorized the misconduct they complain of – here alleged misuse of covert social media accounts – *after* policymakers had notice of the misconduct. *Ware,* 150 F.3d at 880; *Parrish v. Luckie*, 963 F.2d 201, 204 (8th Cir. 1992) (must have

had notice and *deliberately* failed to take action). "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson*, 709 F.3d at 1216. Without alleged facts showing that the City policymakers "deliberately" ignored the alleged misuses of covert social media accounts, a custom-based *Monell* claim fails. *Johnson v. Douglas County Medical Dept.*, 725 F.3d 825, 829 (8th Cir. 2013).

Plaintiff's Complaint is simply devoid of any facts showing that City policymakers either tacitly approved or deliberately ignored the alleged misuse of covert social media accounts. In fact, Plaintiff specifically pleads otherwise by affirmatively alleging that the City: (1) did not maintain an accurate inventory of covert accounts; (2) did not require supervisors to review the contents of the covert social media accounts to ensure that covert accounts were being used for legitimate investigative purposes; and (3) in the Settlement Agreement with the MDHR, the City agreed to institute procedures for monitoring the accounts by supervisors and the MPD's Review Panel. (Compl. ¶ 67.) Plaintiff alleges that the City was ignorant of the manner in which the accounts were used, not that the City allowed such use, and that the City has now agreed to monitor the accounts to prevent any misuse. Nowhere does Plaintiff allege that City policymakers knew about any instances of improper use of covert social media accounts. As a result, Plaintiff's allegations of a custom-based *Monell* claim are legally insufficient.

Finally, even if Plaintiff had alleged that the City knew of the alleged misuse of the covert social media accounts, the City cannot be *deliberately* indifferent to constitutional rights that were not clearly established. *Graham v. Barnette*, 5 F.4th 872, 891 (8th Cir. 2021), *reh'g denied* (Aug. 20, 2021). As discussed, *supra*, Plaintiff's contention that the use of covert social media accounts by "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles" was unconstitutional was not clearly established. Therefore, the City cannot be liable on a theory of *Monell* liability premised on deliberate indifference. *Id.*

### C. Plaintiff has failed to plead a failure to train or supervise claim

"Under § 1983, 'a claim for failure to supervise requires the same analysis as a claim for failure to train.' Neither claim can succeed without evidence the municipality '[r]eceived notice of a pattern of unconstitutional acts committed by [its employees].'" *Atkinson,* 709 F.3d at 1216–17 (internal citations omitted) (alterations in original) (quoting *Robinette v. Jones,* 476 F.3d 585, 591 (8th Cir. 2007); *Parrish v. Ball,* 594 F.3d 993, 1002 (8th Cir. 2010)). Plaintiff has failed to allege any facts to support that the City policymakers were aware of a pattern of unconstitutional use of covert social media accounts by MPD officers. Plaintiff instead alleges that the City did not adequately track the accounts.

The Supreme Court has recognized that it is possible that in rare

circumstances, a pattern of violations may not be necessary if the constitutional violation was the "obvious" consequence of a failure to train or supervise. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011). It is in no way obvious that the City should have known that officers would use covert social media accounts, in violation of the MPD's policy, to violate citizens' rights. Assuming, without agreeing, that the type of actions Plaintiff alleges—friending, following, posting, or otherwise communicating with Black individuals or Black organizations from a covert social media account—violates the constitution, the City would have no reason to obviously conclude that this would result. Plaintiff concedes as much in its allegations stating that, "Defendants' investigation [of Plaintiff and its members] was undertaken without a criminal investigative purpose or seemingly any purpose, and thus was … at variance with what would be reasonably anticipated[.]" (Compl. ¶ 108a.) Thus, Plaintiff's allegations of failure to train or supervise fail.

## VI. PLAINTIFF HAS FAILED TO ALLEGE A VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT

Plaintiff alleges that the City "is a municipality that receives federal financial assistance for its programs, services, and activities, including law enforcement." (Compl. ¶ 94.) Plaintiff alleges the City has violated Title VI of the Civil Rights Act by "not taking appropriate remedial actions to prevent or stop unlawful surveillance of the Minneapolis NAACP and its members" and "acted

intentionally or with deliberate indifference in discriminating against Plaintiff." (Compl. ¶¶ 99-100.) However, Plaintiff's threadbare allegations are insufficient to establish that the City intentionally engaged in racially discriminatory conduct or to establish that the City was deliberately indifferent to such actions. Nor has Plaintiff alleged that it is an intended beneficiary of federal funding received by the City. As such, Plaintiff cannot sustain a claim under 42 U.S.C. §2000d.

