UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Minneapolis Branch of the National Association for the Advancement Of Colored People and Urban League Twin Cities,

Plaintiffs,

v.

City of Minneapolis and Officers John Does 1-20,

Defendants.

Case No. 23-cv-01175 (NEB/DTS)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CITY OF MINNEAPOLIS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Minneapolis Branch of the National Association for the Advancement of Colored People ("NAACP") and Urban League – Twin Cities ("ULTC") (collectively "Plaintiffs") allege that their members were "surveilled" by unnamed John Doe Minneapolis Police Department ("MPD") officers from a period of 2010-2021. Plaintiffs' first amended complaint ("FAC") fails to plead sufficient facts to establish that Plaintiffs have standing as organizations, fails to allege an injury in fact, and fails to allege sufficient facts to hold Defendant City of Minneapolis ("City") liable under a *Monell* claim or under Title VI. Moreover, Plaintiffs' state law discrimination claim is barred by the statute of limitations. Therefore, the City respectfully moves the Court to dismiss this lawsuit in its entirety.

## FACTS

The City accepts as true the FAC's allegations solely for the purpose of this motion.

Plaintiff NAACP alleges that it is an organization whose mission is "'to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination.' The organization has committees focused on economic development, behavioral health and wellness, child protection, and more. It has also championed efforts to raise funds for public safety causes, support Black educators, and to preserve Minnesota history." (ECF Doc. 21, "FAC" at ¶14.) "One of the central goals of the Minneapolis NAACP is to eliminate racial discrimination in policing." (*Id.* at ¶17.) Plaintiff alleges that "[t]he Minneapolis NAACP is comprised of Black Minneapolis community members." (*Id.* at ¶15.)

Plaintiff ULTC alleges that it is a local chapter of the National Urban League, "an historic civil rights organization[.]" (*Id.* at ¶19.) The ULTC has "established Street Academies, launched voter education drives and undertook community health and neighborhood improvement programs" on behalf of the African American community in the Twin Cities. (*Id.*) The ULTC's mission "is to provide platforms, pathways, and programs for African descendants to dismantle racist structures, overcome racial disparities, and achieve equitable outcomes." (*Id.*)

Plaintiffs allege that the MPD was subject to an investigation by the Minnesota Department of Human Rights ("MDHR") starting in 2020 and the MDHR released a report following its investigation on April 27, 2022. (*Id.* ¶¶5, 43.) The report states:

> A review of MPD's covert social media accounts from January 2010, through December 2020, demonstrates that MPD officers used covert, or fake, social media accounts to surveil and engage Black individuals, Black organizations, and elected officials unrelated to criminal activity, without a public safety objective. In contrast, MPD officers did not similarly track and surveil white people unrelated to criminal activity using MPD covert social media accounts.

(*See id.* ¶¶49, 50, 54; Robertson Decl. Ex. A ("MDHR Report") at 35.) The "surveillance" actions included "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles." (*Id.* ¶51.) The MDHR later publicly clarified that "surveillance" did not include "hacking" or "wiretapping":

> With respect to MDHR's Findings about MPD's covert social media use, when MDHR described MPD as "surveilling" individuals and groups through social media, MDHR did not use that term to indicate "hacking into" accounts or private messaging systems or "wiretapping" those individuals or groups. What was meant by "surveillance" was that MPD officers used covert social media accounts to "follow" and "engage with" individuals and groups through their social media accounts. It is common practice for law enforcement agencies to "follow" and "engage with" individuals and groups through their social media accounts to establish a credible undercover social media profile.

(Robertson Decl. Ex. B at 3.)

The FAC repeats the only examples of problematic "surveillance" of Black individuals or the Plaintiffs alleged in the MDHR report:

- The accounts used language that furthered racial stereotypes associated with Black people, specifically Black women. (FAC at ¶52; Ex. B at 1.) (no specific examples of objectionable language were provided).)

- One covert account user posed as a Black individual to send a message criticizing the NAACP. (*Id.*)

- One covert account user posed as a community member and RSVP'd to attend the birthday party of a prominent Black civil rights lawyer and activist. (*Id.* at ¶53; Ex. B at 1.)

Nekima Levy Armstrong is a prominent Black civil rights lawyer and activist, a member of the Minneapolis NAACP, and the former President of the organization from May 2015 to November 2016. (FAC at ¶¶16, 53.) Armstrong believes that she was the individual referenced in the report. (*Id.* at 53.)

At the time of Armstrong's June 2017 birthday party, she was a candidate for mayor of Minneapolis running on a police accountability platform. (*Id.* at ¶53.) That year, she decided to hold a combination birthday party/campaign event at the Lotus restaurant in uptown. (*Id.* at ¶53 n.45; Robertson Decl. Ex. C at 1:29-34.) Armstrong stated that she invited people from the public, activists, and community members to come and celebrate her birthday and campaign. (*See* FAC n.45; Robertson Decl. Ex. C at 2:35-36.) While the event was taking place in the public restaurant, she noticed a group of MPD officers sitting down and eating

dinner. (*Id.* at 2:41-42.) She did not believe their presence was a coincidence. (*Id.* at 2:43-44.) She brought the issue of the police officers' presence to the attention of the restaurant owners, but they did not take any action to remove the officers and, according to Armstrong, seemed to "side with the police." (*Id.* at 2:48-49.) The restaurant then began treating her party differently, asking them to turn down the music periodically, and then asking them to wrap up the party early. (*Id.* at 2:49-52.) Armstrong believed that the officers' presence was an attempt to harass and intimidate her and she later complained to the restaurant and to the then-Chief of Police Janee Harteau. (*Id.* at 2:45-46, 2:58-62, 2:64-65.)

Plaintiffs allege that "surveillance of Plaintiffs was undertaken without a criminal investigative purpose in violation of MPD policy." (FAC ¶49.) The MDHR report, which Plaintiffs rely on, notes that:

> Since at least 2013, MPD has maintained a policy outlining its use of covert social media accounts for the purpose of investigating criminal activity on social networking sites, like Facebook, Twitter, Instagram, and others. If a clear investigative purpose to advance public safety exists, MPD, like many other law enforcement agencies, may create and use covert or fake social media accounts to gather evidence and investigate suspected criminal activity. MPD's policy requires a supervisor to approve the creation of a covert social media account.