### A. Title VI does not allow vicarious liability claims against employers for the acts of their employees

While the Supreme Court and the Eighth Circuit have not specifically ruled on the issue of whether Title VI allows vicarious liability against employers, the issue is generally agreed to have been settled by the Supreme Court's decision in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998). There, the Court found that an entity may not be held vicariously liable for an employee's conduct pursuant to Title IX of the Civil Rights Act. *Id.* As Title IX was modeled after Title IV, uses the same enforcement mechanism, and operates in the same manner, "a theory of vicarious liability is not viable under Title VI just as it is not viable under Title IX." *Sahu v. Minneapolis Cmty. & Tech. Coll.*, No. CV 14-5107 (PJS/FLN), 2015 WL 13731342, at *5 (D. Minn. Oct. 9, 2015), *report and recommendation adopted,* No. 14-CV-5107 (PJS/FLN), 2016 WL 310727 (D. Minn. Jan. 26, 2016), *aff'd,* 674 F. App'x 606 (8th Cir. 2017); *accord United States v. County of Maricopa*, 889 F.3d 648, 652 & n.2 (9th Cir. 2018); *Rodgers v. Smith*, 842 F. App'x 929, 929 (5th Cir. 2021) (per

curiam); *Jones v. City of Detroit, Michigan*, 20 F.4th 1117, 1121 (6th Cir. 2021), *cert. denied,* 143 S. Ct. 84 (2022); *Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022), *cert. dismissed,* 142 S. Ct. 2855 (2022). Therefore, the City can only be liable if it is "deliberately indifferent to known acts" of discrimination or has an official policy that results in discrimination. *County of Maricopa*, 889 F.3d at 652. Therefore, the standard is the same for Title VI as it is for *Monell* liability. *Id.* at 652-53.

As discussed, *supra*, Plaintiff has failed to plead either a policy of or deliberate indifference to the improper use of covert social media accounts by the City. Whether or not individual officers violated the constitutional rights of Plaintiff by their covert social media activities, that does not create liability for the City under 42 U.S.C. § 2000d and the claim must be dismissed.

**B. Plaintiff has failed to allege NAACP is the intended beneficiary of a federally funded program or activity**

Having only generally alleged that the City receives federal funding including funding "for law enforcement" Plaintiff has not sufficiently pled that it is an intended beneficiary of the federally funded program or activity of the City and therefore fails to state a Title VI claim against the City. "To prevail on a Title VI claim, a plaintiff must be an 'intended beneficiary' of a federally funded 'program or activity.'" *Ash v. City of Duluth*, 331 F. Supp. 3d 935, 939–40 (D. Minn. 2018)(citing *Carmi v. Metro. St. Louis Sewer Dist.*, 620 F.2d 672, 674 (8th Cir. 1980), *abrogated on other grounds by Consol. Rail Corp. v. Darrone*, 465 U.S. 624, (1984)).

"This requires a nexus between the alleged discrimination and a specific program or activity that receives federal funding." *Id.* (citing *Consol. Rail Corp.*, 465 U.S. at 636). Plaintiff does not allege that the MPD's activities involving undercover social media have received federal funding. As Plaintiff has not alleged either that it is the intended beneficiary of specific federally funded programs nor "that a nexus exists between the alleged discrimination and the specific 'program or activity' that receives those federal fund" the Title VI claim must be dismissed. *Id.*

## VII. PLAINTIFF'S CLAIMS UNDER MINN. STAT. § 363A.12 ARE BARRED BY THE STATUTE OF LIMITATIONS

Plaintiff's claims under the Minnesota Human Rights Act are governed by the statute of limitations in Minn. Stat. § 363A.28, subd. 3(a), which provides that, "A claim of unfair discriminatory practice must be brought as a civil action . . . within one year after the occurrence of the practice." Plaintiff alleges that "the social media accounts used to surveil the Minneapolis NAACP were deactivated in the winter of 2021." (Compl. ¶ 48 n.37.) It does not allege that any "surveillance" has taken place since that time. Plaintiff filed this case on April 26, 2023.

In order to be timely within the one-year limitations period, Plaintiff would need to show that at least one of the alleged acts of discrimination fell within the limitations period. *Abel v. Abbott Nw. Hosp.,* 947 N.W.2d 58, 71 (Minn. 2020). However, on the face of the Complaint, Plaintiff alleges the practice stopped in the

winter of 2021, more than one year before this case was filed. This claim is barred by the statute of limitations and must be dismissed.[4]

## CONCLUSION

The City respectfully requests that the Court dismiss the Complaint in its entirety since Plaintiff lacks standing, has failed to allege a constitutional violation, has failed to allege the City had a policy requiring or knowledge of any alleged violations, and Plaintiff's state law claim is barred by the statute of limitations.

[4] Plaintiff alleges generally that the "surveillance" occurred between 2010 and 2021, relying on the MDHR report. (Compl. ¶ 25, MDHR report 35) However, neither the Complaint nor report identify when the alleged instances of "surveillance" occurred. To the extent that any or all instances occurred before April 26, 2017, they would be barred by the six-year statute of limitations of § 1983 claims and Title VI claims. *See Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 (8th Cir. 1995). The City preserves the right to move to dismiss claims on that basis as well.

Dated: June 23, 2023

KRISTYN ANDERSON
City Attorney
By
/s Heather Robertson
KRISTIN R. SARFF (388003)
HEATHER P. ROBERTSON (390470)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-3919
(612) 673-3949
kristin.sarff@minneapolismn.gov
sharda.enslin@minneapolismn.gov
heather.robertson@minneapolismn.gov

*Attorneys for Defendant City of Minneapolis*