(MDHR report at 36-37; *See* FAC ¶49 n.38). The MPD policy referred to specifically states that a covert social media profile is "for the purpose of investigating criminal activity." (Robertson Decl. Ex. D at 1, 4, 10.) The MPD policy on covert social media accounts requires: "(i) approval by a supervisor to create a covert account,

(ii) mandated registration of covert social networking profiles with the commander of the Strategic Information Center; (iii) a prohibition of any post that promotes violence or criminal activity; and (iv) required deletion of the profile when it is no longer needed." (MDHR report at 37 n.57.)

Plaintiffs also allege that the MPD did not adequately track the use of covert social media accounts as the MPD was unaware of some two dozen accounts and there is no policy that requires "MPD leaders to substantively review MPD officers' covert social media activity to ensure that covert accounts were being used for legitimate investigative purposes." (FAC ¶74.)

Additionally, Plaintiffs allege that a recent Department of Justice ("DOJ") investigation of the MPD did not "identif[y] any individuals or organization that MPD subjected to surveillance, targeting, or harassment via social media." (*Id.* at ¶55.) The DOJ report did not, in fact, cite to any instances of use of social media to support its findings and made no censure of MPD's use of social media. (Robertson Decl. Ex. F.)

Plaintiff ULTC alleges it first learned of the asserted "surveillance" through the MDHR report and it alleges the following negative impacts from the alleged "surveillance":

- Staff members were advised to "be cognizant of language used on social media and mindful that they are being watched";
- Changed the "type and frequency of information provided by

the ULTC";

- The ULTC has been required to "expend significant staff time and resources to addressing the findings in the MDHR report, including MPD's surveillance and harassment of the ULTC—time that could have been spent advocating for proactive public safety measures such as legislative policy advocacy, rather than responding to and addressing Defendants' conduct alleged herein."

(*Id.* at ¶24.)

Plaintiff ULTC alleges that it has "work[ed] tirelessly with likeminded organizations and activists to hold the Minneapolis Police Department accountable to the community and uphold civil and human rights." (FAC at ¶23.) This included work after the MDHR report was published to "facilitate outreach and engagement with the Black community to inform and shape the MDHR's consent decree process" and conversations with the DOJ during its investigation of the MPD. (*Id.*)

Plaintiff NAACP brought suit on April 26, 2023. (ECF Doc. 1.) In response to a motion to dismiss, the NAACP filed the FAC adding Plaintiff ULTC and alleging: (1) John Doe officers violated its Fourteenth Amendment Rights to Equal Protection of the Law; (2) The City violated Plaintiffs' Fourteenth Amendment Rights; (3) John Doe officers committed First Amendment retaliation; (4) The City violated Title VI of the Civil Rights Act of 1964; (5) All Defendants violated Minn. Stat. § 363A.12. (ECF Doc. 21.)

# ARGUMENT

The FAC is deficient in the following respects: (1) it fails to establish that Plaintiffs have standing, either on behalf of their members or in their own rights as organizations; (2) it fails to allege an Equal Protection claim or a First Amendment retaliation claim; (3) John Doe officers using undercover social media accounts have qualified immunity; (4) Plaintiffs have failed to allege a *Monell* claim against the City; (5) Plaintiffs have failed to allege a Title VI claim against the City; (6) Plaintiffs' state law claims are barred by the statute of limitations.

## I. STANDARD OF REVIEW

Whether a plaintiff has standing is an issue of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 980 (8th Cir. 2009) (internal citations omitted) ("[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction."). "A motion to dismiss for lack of jurisdiction under Rule 12(b)(1) which is limited to a facial attack on the pleadings is subject to the same standard as a motion brought under Rule 12(b)(6)." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003) (citing *Osborn v. U.S.*, 918 F.2d 724, 729 n. 6 (8th Cir. 1990)). A plaintiff has standing only if it can "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (citations omitted).

A motion to dismiss under Rule 12(b)(6) tests whether the plaintiff has pleaded a cognizable claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wartman v. United Food & Commercial Workers Local 653*, 871 F.3d 638, 640 (8th Cir. 2017). A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

"[A] Complaint need not contain 'detailed factual allegations,' but 'it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'" *Minnesota Majority v. Mansky*, 708 F.3d 1051, 1055 (8th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, the court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002).

In deciding Rule 12(b)(6) motions, courts are not strictly limited to the four corners of complaints. *Outdoor Cent., Inc. v. GreatLodge.com, Inc.*, 643 F.3d 1115, 1120 (8th Cir. 2011). Courts also may consider matters of public record, materials

embraced by the complaint, and exhibits attached to the complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). Therefore, in deciding this motion to dismiss, the Court may consider Armstrong's statements that were relied on in footnote 45 of the FAC, the public FAQs from the MDHR's website, the DOJ's report on the use of social media in policing, and the DOJ Investigation of the MPD.

## II. PLAINTIFFS FAIL TO ALLEGE FACTS ESTABLISHING STANDING TO BRING SUIT

Standing requires that: (1) a plaintiff has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, Plaintiffs are organizations. An organization may have standing when it alleges an injury to itself, or it may have standing as the representative of its members if certain conditions are met. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Plaintiffs do not allege sufficient facts to establish standing either on behalf of their members or on their own behalf.

### A. Plaintiffs do not have associational standing to bring claims on behalf of its members

An organization must meet a three-part test in order to establish standing to bring claims on behalf of its members: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane

to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members." *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 602 F. Supp. 1361, 1368 (D. Minn. 1985), *aff'd,* 780 F.2d 1389 (8th Cir. 1985) (citing *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 342–43 (1977)). Plaintiffs state that they brought suit "to seek redress for the [MPD's] violation of the organizations' members' constitutional and statutory rights" by use of covert social media accounts (FAC ¶¶1-3) and that it is seeking both punitive and compensatory damages. (FAC ¶24.) The nature of the claim and the nature of the relief sought here fail to establish standing for Plaintiffs on behalf of their members under the third prong, as the claims asserted would require individual member participation.

Generally, any claim for damages for individuals defeats associational standing because "whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Warth*, 422 U.S. at 515–16; *Cmty. Stabilization Project v. Cuomo*, 199 F.R.D. 327, 333 (D. Minn. 2001). Even where individual damages on behalf of members is not requested, if the need for individualized proof "so pervades the claims asserted" then associational standing is inappropriate. *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 471 (8th Cir. 1985).

Here, Plaintiffs have requested damages, which would require the individual members to prove what damages asserted on their behalf they may be entitled to. This bars Plaintiffs from having associational standing. Additionally, the types of claims here—that the MPD surveilled Plaintiffs' members based on their race and membership in the organizations without a criminal investigative purpose in violation of the First Amendment, the Fourteenth Amendment, and other law—are highly individualized claims. The alleged circumstances of any individuals who were allegedly "surveilled"[1] would each involve different factual allegations. For example, any one of the individuals may have been sent a friend request or message for reasons unconnected to their membership in the NAACP or ULTC. It could be that they or a person they knew was a victim or perpetrator of a crime and the friend request was a necessary part of an investigation. The need for individualized proof, both to establish the fact of constitutional injury and what damages that injury caused, so pervades this case that associational standing is inappropriate. *Id.* (disallowing associational standing where each individual purchase of subdivision lot would need to be separately evaluated with separate proof to establish each violation); *Cmty. Stabilization Project v. Cuomo*, 199 F.R.D. 327, 333 (D. Minn. 2001) (associational standing inappropriate where individual

[1] Relying on the MDHR report, the FAC states that "surveillance" was actually "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles." (FAC ¶51; MDHR report 35.)

information about each allegedly wrongfully withheld Section 8 voucher would be necessary). Plaintiffs cannot establish associational standing and, as such, any claims of violation of Plaintiffs' members' rights must be dismissed.

### B. Plaintiffs do not have standing as they have not alleged a plausible injury in fact

To determine whether Plaintiffs, as organizations, have standing, the Court conducts "the same inquiry as in the case of an individual: Has the plaintiff alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction?" *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) (internal quotation omitted). Here, Plaintiffs have not plausibly alleged any injuries as an organization. (*See* FAC) It is insufficient to establish standing to allege that an action is simply "a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 378–79 (1982) (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)). For example, in *Havens*, the plaintiff was an organization that attempted to make equal opportunity housing attainable by operating a housing counseling service and investigating and referring complaints concerning housing discrimination. *Id.* at 369. The plaintiff organization alleged that because the defendant, an apartment complex, would lie to Black applicants about the availability of apartments, the defendant had "frustrated the organization's counseling and referral services, with a consequent drain on resources." *Id.* The Court found that this was a sufficient injury to the

organization by "perceptibly impair[ing the plaintiff's] ability to provide counseling and referral services for low-and moderate-income homeseekers[.]" *Id.* at 379. A "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources" is a sufficient allegation of injury.

In contrast, here, Plaintiff NAACP has made **no** allegation of injury to itself as an organization. Plaintiff NAACP does not allege, for example, that the fact that it has been "followed," friended, or communicated to on social media by MPD undercover social media accounts has resulted in any lessening of membership or interest, any need to divert resources to deal with the alleged "surveillance," nor any frustration of the NAACP's work "to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination." Without any injury in fact alleged, Plaintiff NAACP claims must be dismissed in their entirety.

Plaintiff ULTC alleged that the asserted "surveillance" has "perceptibly impaired" its ability to provide advocacy and public safety services. (FAC ¶24.) However, this is merely repeating (and citing) the holding from *Havens Realty Corp.* and is insufficient without "factual enhancement." *Iqbal*, 556 U.S. at 678. The only facts ULTC alleges are: 1) it advised staff to be cognizant of what they were posting on social media; 2) changed the "type and frequency" of information

posted; and 3) "expend[ed] significant staff time and resources to addressing the findings in the MDHR report[.]" This is not sufficient to allege an injury to the organization.

That staff were advised to be cognizant of what they were posting on social media, a forum designed to be viewed by the public, is not an impairment to an organization's activities, it is best practices for any organization. The City of Minneapolis, for example, has guidelines for employees' use of social media for both private and official purposes. (Robertson Decl. Ex. D at 4-5, 10-11 (City employees must "[a]lways consider how something may be interpreted or understood before posting.")) That the ULTC gave its employees similar advice is not an injury.

The allegation that ULTC changed the "type and frequency" of information provided also does not establish an injury. It does not show that the activities of the ULTC were impaired by any change to the type and frequency of social media postings. If Plaintiffs cannot identify any specific projects they have had to "put on hold or otherwise curtail" they have not established an injury. *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). Additionally, that the ULTC has spent significant staff time and resources "addressing the findings in the MDHR report" does not establish that significant resources were spent addressing the alleged "surveillance" issue. ULTC alleges that after the report was released it

"partnered with the MDHR and Minnesota Justice Research Center to facilitate outreach and engagement with the Black community to inform and shape the MDHR's consent decree process." (FAC at ¶23.) The fact that the ULTC spent time addressing the myriad of issues identified in the MDHR report, doing community outreach and advocacy, does not establish an injury due to alleged social media "surveillance." Additionally, activities that do not differ from an organization's normal activities cannot constitute an injury. *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d at 238. The only factual allegation regarding how ULTC addressed the alleged "surveillance" was telling its employees to be cognizant of what they were posting. This does not allege a factually plausible injury.

## III. ALLEGATIONS THAT MPD OFFICERS USED FAKE PROFILES TO ENGAGE ON SOCIAL MEDIA FAILS TO STATE A CONSTITUTIONAL VIOLATION

Plaintiffs have alleged that "surveillance" actions by MPD officers "included sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles." (FAC ¶45.) The MDHR publicly clarified that, in its report, "[w]hat was meant by 'surveillance' was that MPD officers used covert social media accounts to 'follow' and 'engage with' individuals and groups through their social media accounts. It is common practice for law enforcement agencies to 'follow' and 'engage with' individuals and groups through their social media accounts to establish a credible undercover

social media profile." (Robertson Decl. Ex. B at 3.) Plaintiffs further allege that the MPD did not "use covert accounts to track the actions of white supremacist or white nationalist groups."

Neither Plaintiffs' FAC nor the MDHR report it relies on explains what is meant by surveillance "without a public safety objective" or "without a criminal investigative purpose." Does that include the "common practice" where an officer was trying to create a "a credible undercover social media profile" and was friending individuals or liking or "following" organizations for that purpose, but the specific person or organization they engaged with was not suspected of criminal activity? What is described in the FAC is similar to an undercover officer walking into a bar in an undercover capacity. That the undercover officer engages with patrons of the bar in an effort to build a credible undercover identity does not violate the constitutional rights of the patrons of the bar. The allegations that Black individuals were "surveilled" "without a criminal investigative purpose" are precisely the type of unsupported "threadbare" allegations which are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678, 680.

In *Iqbal*, the plaintiff, who was detained on suspicion of terrorist connections after the September 11 attacks, brought suit both against the head of the FBI and the Attorney General for discrimination based on his race or ethnicity because most of the thousands of individuals swept up in the investigation of the events of

September 11, 2001, were Arab Muslims. *Id.* at 681. The Court, however, found that these allegations, "given more likely explanations, . . . do not plausibly establish this purpose." *Id.* The Court noted that the September 11 attacks were perpetuated by al Qaeda, an Islamic fundamentalist group headed by Osama bin Laden, an Arab Muslim, that was composed of largely Arab Muslim disciples. *Id.* The Court noted it "should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims[.]" *Id.* at 682. The Court went on to find that "between that 'obvious alternative explanation' for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." *Id.* (quoting *Twombly*, 550 U.S. at 567).

Here, the more obvious explanation for the use of undercover social media accounts that "follow" and "engage with" individuals and groups is that officers were attempting to establish a credible social media profile that appeared to have friends and ties in the local community to enhance the ability to use an undercover identity to further their police work. The MDHR report states that online, "officers posed as like-minded individuals and claimed, for example, that they met the targeted person at a prior demonstration or protest." (MDHR report at 35.) The obvious inference is that the officer positioned themselves to receive information

about a planned protest to be prepared to safely police the protest. (Robertson Decl. Ex. E at 41 ("Use of social media should be part of a comprehensive program of police planning for mass demonstrations and other large-scale events."))[2] The more plausible explanation for the alleged uses of undercover social media accounts is that they were used by MPD for intelligence gathering and for cultivating credible undercover profiles.

Just as in *Iqbal*, the "conclusory nature" of the allegations in this case "disentitles them to the presumption of truth." *Id.* at 681. Plaintiffs' factual allegations, stripped of unsupported conclusory statements, fail to state a constitutional violation.

### A. Plaintiffs fail to state an equal protection claim as they do not allege that similarly situated individuals or organizations were not "surveilled"

While Plaintiffs claim that MPD officers committed a violation of the Equal Protection clause of the Fourteenth Amendment, they fail to plausibly allege that similarly-situated individuals or organizations were not "surveilled." Courts have implied, in a criminal case, that surveillance based solely on racial considerations may constitute a violation of the Equal Protection Clause under a theory of selective enforcement of the law. *U.S. v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005)

[2] Social Media and Tactical Consideration for Law Enforcement, U.S. Department of Justice Community Oriented Policing Services (publicly available at https://portal.cops.usdoj.gov/resourcecenter/content.ashx/cops-p261-pub.pdf)

(citing *U.S. v. Woods*, 213 F.3d 1021, 1022-23 (8th Cir. 2000)). As an initial matter, it is doubtful whether the type of "surveillance" alleged here could be considered selective enforcement. In *Frazier* and *Woods*, the surveillance consisted of law enforcement physically following and watching an individual or location with the goal of detecting criminal activity. *Frazier*, 408 F.3d at 1106 (officers following U-Haul they noticed at a drive-thru surveilling for potential drug trafficking); *Woods*, 213 F.3d at 1022 (officers watching greyhound bus station for suspicious activity saw defendant acting furtively). The "surveillance" alleged here, "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles" is not alleging that the individuals the accounts had contact with were potential targets for the enforcement of criminal laws, therefore it is doubtful that the social media activities are "enforcement" at all to trigger an Equal Protection claim.

However, even assuming that the activities alleged could theoretically be considered to be "enforcement," to establish a claim of selective enforcement in a § 1983 claim, Plaintiffs must plausibly allege "that '(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race[.]'" *Mack v. Caryotakis*, No. CIV. 13-1838 (JRT/FLN), 2014 WL 1303923, at *7 (D. Minn. Feb. 14, 2014), *report and recommendation adopted,* No. CIV. 13-1838 (JRT/FLN), 2014 WL

1309111 (D. Minn. Mar. 31, 2014) (quoting *Advantage Media, L.L.C. v. City of Hopkins*, 379 F.Supp.2d 1030, 1045–46 (D. Minn. 2005)).

Plaintiffs allege generally that, from 2010-2021, MPD surveilled Black organizations and individuals without a criminal investigative purpose and "MPD did not similarly surveil white individuals." (FAC ¶48.) This is precisely the type of unsupported "threadbare" allegations which are not entitled to an assumption of truth nor sufficient to state a claim. *Iqbal*, 556 U.S. at 678, 680. In *Iqbal*, the Court found that allegations that were nothing more than a "formulaic recitation of the elements of a constitutional discrimination claim" were "conclusory and not entitled to be assumed to be true." *Id.* at 681 (citations omitted). Therefore, this allegation must be disregarded.

All Plaintiffs have, arguably, specifically alleged is that the MPD did not similarly "surveil," that is, send friend requests, comment on posts, send private messages, and contribute to discussions using fake profiles, for white nationalist or white supremacist groups. However, these groups are not similarly situated to the NAACP or the ULTC. White nationalist and white supremacist groups are considered domestic terrorism threats. *See* "Domestic Terrorism Prevention Act of 2019" S. 894, 116th Cong., § 2 ("White supremacists and other far-right-wing extremists are the most significant domestic terrorism threat facing the United States.") The NAACP and ULTC, on the contrary, state that their purpose,

broadly, is to promote equity and eliminate race-based discrimination. The FAC alleges no realistic comparators to articulate how the MPD used undercover social media with other organizations, which are not composed largely or exclusively of Black members, that promote civil rights, racial justice, or police accountability. Without allegations of an similarly situated comparator group, Plaintiffs' equal protection claim fails. *Klinger v. Dep't of Corr.*, 31 F.3d 727, 733 (8th Cir. 1994) (finding inmates of two separate prisons were not similarly situated for an equal protection claim).

The FAC alleges, confusingly, that because the DOJ report did *not make any mention* of social media use, Plaintiffs can infer that "similarly situated individuals or organizations – that promote civil rights, racial justice, or police accountability – were not subjected by MPD to surveillance, targeting, or harassment via social media." (FAC at ¶55.) However, this is an entirely implausible conclusion. The DOJ has promoted the use of social media in policing. (Robertson Decl. Ex. E.) And the DOJ report does not mention any unlawful or discriminatory practice regarding social media "surveillance" or use at all, much less with respect to only certain organizations or individuals. (Robertson Decl. Ex. F at 31.) Far from establishing that the MPD was not surveilling similarly situated white organizations, like in *Iqbal*, the more plausible inference is that the DOJ did not mention social media "surveillance" because it did not find there was a race-based

disparity, or any constitutional violation, in MPD's social media-related activity. Plaintiffs' Equal Protection claim fails.

**B. Plaintiffs fail to state a First Amendment claim as they fail to plausibly allege that protected First Amendment activity was chilled or that the protected speech was the "but for cause" of alleged unconstitutional conduct.**

Plaintiffs purport to bring a First Amendment retaliation claim. To successfully allege First Amendment retaliation, a plaintiff must plausibly plead "(1) that she engaged in a protected activity, (2) that the defendant's actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, and (3) that a causal connection exists between the retaliatory animus and the injury." *Stamm v. Cnty. of Cheyenne, Nebraska*, 326 F. Supp. 3d 832, 858–59 (D. Neb. 2018) (citing *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070 (8th Cir. 2017)). Plaintiffs make only conclusory allegations that the MPD's actions "would chill a person of ordinary firmness from continuing to engage in the protected activity in which they were previously engaged" and that Plaintiffs' "protected activity was a substantial motivating, and significant factor" in the MPD officers' social media conduct. (FAC ¶¶87-88.) This is again insufficient under *Iqbal* as these allegations lack any factual enhancement to make them plausible.

Additionally, the Supreme Court has found that the mere existence of a surveillance program (even a real surveillance program, unlike the social media

"liking" and "friending" alleged here) is insufficient to allege a "chilling" of speech. *Laird v. Tatum*, 408 U.S. 1, 12-15 (1972). In *Laird*, the plaintiffs brought a class action seeking to enjoin the Army's alleged "surveillance of lawful and peaceful civilian political activity." *Id.* at 2. The Court determined the plaintiffs had failed to state a claim when they alleged "that the exercise of [their] First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose." *Id.* at 10. The Court found that only litigants that faced actual present or immediately threatened injury could state a claim. *Id.* at 13-14. Speculative fear that the lawfully-obtained information could be misused on some future date was insufficient. *Id.* Similarly, Plaintiffs' allegation that the MPD has been obtaining information about them from social media interactions is insufficient to state a claim for First Amendment retaliation as "surveillance" alone is insufficient to support a claim that First Amendment rights have been chilled.

Any allegation of "chilling" is further undermined by the fact that *after* the MDHR report came out, the ULTC alleges that it worked with the MDHR on the consent decree with the City and the DOJ in its investigation of the City. Clearly these actions furthered the organization's goal of advocacy regarding nondiscriminatory policing, undeterred by the alleged "surveillance," because no

reasonable person would be chilled by learning that their activities on social media, an inherently public forum, were viewable by the police.

Plaintiffs' FAC is similarly devoid of plausible allegations that Plaintiffs' protected expression was the motivation behind the MPD officers' undercover social media engagement with Plaintiffs and their members. Under the causation prong of a retaliation claim, plaintiffs must allege that the retaliatory motive was a "but-for cause" of the adverse action, meaning the plaintiffs must have been singled out because of the exercise of constitutional rights. *Baribeau v. City of Minneapolis,* 596 F.3d 465, 481 (8th Cir. 2010). Plaintiffs allege that MPD officers engaged on social media with Plaintiffs and their members and that in one instance an MPD officer using a covert account sent a message criticizing the NAACP, and in another instance a covert account was used to RSVP to a birthday party for Armstrong.

Even assuming that one critical message or an RSVP to a birthday party from an unknown person on the internet could in any way chill the free speech of an organization or individual, this does not support any plausible allegation that the motive behind the MPD officers' undercover social media engagement with the Plaintiffs or their members was based on their First Amendment protected activity. Armstrong's contention that MPD officers showed up at the restaurant and ate dinner while she was having her party does not plausibly allege a speech-

based adverse action as there is no allegation that the police officers had any interaction with her or her party. Concluding that these officers appeared at a restaurant open to the public at dinner time because some other unknown employee of the City RSVP'd with an undercover social media account is pure speculation. Without a connection between the allegedly adverse action and the First Amendment activity, the First Amendment retaliation claim fails.

## IV. OFFICERS COULD NOT HAVE BEEN ON NOTICE THAT THEIR BEHAVIOR WAS A VIOLATION OF THE CONSTITUTION

Even if this Court finds the alleged use of the undercover social media accounts to be a constitutional violation, the claims should still be dismissed on the basis of qualified immunity. Qualified immunity is a question of law that the court determines as early as possible to shield appropriate officials from suit. *See Gainor v. Rogers*, 973 F.2d 1379, 1382–83 (8th Cir. 1992). If the Court finds the alleged conduct amounts to a constitutional violation, the Court still must determine whether the right alleged to be violated was clearly established so that a reasonable officer would understand that his conduct was unlawful. *Wilson v. Layne*, 526 U.S. 603, 614–15 (1999). The unlawfulness of the officer's action "must be apparent" in light of pre-existing law. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While there need not be "a case directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017).

In cases where the constitutional question is not beyond debate, the Court determines whether there was an existing case with similar "material facts." *Riveras-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).

There are no controlling cases in this district or circuit, much less at the Supreme Court, regarding the use of undercover social media accounts and the appropriate uses thereof, or that define their use as violations of the First Amendment or the Fourteenth Amendment. Rather, the most definitive case on the use of actual surveillance (unlike the "following" and "engaging" on social media as here), without any immediate reason to believe that those being surveilled have done anything wrong, was found by the Supreme Court to not offend the First Amendment. *Laird v. Tatum*, 408 U.S. at 12-15. Nor could an officer have been on notice that engaging on social media with Black individuals or organizations of Black individuals in order to build a credible undercover social media profile would offend either the First Amendment or the Equal Protection clause. There are simply no cases that speak to this. The individual officers are entitled to qualified immunity.[3]

## V. PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE *MONELL* LIABILITY

The City cannot be held liable merely because Plaintiffs allege that the John

[3] Use of social media for police investigations and intelligence gathering has been supported by the DOJ, further undermining any contention that there is settled law making the practice unconstitutional. (*See generally,* Robertson Decl. Ex. E.)

Doe defendants are employed by the MPD. *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 985 (8th Cir. 2016). First, there can be no *Monell* liability because there are no valid claims against individual officers. "[F]or municipal liability to attach, individual liability must first be found on an underlying substantive claim." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007); *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or *Monell* …municipal liability.") On that basis alone, the *Monell* claim fails.

Second, even if the Court assumes that the FAC sets forth sufficient facts that the John Does' use of undercover social media accounts constitute unlawful retaliation or discriminatory policing, that alone does not support liability against the City. *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406–07 (1997). The City may only be held liable if its own conduct served as the moving force behind the Plaintiffs' alleged constitutional violations. *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 690–91 (1978). "Liability for a constitutional violation will attach to a municipality only if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise an official or employee." *Bolderson*, 840 F.3d at 985; *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013). To the extent that Plaintiffs attempt to keep the City in this suit based on its *Monell* claim, the claim fails.

### A. The City's policies are constitutional

The FAC fails to establish that a City policy was the moving force behind the purported constitutional violations. A municipality is liable under Section 1983 only where its policy is the moving force behind a constitutional violation. *Slaven v. Engstrom*, 848 F.Supp.2d 994, 1002 (D. Minn. 2012) (citing *Monell*, 436 U.S. at 694–95). A "policy" is an official policy, a deliberate choice of a guiding principle, or procedure made by the municipal official who has final authority regarding such matters. *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

Plaintiffs merely alleges that, "as of April 2022, MPD's Policy and Procedure Manual failed to require MPD leaders to substantively review MPD officers' covert social media activity to ensure that covert accounts were being used for legitimate investigative purposes." (ECF 1 at ¶74.)

Plaintiffs do not and cannot allegethat the use of covert social media accounts are inherently unconstitutional. The existing policy does not, on its face, require (or permit) officers to use covert social media accounts in a racially discriminatory manner or to punish First Amendment conduct. A policy that does not affirmatively sanction unconstitutional conduct is not unconstitutional on its face, nor can it be the moving force behind a constitutional violation, and therefore it cannot establish *Monell* liability. *Dick v. Watonwan Cty.*, 738 F.2d 939, 942 (8th Cir. 1984). Even if a circumstance arose where the use of a covert social media

account may be unconstitutional, a "policy is not unconstitutional if it might allow for unconstitutional conduct in some instances[;] such a policy is unconstitutional only if it requires its officer to act in such an unconstitutional manner." *Peroceski v. Tarr*, 2009 WL 3202463, at *12 (D. Minn. Sept. 30, 2009) (citations omitted); *Conley v. City of Minneapolis*, 2009 WL 1562756, *4 (D. Minn. June 3, 2009).

Officers are allowed by policy to use covert social media accounts for investigative purposes, and not every post, message, or decision to engage with an individual or organization needs to be vetted with a superior, but is left to the discretion of the officer. Plaintiffs allege some officers used this discretion in an unconstitutional way. Even if this were true, committing some decisions to the discretion of an employee does not establish *Monell* liability. *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 392 (8th Cir. 2007) (facially constitutional policy that fails to give detailed guidance that might have averted a constitutional violation by an employee does not give rise to municipal liability); *Dick v. Watonwan Cnty.*, 738 F.2d at 942–43 (giving discretion to subordinates did not subject the municipality to liability for the subordinates' errors of judgment); *Atkinson*, 709 F.3d at 1216 (the absence of a binding, written policy that "would have prevented an unconstitutional act by an employee otherwise left to his own discretion" is insufficient to impose municipal liability); *Pitts v. Ramsey County*, 2018 WL 3118437, at *9 (D. Minn. May 25, 2018) (granting city's motion to dismiss

*Monell* claim based on the absence of a policy, specifically an alleged "failure to have and maintain a . . . policy to protect citizens from police physical abuse").

Because the MPD Policy at issue, former Section 7-119(IV)(C) of the MPD Policy and Procedure Manual authorizing the use of covert social media accounts for criminal investigative purposes, is not unconstitutional on its face, Plaintiffs cannot impute liability to the City for the alleged misuse of covert social media accounts asserted in its FAC.

**B. The FAC fails to plead sufficient facts to sustain an unlawful custom claim against the City**

The FAC does not contain sufficient facts to establish that the City had a custom of using covert social media accounts in an unconstitutional manner. To establish the existence of a municipal "custom," a plaintiff must show:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

*Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998). Plaintiffs' FAC fails to establish these elements. While Plaintiffs make the conclusory allegation that the "City of Minneapolis had a custom between at least 2010 and 2020 of using covert

social media accounts to surveil and engage Black individuals and Black organizations, including [Plaintiffs]," this conclusory legal assertion is insufficient to make out a custom claim. *Iqbal*, 556 U.S. at 678; *Wiles*, 280 F.3d at 870 (courts are free to ignore sweeping legal conclusions cast in the form of factual allegations); *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

**1. Plaintiffs have not alleged a continuing, widespread, and persistent pattern of racially-motivated misuse of covert social media accounts**

In support of the allegation of a custom, Plaintiffs only allege that the MDHR report "concluded that MPD's surveillance targeted the NAACP and ULTC as part of a pattern of racially discriminatory surveillance." (FAC ¶49.) However, the report does not state there was a pattern of racially discriminatory *surveillance*. It instead concludes that the instances it cites of improperly using covert social media accounts to "target and surveil Black community members demonstrates a pattern or practice of discriminatory, race-based policing." (MDHR report at 35.) The report does not state how many instances of race-based *surveillance* the MDHR found, merely that the isolated ones that it did find supported MDHR's overall conclusion that there was a pattern or practice of discriminatory policing. (*Id.*) The report gives only three specific examples of purportedly improper use of covert social media accounts, one of using language associated with stereotypes of Black people, one of an account that sent a message to the NAACP criticizing the

group and one RSVP'ing to the birthday party of a prominent Black civil rights lawyer and activist. (MDHR report at 35.)

The fact that there are no further specific instances or other facts supporting the bald assertion of a pattern is fatal to a *Monell* claim. For a municipality "to be held liable on the basis of custom, there must have been a pattern of 'persistent and widespread' unconstitutional practices which became so 'permanent and well settled' as to have the effect and force of law." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist.*, 901 F.2d 642, 646 (8th Cir. 1990) (citing *Monell*, 436 U.S. at 691). The prior instances of misconduct must also be factually similar. *See Mettler v. Whitledge*, 165 F.3d at 1205 (dismissing custom claim because plaintiff did not show "that the incidents giving rise to these complaints bear any factual similarity to the January 22, 1994, confrontation with her son"). Therefore, Plaintiffs' allegations regarding non-covert-social-media-related allegedly discriminatory policing are not relevant establishing a pattern.

That leaves only three specific allegations of covert social media "surveillance" ("following," and "engaging with" individuals and groups through their social media accounts) targeting Black individuals or organizations. Three occasions of challenged conduct from the MDHR's ten-year review of the MPD can hardly be said to show a practice that is "persistent and widespread." Courts have routinely rejected custom claims premised on more frequent conduct. *See,*

*e.g. Mettler*, 165 F.3d at 1204 (fifteen citizen complaints against deputies failed to establish an unofficial custom); *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018) (citing favorably to *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (eleven incidents of police misconduct were insufficient to establish an unconstitutional pattern)). Plaintiffs' FAC has not pled facts supporting the existence of sufficient instances of similar misconduct to show a pattern.

**2. Plaintiffs have not alleged that City policymakers were deliberately indifferent to the misuse of covert social media accounts, but instead allege that City policymakers did not know of the accounts and their content**

Plaintiffs must also show that policymakers were deliberately indifferent to or tacitly authorized the misconduct they complain of – here alleged misuse of covert social media accounts – *after* policymakers had notice of the misconduct. *Ware,* 150 F.3d at 880; *Parrish v. Luckie*, 963 F.2d 201, 204 (8th Cir. 1992) (must have had notice and *deliberately* failed to take action). "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson*, 709 F.3d at 1216. Without alleged facts showing that City policymakers "deliberately" ignored the alleged misuses of covert social media accounts, a custom-based *Monell* claim fails. *Johnson v. Douglas County Medical Dept.*, 725 F.3d 825, 829 (8th Cir. 2013).

Plaintiffs attempt to allege that incidents of unlawful "surveillance" "occurred over a course of time sufficiently long to permit notice of, and/or

deliberate indifference to, a custom of misconduct." (FAC at ¶71.) This is simply a conclusory allegation. The FAC is devoid of any facts alleging that City policymakers knew of and either tacitly approved or deliberately ignored the alleged misuse of covert social media accounts. In fact, in direct contradiction of its conclusory allegation that notice can be inferred, Plaintiffs specifically plead otherwise by affirmatively alleging that the City: (1) did not maintain an accurate inventory of covert accounts; (2) did not require supervisors to review the contents of the covert social media accounts to ensure that covert accounts were being used for legitimate investigative purposes; and (3) in the Settlement Agreement with the MDHR, the City agreed to institute procedures for monitoring the accounts by supervisors and the MPD's Review Panel. (FAC ¶74.) Plaintiffs allege that the City was ignorant of the manner in which the accounts were used, not that the City allowed such use, and that the City has now agreed to monitor the accounts to prevent any misuse. Nowhere do Plaintiffs allege that City policymakers knew about any instances of improper use of covert social media accounts. As a result, Plaintiffs' allegations of a custom-based *Monell* claim are legally insufficient.

Finally, even if Plaintiffs had alleged that the City knew of the alleged misuse of the covert social media accounts, the City cannot be *deliberately* indifferent to constitutional rights that were not clearly established. *Graham v. Barnette*, 5 F.4th 872, 891 (8th Cir. 2021), *reh'g denied* (Aug. 20, 2021). As discussed,

*supra*, Plaintiffs' contention that the use of covert social media accounts by "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles" was unconstitutional was not clearly established. Therefore, the City cannot be liable on a theory of *Monell* liability premised on deliberate indifference. *Id.*

### C. Plaintiffs failed to plead a failure to train or supervise claim

"Under § 1983, 'a claim for failure to supervise requires the same analysis as a claim for failure to train.' Neither claim can succeed without evidence the municipality '[r]eceived notice of a pattern of unconstitutional acts committed by [its employees].'" *Atkinson,* 709 F.3d at 1216–17 (internal citations omitted) (alterations in original) (quoting *Robinette v. Jones,* 476 F.3d 585, 591 (8th Cir. 2007); *Parrish v. Ball,* 594 F.3d 993, 1002 (8th Cir. 2010)). Plaintiffs have failed to allege any facts to support the notion that City policymakers were aware of a pattern of unconstitutional use of covert social media accounts by MPD officers. Plaintiffs instead allege that the City did not adequately track the accounts.

The Supreme Court has recognized that, in rare circumstances, proof of a pattern of violations may not be necessary if the constitutional violation was the "obvious" consequence of a failure to train or supervise. *Connick v. Thompson*, 563 U.S. 51, 63-64 (2011). It is in no way obvious that the City should have known that officers would use covert social media accounts, in violation of the MPD's policy,

to violate citizens' rights. Assuming, without agreeing, that the type of actions Plaintiffs allege—friending, following, posting, or otherwise communicating with Black individuals or Black organizations from a covert social media account—violates the constitution, the City would have no reason to obviously conclude that this would result. Plaintiffs concede as much in their allegations stating that, "Defendants' investigation [of Plaintiffs and their members] was undertaken without a criminal investigative purpose or seemingly any purpose, and thus was … at variance with what would be reasonably anticipated[.]" (FAC ¶111a.) Thus, Plaintiffs' allegations of failure to train or supervise fail.

## VI. PLAINTIFFS FAILED TO ALLEGE A VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT

Plaintiffs allege that the City "is a municipality that receives federal financial assistance for its programs, services, and activities, including law enforcement." (FAC ¶96.) Plaintiffs alleges the City violated Title VI of the Civil Rights Act by "not taking appropriate remedial actions to prevent or stop unlawful surveillance of the Minneapolis NAACP and its members" and "acted intentionally or with deliberate indifference in discriminating against Plaintiffs." (FAC ¶¶101-02.) However, Plaintiffs' threadbare allegations are insufficient to establish that the City intentionally engaged in racially discriminatory conduct or to establish that the City was deliberately indifferent to such actions.

While the Supreme Court and the Eighth Circuit have not specifically ruled

on the issue of whether Title VI allows vicarious liability against employers, the issue is generally agreed to have been settled by the Supreme Court's decision in *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998). There, the Court found that an entity may not be held vicariously liable for an employee's conduct pursuant to Title IX of the Civil Rights Act. *Id.* As Title IX was modeled after Title VI, uses the same enforcement mechanism, and operates in the same manner, "a theory of vicarious liability is not viable under Title VI just as it is not viable under Title IX." *Sahu v. Minneapolis Cmty. & Tech. Coll.*, No. CV 14-5107 (PJS/FLN), 2015 WL 13731342, at *5 (D. Minn. Oct. 9, 2015), *report and recommendation adopted,* No. 14-CV-5107 (PJS/FLN), 2016 WL 310727 (D. Minn. Jan. 26, 2016), *aff'd,* 674 F. App'x 606 (8th Cir. 2017); *accord United States v. County of Maricopa*, 889 F.3d 648, 652 & n.2 (9th Cir. 2018); *Rodgers v. Smith*, 842 F. App'x 929, 929 (5th Cir. 2021) (per curiam); *Jones v. City of Detroit, Michigan*, 20 F.4th 1117, 1121 (6th Cir. 2021); *Ingram v. Kubik*, 30 F.4th 1241, 1258 (11th Cir. 2022). Therefore, the City can only be liable if it is "deliberately indifferent to known acts" of discrimination or has an official policy that results in discrimination. *County of Maricopa*, 889 F.3d at 652. Therefore, the standard is the same for Title VI as it is for *Monell* liability. *Id.* at 652-53.

As discussed, *supra*, Plaintiffs have failed to plead either a policy of or deliberate indifference to the improper use of covert social media accounts by the City. Whether or not individual officers violated the constitutional rights of

Plaintiffs by their covert social media activities, that does not create liability for the City under 42 U.S.C. § 2000d and the claim must be dismissed.

## VII. PLAINTIFFS' CLAIMS UNDER MINN. STAT. § 363A.12 ARE BARRED BY THE STATUTE OF LIMITATIONS

Plaintiffs' claims under the Minnesota Human Rights Act are governed by the statute of limitations in Minn. Stat. § 363A.28, subd. 3(a), which provides that, "A claim of unfair discriminatory practice must be brought as a civil action . . . within one year after the occurrence of the practice." Plaintiffs allege that "the social media accounts used to surveil the Minneapolis NAACP were deactivated in the winter of 2021." (FAC ¶48 n.37.) It does not allege that any "surveillance" has taken place since that time. Plaintiffs filed this case on April 26, 2023.

In order to be timely within the one-year limitations period, Plaintiffs would need to show that at least one of the alleged acts of discrimination fell within the limitations period. *Abel v. Abbott Nw. Hosp.*, 947 N.W.2d 58, 71 (Minn. 2020). However, on the face of the FAC, Plaintiffs allege the practice stopped in the winter of 2021, more than one year before this case was filed. This claim is barred by the statute of limitations and must be dismissed.

## CONCLUSION

The City respectfully requests that the Court dismiss the FAC in its entirety as Plaintiffs lack standing, have failed to allege a constitutional violation, have failed to allege the City had a policy requiring or knowledge of any alleged

violations, and Plaintiffs' state law claim is barred by the statute of limitations.

Dated: July 27, 2023

KRISTYN ANDERSON
City Attorney
By
*/s Heather Robertson*
HEATHER P. ROBERTSON (390470)
KRISTIN R. SARFF (388003)
Assistant City Attorneys
Minneapolis City Attorney's Office
350 South Fifth Street, Room 210
Minneapolis, MN 55415
(612) 673-3949
(612) 673-3919
heather.robertson@minneapolismn.gov
kristin.sarff@minneapolismn.gov

*Attorneys for Defendant City of Minneapolis*