**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MINNEAPOLIS BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and URBAN LEAGUE TWIN CITIES,<br><br>Plaintiffs,<br>v.<br><br>CITY OF MINNEAPOLIS and OFFICERS JOHN DOES 1–20,<br><br>Defendants. | No. 23-cv-1175 (NEB/DTS)<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CITY OF MINNEAPOLIS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** |

## PRELIMINARY STATEMENT

The City of Minneapolis ("City") has moved to dismiss Plaintiffs' First Amended Complaint ("FAC," ECF Doc. 21) on the basis that, in its view: (1) Plaintiffs have failed to assert standing, either on behalf of their members or in their own rights as organizations; (2) Plaintiffs have failed to state claims for Equal Protection or First Amendment retaliation; (3) Officers John Does 1–20 ("Doe Officers" or "Doe Defendants") are entitled to qualified immunity; (4) Plaintiffs have failed to allege a *Monell* claim against the City; (5) Plaintiffs have failed to state a Title VI claim against the City; and finally (6) Plaintiffs' state law claim is time-barred. *See* City's Mot., ECF Doc. 22; City's Mem., ECF Doc. 23.

For the reasons set forth below, all six arguments fail and must be rejected. The City's motion to dismiss the FAC must be denied in its entirety.

## I. STANDARD OF REVIEW

Plaintiffs hereby incorporate the facts set forth in the FAC as if fully stated herein.

Whether a plaintiff has standing is an issue of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 980 (8th Cir. 2009). The same standard of review is applied to motions under Rule 12(b)(1) as to motions under 12(b)(6). To survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wartman v. United Food & Commercial Workers Local 653*, 871 F.3d 638, 640 (8th Cir. 2017). A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). "[A] Complaint need not contain 'detailed factual allegations,' but 'it must contain facts with enough specificity 'to raise a right to relief above the speculative level.'" *Minnesota Majority v. Mansky*, 708 F.3d 1051, 1055 (8th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In deciding Rule 12(b)(6) motions, Plaintiffs agree with the City that courts are not limited to the four corners of a complaint. *Outdoor Cent., Inc. v. GreatLodge.com, Inc.*, 643 F.3d 1115, 1120 (8th Cir. 2011). The Court may consider matters of public record and materials embraced by the complaint, among other sources. Thus, this Court may consider not only some of the documents relied on by the City in support of its Motion, but also, *inter alia*, factual findings made by the Minnesota Department of Human Rights ("MDHR"), in its April 27, 2022 report; statements made by City Attorney Kristyn

Anderson and MDHR Commissioner Rebecca Lucero during the March 31, 2023 press conference held by the City and MDHR announcing an agreement in principle regarding a Consent Decree; factual findings made by the Department of Justice in its June 16, 2023 report; and the City of Minneapolis' public funding information. *See* Zaragoza Decl. and Exs A–F.

So long as Plaintiffs' allegations, accepted as true, "contain facts with enough specificity 'to raise a right to relief above the speculative level[,]'" Plaintiffs' complaint is sufficient to survive Defendants' motion to dismiss under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6). *Mansky*, 708 F.3d 1055 (quoting *Twombly*, 550 U.S. at 555).

## II. PLAINTIFFS HAVE ALLEGED FACTS SUFFICIENT TO SUPPORT ARTICLE III STANDING TO BRING THIS SUIT

To establish Article III standing, a plaintiff must sufficiently allege that they have (1) an injury in fact; (2) that is traceable to the conduct of the defendant; and (3) redressable by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). But a plaintiff need not prove its case to establish Article III standing. So long as Plaintiffs' factual allegations, accepted as true, "contain . . . enough specificity 'to raise a right to relief above the speculative level" and are "plausible on [their] face[,]" Plaintiffs have met Article III's standing requirements sufficient to support jurisdiction. *Minnesota Majority*, 708 F.3d at 1055 (quoting *Twombly*, 550 U.S. at 555, 570). Where any plaintiff has standing, whether under an associational or organizational standing theory, this is sufficient to confer jurisdiction on this Court. *See Jones v. Gale*,

470 F.3d 1261, 1265, 1267 (8th Cir. 2006); *Nat'l Wildlife Fed'n v. Agric. Stabilization & Conservation Serv.*, 955 F.2d 1199, 1203 (8th Cir. 1992).

### A. Both Plaintiff Organizations Have Associational Standing to Bring Claims on Behalf of Their Members

Plaintiffs NAACP and ULTC ("Plaintiffs or Plaintiff Organizations") both meet the three-part test required of organizations asserting associational standing: (1) their members would have standing to bring suit as individuals in their own right; (2) the interests each organization seeks to protect are germane to each organization's purpose; and (3) contrary to Defendants' position, neither the claims asserted nor the relief requested requires individual member participation in the litigation. *Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 602 F. Supp. 1361, 1368 (D. Minn. 1985), *aff'd,* 780 F.2d 1389 (8th Cir. 1985) (citing *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 342–43 (1977)).

1. <u>Each Organization Has Identified Members Who Would Have Individual Standing</u>

To meet the first prong, an organization need only show that at least one member would have individual standing in their own right. *City of Kennett, Missouri v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018); *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (organization asserting associational standing "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing") (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To establish Article III standing, an individual plaintiff must allege they have suffered (1) an

injury in fact, that is (2) traceable to the defendants, and is (3) redressable by a court order. *Lujan*, 504 U.S. at 560–61.

Accepting the allegations in the FAC as true, each Plaintiff organization has named at least one member who meets the individual standing requirements for the various claims asserted. Allegations of race-based selective enforcement constitute a per se injury in fact. *See Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Jones v. City of Faribault*, No. 18-1643-JRT-HB, 2021 WL 1192466, at *1 (D. Minn. Feb. 18, 2021) (finding standing for all plaintiffs, including organization, at summary judgment stage where "the record supports a reasonable inference that racial animus was either a motivating factor or the but-for cause in the City's decision to implement the Ordinance"); *infra* Section III.A (discussing Equal Protection claim). Allegations of First Amendment violations, too, are per se injuries in fact. *See infra* Section III.B (discussing First Amendment claim). Here, each organization has named at least one member who is a member of a protected class, alleges they were singled out by MPD on social media platforms for targeting or harassment on the basis of race, and engaged in protected speech. Cynthia Wilson and Marquita Stephens, Presidents of the NAACP and ULTC, respectively, are each the lead officer of their respective organization and have access to the organization's social media accounts. Plaintiffs NAACP and ULTC have also named other officers who led each organization or managed social media accounts during the relevant period. FAC ¶¶ 16, 21. Relevant here, each named organizational member is Black and thus a member of a protected class, and each named person engages in protected speech by advocating for the social and political rights of Black Minneapolis

residents. The allegations are traceable to the Doe Officers, whose identities are not yet known, and to the City, which Plaintiffs have alleged maintained a custom of selective enforcement and First Amendment retaliation via social media targeting and surveillance either through knowledge or deliberate indifference. FAC ¶¶ 70–81. Finally, the harms alleged would be redressable via damages, declaratory relief, and any remedy this Court deems just and proper. Thus, each named organizational member would satisfy the injury in fact requirement for Article III standing.

2. <u>The Interests Each Plaintiff Organization Seeks to Protect Are Germane to Each Organization's Purpose</u>

Second, the interests Plaintiff Organizations seek to protect in this lawsuit are germane to each organization's purpose. The City does not contest this prong of the associational standing test in its Motion. To determine if the interests are germane to the organization's purpose, the Eighth Circuit looks to not only the text of the organization's stated mission, but also the organization's interests. *See Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018) (animal rights advocacy organization had standing to challenge zoo's alleged mistreatment of animals); *Heartland Academy Community Church v. Waddle*, 427 F.3d 525, 552–53 (8th Cir. 2005) (school had associational standing where protecting students was germane to its interests). Each Plaintiff Organization's mission and purpose includes combatting race discrimination, including in matters of policing and public safety, and engaging in protected speech in order to advocate on behalf of Black Minneapolitans. FAC ¶¶ 12–14, 17–20, 22–23. The interests the Plaintiff Organizations

seek to protect in this litigation—First Amendment, Equal Protection, and analogous federal and state interests—are germane to Plaintiffs' stated missions.

3. Neither the Claim Asserted nor the Relief Requested Requires Individual Member Participation

Third, individual member participation is not necessary here. Although individual members may have relevant testimony, "neither the claim asserted nor the relief requested *requires* the participation in the lawsuit of each of the individual members." *Hunt,* 432 U.S. at 342–43 (emphasis added). Where individualized proof is not necessary to establish a claim, associational standing is appropriate. In *Red River Freethinkers v. City of Fargo*, the Eighth Circuit held that an association of atheistic and agnostic persons had standing to sue the City of Fargo for prominently displaying a Ten Commandments monument, asserting violations of the First Amendment Establishment Clause. 679 F.3d 1015, 1027 (8th Cir. 2012). The association's claims were based on its members' responses to the monument of "feel[ing] isolated and unwelcome in the city." *Id.* at 1024. Thus, although each member's specific encounter and emotional responses to the monument might be highly individualized, neither "the fact [nor] extent of injury would require individualized proof." *Warth*, 422 U.S. at 515–16. Moreover, associational standing is appropriate where a plaintiff organization can prove its case using information that can be "easily be supplied by the [Plaintiff and Defendant] organizations." *Arkansas Med. Soc., Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir. 1993) (holding "the resolution of this case does not require the participation of individual association members").

Here, as in *Red River Freethinkers*, the claims asserted are universal to any affected members, notwithstanding any potential differences in experience or emotional responses to the alleged conduct. The injuries alleged are not subjective ones, but rather objective questions of (1) whether MPD singled out NAACP and ULTC members on account of their race and/or association with a Black advocacy organization, and (2) whether the organizations' members were subjected to conduct which would have chilled the speech of persons of "ordinary firmness." *See infra* Section III.B.

Accordingly, individualized proof would not be necessary to prove the claims asserted. The MDHR report, which is incorporated into the Complaint, was based on underlying data supplied by MPD. It is plausible based on the MDHR's findings that this underlying data, including "data from MPD's covert social media accounts[,]" supports each of Plaintiffs' claims. Zaragoza Decl. Ex A at 2; *see also infra* Section III, III.A (equal protection claims). Moreover, any members who served in the role of social media manager or otherwise managed social media accounts for the NAACP or ULTC for the six years preceding this lawsuit would each have had access to the login information for the Plaintiff Organizations' various social media accounts and access to any posts made or private messages sent to the organizational accounts by MPD officers. Present organizational leadership would similarly have the relevant login information to access any private messages or posts that past social media managers would have seen or had access to during the relevant period. For those members whose personal social media accounts were tracked, followed, or otherwise engaged with, their identities are not yet known due to the covert nature of Defendants' conduct. But the names of such accounts,

underlying posts, and private messages sent by MPD officers would be readily ascertainable via discovery requests to Defendants, obviating the need for individual member participation in order to access the same information. Moreover, Defendants' internal communications may further reveal the motivation of the Doe Officers, which would substantiate Plaintiffs' claims. *See, e.g., Arkansas Med. Soc., Inc. v. Reynolds*, 6 F.3d at 528 (finding individualized proof not necessary where information could be "easily supplied" by the parties). Thus, "the need for individualized proof" does not "'so pervade[] the claims asserted'" as the City contends. City's Mem. at 11 (quoting *Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.*, 772 F.2d 467, 471 (8th Cir. 1985)).

Similarly, the relief requested does not require individual participation. To the extent the NAACP and ULTC seek declaratory relief and damages on behalf of their members, the facts alleged do not preclude associational relief on behalf of their members. For example, should Plaintiffs ultimately prevail at trial, a jury could devise a damages matrix whereby a dollar amount could attach to each private message, harassing post, or other interaction by an officer to or regarding a member of one of the Plaintiff Organizations. An award amount could reflect the set dollar amount multiplied by the number of impermissible messages, posts, or social media interactions. Other methods to calculate damages may be available, but this example demonstrates that the participation of individual members is not strictly necessary to provide the relief requested.

Because at least one path exists whereby the Plaintiff Organizations *can* assert claims and seek relief on behalf of their members, this is sufficient to establish associational standing.

### B. Plaintiff ULTC Has Organizational Standing to Bring Suit on its Own Behalf

An organization asserting standing on its own behalf must meet the same test required of an individual plaintiff for standing. "Standing may be found when there is a concrete and demonstrable injury to an organization's activities which drains its resources," so long as the injury "is more than simply a setback to [the organization's] abstract social interests." *Nat'l Fed'n of Blind of Mo. v. Cross*, 184 F. 3d 973, 979 (8th Cir. 1999) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

An organization that usually works in a particular issue area can nevertheless show a "drain [on] its resources" if it has had to "divert its efforts from other matters in response to Defendants' alleged violations." *Rosebud Sioux Tribe v. Barnett*, 603 F. Supp. 3d 783, 790 (D.S.D. 2022). For example, an organization that typically works on voting rights satisfies this test by alleging that it "diverted resources from its usual election year advocacy work to combat confusion and difficulties relating to" the challenged provisions or by alleging that it diverted "resources from other core work." *Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 798 (W.D. Mo. 2020) (finding organizational standing). The Fifth Circuit case relied upon by Defendants is not controlling here: a plaintiff need not "identify any specific projects they have had to 'put on hold or otherwise curtail'" under Eighth Circuit precedent. City's Mem. at 15–16 (quoting *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010)).

Plaintiff ULTC has sufficiently alleged injury to itself as an organization.[1] Regarding diversion of resources, ULTC has alleged that it "could have . . . spent" any time expended triaging and responding to MPD's targeting and surveillance of them in other ways—for example, on other public safety topics including "advocating for proactive public safety measures such as legislative policy advocacy, rather than responding to and addressing Defendants' conduct." FAC ¶ 24; *see, e.g., Rosebud Sioux Tribe*, 603 F. Supp. at 790; *Org. for Black Struggle*, 493 F. Supp.3d at 798.

Plaintiff ULTC has alleged additional facts that support organizational harm. ULTC informed its staff "of the surveillance and [they] were advised to be cognizant of language used on social media and mindful that they are being watched." FAC ¶ 24. The City states that this is "[t]he only factual allegation regarding how ULTC addressed the alleged 'surveillance[,]'" but that is inaccurate. City's Mem. at 16. ULTC also alleged that learning it had been singled out for surveillance "negatively impacted ULTC's work" and the "type and frequency" of communications made to the public. FAC ¶ 24. Moreover, although the City states that "social media [is] a forum designed to be viewed by the public" and thus argues that a warning from the ULTC to its staff was "not an impairment to the organization's activities[,]" City's Mem. at 15, not all social media interactions are public. Plaintiffs have alleged, supported by the MDHR report's findings, that MPD officers sent "private messages" to the Plaintiff Organizations. FAC ¶ 51.

[1] Defendants are correct that Plaintiff NAACP has made no allegation of injury to itself as an organization—NAACP asserts only associational standing on behalf of its members. Plaintiff ULTC asserts both associational standing on behalf of its members and organizational standing.

ULTC's admonition was general, encompassing all social media communications, private or public, and this had an impact on ULTC's ability to engage in free speech. This reduced communication constitutes chilling of speech sufficient to support organizational standing with respect to ULTC's First Amendment claim.

The City argues that time spent addressing the findings in the MDHR report is not relevant for the purposes of establishing organizational diversion of resources. City's Mem. at 15–16. But ULTC has alleged that it spent significant staff time and resources addressing the findings in the MDHR report "*including* MPD's surveillance of" ULTC. FAC ¶ 24 (emphasis added). The City is correct that ULTC would ordinarily work on public safety advocacy generally, but this does not mean that ULTC ordinarily worked on the narrow public safety issue of addressing social media surveillance of itself, including taking steps to modify organizational behavior. If ULTC's work prior to April 2022 had included addressing MPD's social media surveillance of the organization, that would be a different matter. But that is not the case. *See, e.g., Rosebud Sioux Tribe,* 603 F. Supp.3d at 790; *Org. for Black Struggle*, 493 F. Supp. at 798.

At this stage, ULTC has sufficiently alleged injury to itself, including a diversion of resources, to support organizational standing.

## III. THE FIRST AMENDED COMPLAINT ADEQUATELY STATES CLAIMS OF CONSTITUTIONAL VIOLATIONS

Accepting the allegations in the FAC as true, Plaintiffs have sufficiently stated claims for both Equal Protection and First Amendment free speech violations. FAC ¶¶ 57–69, 82–92.

Defendants cite *Iqbal v. Ashcroft* at length to argue that Plaintiffs constitutional claims are not "plausible," but this reference to *Iqbal* is telling. In that case, the U.S. Supreme Court concluded that it "should come as no surprise" that after September 11, 2001, a policy directing officers "to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims." City's Mem. at 17–18 (quoting *Iqbal*, 556 U.S. at 682). But the City recognizes that the NAACP and ULTC are not domestic terrorist entities, while white supremacist organizations are. City's Mem. at 21 ("White supremacists and other far-right-wing extremists are the most significant domestic terrorism threat facing the United States.") (quoting Domestic Terrorism Prevention Act of 2019 S. 894, 116th Cong., § 2). One would expect this information and the allegedly "common practice" of "attempting to establish a credible social media profile . . . to further [MPD's] police work[,]" City's Mem. at 18, to "produce a disparate, incidental impact" on white people in Minneapolis, *Iqbal,* 556 U.S. at 562. Yet MDHR found the opposite was true—Black individuals and organizations, including Plaintiffs, were targeted and harassed on social media, while no similarly situated white individuals *or even white supremacists* were found to be disrupted in the same manner. FAC ¶ 54; *see* Zaragoza Decl. Ex. A at 4.

Contrary to the City's contention, Plaintiffs' "allegations that Black individuals were 'surveilled' 'without a criminal investigative purpose'" while not similarly tracking, following, or engaging with white individuals are not "unsupported 'threadbare' allegations." City's Mem. at 17, 21 (quoting *Iqbal*, 556 U.S. at 678, 680). In support of these allegations, Plaintiffs cite to the MDHR report and statements Commissioner

Rebecca Lucero made as recently as March 31, 2023. FAC ¶¶ 54, 56; *see also* Zaragoza Decl. Ex. B (March 31, 2023 Press Conference Transcript) at 5:7–10 ("[O]ur findings are correct. MPD uses covert social media to target black leaders, black organizations, and elected officials without a public safety objective. That remains true."). The factual findings in the MDHR report—including that there was *no evidence* suggesting MPD similarly tracked, followed, or engaged with white individuals, after careful review of over 400,000 MPD documents—are both plausible and would even constitute admissible evidence at trial as "record[s] or statement[s] of a public office" which "set[] out . . . in a civil case . . . factual findings from a legally authorized investigation[.]" Fed. R. Evid. 803(8).

Plaintiffs' allegations are thus supported by credible and admissible evidence. Indeed, because the City has maintained that the data underlying the MDHR's investigation must remain "non-public," Plaintiffs have pleaded these allegations to the fullest extent possible based the evidence available to them prior to engaging in discovery. *See* Zaragoza Decl. Ex. B, at 4:16–20 ("At this point all of the data with respect to MDHR's investigation is covered under Minnesota Statute Section 13.39, which is civil investigatory data, which is non-public at this point."). For the reasons set forth below, Plaintiffs have sufficiently alleged constitutional claims for violations of the Equal Protection Clause of the Fourteenth Amendment and the First Amendment.

### A. Plaintiffs Have Sufficiently Stated an Equal Protection Claim

As the Eighth Circuit has repeatedly recognized, "[t]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Johnson v.*

*Crooks*, 326 F.3d 995, 999 (8th Cir. 2003) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). A prima facie claim under the Equal Protection Clause requires proof "that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory purpose." *United States v. Bell*, 86 F.3d 820, 823 (8th Cir. 1996); *see also Johnson*, 326 F.3d at 1000; *Parada v. Anoka Cnty.,* 332 F. Supp. 3d 1229, 1244 (D. Minn. 2018) (in a selective enforcement case, a "plaintiff must prove that the officer exercised his or her discretion to enforce the laws on account of the plaintiff's race, nationality, or other characteristics."). A "plaintiff must normally prove that similarly situated individuals were not" subject to similar enforcement actions "in order to show the requisite discriminatory effect and purpose." *Johnson*, 326 F.3d at 1000. But even if no comparator group evidence is offered, the Eighth Circuit has "assume[d] that a prima facie equal protection claim may also be proved by direct evidence of racial discrimination." *Id.* Here, the FAC makes comparator group allegations and references direct and indirect evidence that Plaintiffs were singled out on the basis of race. Plaintiffs have thus sufficiently stated a claim for violation of their and their members' equal protection rights.

Regarding comparators, Plaintiffs have alleged that Black individuals, politicians, and organizations including Plaintiffs NAACP and ULTC were singled out for selective enforcement via social media surveillance and harassment. FAC ¶ 54. Through its extensive factual investigation, MDHR found *no* evidence that similarly situated white individuals and organizations were targeted for this type of social media surveillance and disruption. *Id.*; *see also* Zaragoza Decl. Ex. A at 2, 4. In fact, even white supremacist

organizations—organizations the City acknowledges to be "domestic terrorism threats" and which should thus be a serious priority for MPD's allegedly "common practice" of following and engaging with "individuals and groups through their social media accounts to establish a credible undercover social media profile[,]" City's Mem. at 3, 16, 17—were not followed or engaged with in this manner. FAC ¶ 54; Zaragoza Decl. Ex. A at 4 ("In contrast, MPD officers did not similarly track and surveil white people unrelated to criminal activity using MPD covert social media accounts. In fact, as of December 2020, MPD did not operate its own covert social media accounts to track white supremacist or white nationalist groups."). These comparator group allegations support Plaintiffs' claim that MPD singled out the NAACP, ULTC, and each organization's members on the basis of race.

Regarding discriminatory purpose, the court may consider the comparator group allegations as well as Plaintiffs' allegations that MPD officers "pose[d]" as Black individuals, criticized the NAACP, and sent social media messages and posts to "push racist stereotypes about Black people, specifically Black women[.]" FAC ¶¶ 52, 67.b; *see also* Zaragoza Decl. Ex A. at 4–5. These allegations, taken as true, support Plaintiffs' prima facie claim of race discrimination. Moreover, MDHR's related factual findings, in its report referenced in and incorporated into the FAC's allegations, include that "MPD maintains an organizational culture where officers consistently use racist . . . language," including the use of various racial slurs by officers and even supervisors. Zaragoza Decl. Ex. B at 7 ("They call Black individuals 'n*ggers' and 'm*nkeys' and call Black women 'Black b*tches.' One MPD supervisor referred to Somali men as 'or*ngutans.'")

(redacted).[2] This evidence of MPD's culture and language is disturbing but important evidence in support of Plaintiffs' Equal Protection, Title VI, and state claims. Discovery into the underlying social media accounts and messages from Defendants would shed further, much-needed light onto the exact content of such messages. Discovery into the identities of Doe Officers would also reveal whether there was overlap in the identities of officers who used racial slurs or made racist comments and those who engaged in the covert social media surveillance scheme. The above information would serve as potential direct evidence of racial animus. *See, e.g. Clark ex rel T.M.J. v. Pielert,* No. CIV. 07-3649DSDJJG, 2009 WL 35337, at *8 (D. Minn. Jan. 5, 2009) ("The word 'ghetto,' however, is a racially-charged word and [an officer's] use of that word in reference to [Plaintiff] raises a factual issue as to whether he treated [Plaintiff] differently based on her race.")

Defendants argue, in the alternative, that Plaintiffs fail to state a claim for selective enforcement because the individuals contacted by MPD officers were not "potential targets for the enforcement of criminal laws, therefore it is questionable whether the social media activities are 'enforcement' at all and would [thus] not trigger an Equal Protection claim." City's Mem. at 20. Yet, earlier in its Motion, the City argues that following, tracking, and engaging with individuals and groups is done "to establish a credible undercover social media profile." *Id*. at 3, 16, 17. The City further acknowledges that MPD's written social media policy "states that a covert social media profile is 'for

[2] Zaragoza Decl. Ex. A maintains the original, unredacted language.

the purpose of investigating criminal activity[.]'" *Id*. at 5 (quoting Robertson Decl., Ex. D, at 1, 4, 10); *see also* Robertson Decl., Ex F (U.S. DOJ *Social Media and Tactical Considerations for Law Enforcement* Report), at 17 (stating that, of over 1,200 "federal, state, and local law enforcement agencies that use[d] social media in some way [as of July 2012], four out of five agencies said they use social media for investigations. In fact, viewing posts on social media for criminal investigations was the most common use of social media by the responding agencies."). Surely, investigations are a type of enforcement action. *See U.S. v. Frazier*, 408 F.3d 1102, 1108 (8th Cir. 2005) (In a selective *enforcement* "equal protection analysis . . . ultimately the 'stage' of *investigation* is irrelevant; the inquiry is whether a government actor has imposed unequal burdens based upon race.") (emphasis added).

Even if the Court were to accept the City's argument that the social media activities alleged here were undertaken against individuals who were not "potential targets for the enforcement of criminal laws," City's Mem. at 20, such an admission only supports Plaintiffs' allegations that Plaintiffs were singled out without a legitimate investigatory purpose and contrary to MPD's written policy, FAC ¶¶ 2, 49, 62, 67.c, 111.a. Defendants' conduct is either an enforcement action or it is not—but Defendants cannot have it both ways in order to avoid liability for violating Plaintiffs' constitutional rights.

Simply put, Defendants' actions were part and parcel of law enforcement activities and Plaintiffs have sufficiently stated an Equal Protection claim of discrimination on the basis of race. *See, e.g., Njaka v. Wright Cnty.*, 560 F. Supp. 2d 746, 755 (D. Minn. 2008)

(at the motion to dismiss stage "the issue is simply whether Plaintiff[s] ha[ve] sufficiently pled a claim for equal protection, not whether [they] ha[ve] presented sufficient evidence in opposition to summary judgment[]" and finding the plaintiff "stated a cognizable [equal protection] claim at this stage").

### B. Plaintiffs Have Sufficiently Stated a First Amendment Retaliation Claim

"To prevail on a § 1983 claim for retaliation in violation of the First Amendment, [a plaintiff] must demonstrate (1) that he engaged in a protected activity; (2) that the government official took adverse action against him that would chill a person of *ordinary firmness* from continuing in the activity; and (3) that the adverse action was motivated *at least in part* by the exercise of the protected activity." *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013) (emphases added). "The 'ordinary-firmness' test is an 'objective one, not subjective.'" *Id.* (quoting *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003)). The FAC includes allegations sufficient to support all three elements. FAC ¶¶ 12–24 (describing political speech and chilling effect), 49–56 (adverse actions).

The City's arguments appear to focus on the second and third elements of a retaliation claim. Regarding any potential chilling effect, the City's reliance on *Laird v. Tatum*, 408 U.S. 1 (1972), is misplaced. The plaintiffs in *Laird* alleged a "chilling effect" on speech caused by "the mere existence, without more, of [non-discriminatory] governmental investigative and data-gathering activity." *Id.* at 10–11. Here, Plaintiffs

have alleged more than the "mere existence of a surveillance program." City's Mem. at 23.[3]

The claim in *Laird*, unlike Plaintiffs' claims, "piled speculation upon speculation: the Army *might* collect information about the plaintiffs, it *might* take some future action based on that information, and that action *might* injure the plaintiffs." *Initiative Referendum Institute v. Walker*, 450 F.3d 1082, 1090 (10th Cir. 2006) (describing facts of *Laird*) (emphasis in original); *see also Missouri Roundtable for Life v. Carnahan*, 676 F.3d 665, 673 (8th Cir. 2012) (describing the *Laird* plaintiff allegations that the Army program "*might* harm them at some future date") (emphasis added). By contrast, allegations of "specific present objective harm or a threat of specific future harm[,]'" including allegations based on a defendant's *past* actions, are sufficient to state a First Amendment claim. *Eckles v. City of Corydon*, 341 F.3d 762, 767–68 (8th Cir. 2003) (quoting *Bigelow v. Virginia*, 421 U.S. 809, 816–17 (1975) and *Laird,* 408 U.S. at 14). In addition, "[t]he plaintiffs in *Laird* did not claim that the information gathering activities were directed against them specifically or that the gathered data could be directly used against them in any foreseeable way." *Ozonoff v. Berzak*, 744 F.2d 224, 229 (1st Cir. 1984). Here, Plaintiffs allege more than speculative future harm—they allege Defendants' social media targeting and harassment already occurred and was directed against Plaintiff Organizations and their members specifically.

[3] Notably, the Court in *Laird* "fully recognize[d] that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Id.* at 12–13.

Moreover, *Laird* does not "stand for the proposition that public surveillance is . . . *per se* immune from constitutional attack." *Hassan v. City of N.Y.*, 804 F.3d 277, 292 (3d Cir. 2015). The "narrow" holding in *Laird*, *see* 408 U.S. at 15, simply does not reach the facts or control the outcome of this case. Several post-*Laird* cases have recognized that, while surveillance in public places may not of itself violate any privacy right, it can still violate other rights that give rise to cognizable harms. *See*, *e.g.*, *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977) (individuals have a viable claim against the government when they are able to show that the government took action against them in retaliation for their exercise of First Amendment rights); *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) ("Under *Mt. Healthy* and its progeny, an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech."); *Hall v. Pa. State Police*, 570 F.2d 86, 91 (3d Cir. 1978) ("Although it may be assumed that the state may arrange for photographing all suspicious persons entering the bank, it does not follow that its criterion for selection may be *racially based*, in the absence of a proven compelling state interest.") (emphasis added, citation omitted).

Here, Plaintiffs' First Amendment retaliation claims are intertwined with the race-based claims, insofar as Plaintiffs allege that any public surveillance of them was motivated in part by race. In addition, the FAC includes allegations not only of public surveillance but also of private social media surveillance via private messages sent by MPD officers. FAC ¶ 51; *accord United States v. Chavez*, 423 F. Supp. 3d 194, 205

(W.D.N.C. 2019) (finding, in the Fourth Amendment context, that a "Defendant manifested a subjective expectation of privacy in his non-public Facebook content that society is prepared to recognize as reasonable.").

Next, the City puzzlingly contends that ULTC's work with the MDHR on the consent decree with the City, and ULTC's work with the DOJ in its investigation of the City, show there was no "chilling effect" on ULTC's speech. Yet "[g]overnment action that does not directly prohibit expressive activity may nonetheless raise profound First Amendment concerns." *Courthouse News Serv. v. Planet*, 750 F.3d 776, 787 (9th Cir. 2014). The logical implication of the City's position is that in order to plausibly allege a "chilling effect" on speech, a plaintiff must have ceased all political speech following the incident at issue, which is absurd.

The City also claims there is no plausible allegation that the social media targeting and harassment of Plaintiffs was in retaliation for Plaintiffs' speech. Yet the MDHR Report states: "MPD officers . . . used MPD's covert accounts to pose as community members in order to post comments and content online *attacking police critics* and criticizing local officials." Zaragoza Decl. Ex. A at 5 (emphasis added). The Report also states that "officers posed as *like-minded individuals* and claimed, for example, that they met the targeted person at a prior *demonstration or protest*." *Id.* at 4 (emphasis added). In addition, the Report states: "In one case, an MPD officer used an MPD covert account to pose as a Black community member to send a message to a local branch of the NAACP *criticizing the group*." *Id.* (emphasis added). These allegations support an inference "that

the adverse action was motivated *at least in part* by the exercise of the protected activity." *Santiago*, 707 F.3d at 991 (emphasis added).[4]

Therefore, the Complaint, which incorporates the MDHR report, states a plausible First Amendment retaliation claim. "Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *McDonough v. Anoka Cnty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011)). Nevertheless, to the extent the Court may seek to determine possible reasons for Defendants' conduct in order to evaluate whether Plaintiffs' allegations of First Amendment retaliation are plausible, the excerpts above from the MDHR report support the inference that social media targeting and harassment occurred based on Plaintiff Organizations' and their members' protected speech, and that such activity would chill the speech of a person of "ordinary firmness."

## IV. THE DEFENDANT JOHN DOE OFFICERS ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR VIOLATIONS OF PLAINTIFFS' CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS

The MPD officers who used covert social media accounts to target and harass Plaintiffs and their members are not entitled to qualified immunity. When analyzing a qualified immunity defense, a court considers two questions: (1) "whether a defendant

---

[4] In First Amendment jurisprudence, political speech is the most valued type of speech. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position[.]").

has violated a constitutional or statutory right and, if so, [2] whether that right was clearly established at the time of the defendant's conduct." *Ivey v. Audrain Cty., Missouri*, 968 F.3d 845, 849 (8th Cir. 2020); *Kohorst v. Smith*, 968 F.3d 871, 876 (8th Cir. 2020). "If the answer to *both* questions is *yes*, then the individual defendants are *not* entitled to qualified immunity." *Saunders v. Thies*, No. 419CV00191JAJHCA, 2020 WL 10731253, at *8 (S.D. Iowa Sept. 8, 2020), *aff'd*, 38 F.4th 701 (8th Cir. 2022), and *aff'd*, 38 F.4th 701 (8th Cir. 2022) (emphasis in original).

On the first question, at the motion to dismiss stage, a court must consider whether the plaintiff has pleaded factual allegations indicating a violation of a constitutional or statutory right. *See Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021) (holding factual questions existed regarding whether Plaintiff's constitutional rights were violated and reversing Eighth Circuit order affirming grant of qualified immunity).

Regarding the second prong, in order for a constitutional right to be "clearly established," "the contours of the right must be clear enough that a reasonable officer would understand that the act in question violates the right." *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017). "Existing law need not be directly on point to clearly establish a right, but it must put the question beyond debate." *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019); *see also id.* ("The relevant question is whether a reasonable officer would have fair warning that his conduct was unlawful.")

Plaintiffs have sufficiently alleged violations of their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment and the First Amendment. For

the reasons stated further below, these rights were clearly established at the time of Defendants' conduct and therefore Doe Officers are not entitled to qualified immunity.[5]

### A. The Right to Be Free from Selective Enforcement on the Basis of Race, Including in Surveillance Actions, Is Clearly Established

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren v. United States*, 517 U.S. at 813; *see also Parada,* 332 F. Supp. 3d at 1245 ("The law on selective enforcement based on race . . . is clearly established.") (citing *Whren*, 517 U.S. at 813). In a selective enforcement "equal protection analysis . . . ultimately the 'stage' of investigation is irrelevant; the inquiry is whether a government actor has imposed unequal burdens based upon race." *Frazier*, 408 F.3d at 1108 (citing *United States v. Avery*, 137 F.3d 343, 355 (6th Cir. 1997)). Thus, officers were on notice of their longstanding constitutional duty not to "impose[] unequal burdens based upon race[]" when engaging in law enforcement investigations. *Id.* Taking the allegations in the FAC as true, when MPD officers targeted and harassed the NAACP, ULTC, and the organizations' members via social media, but did not similarly surveil white individuals, officers ran afoul of this clearly established constitutional duty. The

[5] "Even though some predicate facts have been alleged in this matter, qualified immunity is typically considered on motion for summary judgment and generally involves consideration of facts elicited though (sic) at least some additional discovery." *Hill v. City of Minneapolis*, CIV. 12-738MJD/AJB, 2012 WL 7761496, at *6 (D. Minn. 2012) (citation omitted), report and recommendation adopted, CIV. 12-738 MJD/AJB, 2013 WL 1104257 (D. Minn. 2013). In addition, when a court considers what is "'clearly established' under the qualified immunity analysis," the balance favors the plaintiff "when the test is based solely on the allegations in the complaint." *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997).

FAC's allegations of officers pushing racist stereotypes and posing as Black individuals, as well as evidence of officers' use of racial slurs during the relevant period, show it is plausible that MPD officers were "impos[ing] unequal burdens based upon race." *Id.*; *see*, *e.g.*, *Pielert*, No. CIV. 07-3649DSDJJG, 2009 WL 35337, at *8 (D. Minn. Jan. 5, 2009) (denying qualified immunity where officer used "[t]he word 'ghetto'" to refer to the plaintiff).

Defendants argue that "[t]here are no controlling cases in this district or circuit, much less at the Supreme Court . . . that speak to this[]" case, because officers could not "have been on notice that engaging on social media with Black individuals or organizations of Black individuals in order to build a credible undercover social media profile would offend either the First Amendment or the Equal Protection clause." City's Mem. at 27. But officers need not have been on notice at this level of granularity. Officers were engaged in enforcement activity, *see supra* Section III.A (discussing the City's contradictory statements with respect to social media disruption as enforcement *vel non*), and it has long been clearly established that officers may not engage in discrimination on the basis of race. *See*, *e.g.*, *Hassan*, 804 F.3d at 305–07; *Parada v. Anoka Cnty.*, 481 F. Supp. 3d 888, 905 (D. Minn. 2020) (citing *Graham v. Richardson*, 403 U.S. 365, 372 (1971)).

Moreover, although Plaintiffs are not required to show that selective enforcement is prohibited in the type of surveillance actions alleged, cases cited by the City support Plaintiffs on this point. The City cites to *Frazier*, 408 F.3d at 1108, and *U.S. v. Woods*, 213 F.3d 1021, 1022–23 (8th Cir. 2000)), in an attempt to argue that the type of

enforcement actions alleged in the FAC are not contemplated by existing case law. City's Mem. at 19–20. But the City's own characterization of MPD's use of social media to track, follow, and engage with individuals and organizations supports an analogy between the instant case and the type of prohibited surveillance described in *Frazier* and *Woods*. In *Frazier* and *Woods*, "the surveillance consisted of law enforcement physically following and watching an individual or location with the goal of detecting criminal activity." City's Mem. at 20. This is precisely like Defendants' alleged conduct but applied to a digital space. Just as police officers might follow and watch individuals or groups with the purpose of potentially detecting criminal activity, officers in the digital age "follow[] and watch[] an individual or location" such as a particular social media profile, page, or forum. *Id.*; *see also* Robertson Decl., Ex F. (DOJ Report), at 6 (noting police officers "'mine' social networking sites to identify victims, witnesses, and perpetrators[]" and to view "photographs, videos, and other information about an incident that can be used as investigative leads or evidence."). Here, accepting the FAC's allegations as true, MPD officers did far more than engage in social media "tailing," all in a manner that imposed unequal burdens on the basis of race.

Accordingly, the Doe Defendants were on notice of Plaintiffs' clearly established Equal Protection rights and they are not entitled to qualified immunity with respect to this claim.

### B. The Right to Be Free from First Amendment Retaliation for Exercising Free Speech Is Clearly Established

People's right to exercise the constitutional freedom to speak without facing retaliation from government officials is clearly established. *See*, *e.g.*, *Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1313 (8th Cir. 2014); *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007).

The City relies on *Laird*, again, to argue that its officers should be protected by qualified immunity with respect to Plaintiffs' First Amendment claim. Yet, as discussed above, the *Laird* decision is distinguishable. Unlike the plaintiffs in *Laird*, for example, Plaintiffs have articulated specific harms—the City's race discrimination against them and retaliation in response to their exercise of protected activity under the First Amendment—and their claims cannot be characterized as subjective or speculative. *See Anderson*, 125 F.3d at 160; *see also Hange v. Mansfield*, 257 F. App'x 887, 893–94 (6th Cir. 2007) ("When a threat or chill 'is not merely subjective, but has already been experienced,' we have distinguished *Laird* and held that the past chill constitutes an injury-in-fact.").

The FAC and MDHR report, incorporated by the FAC, provide sufficiently concrete allegations to survive dismissal based on qualified immunity at this stage of the litigation. *See* FAC ¶¶ 49–52; Zaragoza Decl. Ex. A at 4–5. Therefore, the City's "argument for qualified immunity fails because the facts and reasonable inferences allege that [Defendants] violated [Plaintiffs'] constitutional right to be free from retaliation for exercising [their] right to expression." *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir.

2015); *see also Freeman v. Blair*, 862 F.2d 1330, 1332 (8th Cir. 1988) ("The law making retaliation for the exercise of a constitutional right actionable under § 1983 was clearly established long before the events in this case, . . . and objectively reasonable officials could not fail to know of it.").

### C. The Doctrine of Qualified Immunity Itself is Under Increasing Scrutiny by Federal Courts

Finally, Plaintiffs note that the doctrine of qualified immunity itself has faced increasing scrutiny in federal courts across the country. *See Rogers v. Jarrett*, 63 F.4th 971, 979 (5th Cir. 2023) ("[N]ewly published scholarship . . . paints the qualified-immunity doctrine as flawed – foundationally – from its inception.") (citing Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201 (2023)) (Willett, J., concurring); *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 673 (4th Cir. 2020), as amended (June 10, 2020) ("Seven years later, we are asked to decide whether it was clearly established that five officers could not shoot a man 22 times as he lay motionless on the ground. Although we recognize that our police officers are often asked to make split-second decisions, we expect them to do so with respect for the dignity and worth of black lives. Before the ink dried on this opinion, the FBI opened an investigation into yet another death of a black man at the hands of police, this time George Floyd in Minneapolis. This has to stop. To award qualified immunity at the summary judgment stage in this case would signal absolute immunity for fear-based use of deadly force, which we cannot accept."); *Jamison v. McClendon*, 476 F. Supp. 3d 386, 392 (S.D. Miss. 2020) ("But let us not be fooled by legal jargon. Immunity is not

exoneration. And the harm in this case to one man sheds light on the harm done to the nation by this manufactured doctrine. As the Fourth Circuit concluded, 'This has to stop.'").

This scrutiny is tied not only to outcomes, but also to the questionable origins of the doctrine itself in both "judge-made" law, *Reinert,* 111 Cal. L. Rev 201 *supra*, and in the case *Pierson v. Ray*, a case brought by an integrated group of white and Black clergymen Freedom Riders in Mississippi who were arrested by police officers for collectively entering a "Whites Only" area of a bus terminal. 386 U.S. 547 (1967) (case creating doctrine); *see also* Radley Balko, *The Ugly Origins of Qualified Immunity*, WASH. POST (Oct. 26, 2021).[6]

Even under the existing doctrine, however, the Doe Defendants are not entitled to qualified immunity in this case. For the various reasons discussed above, qualified immunity must not shield the Doe Officers as to the social media targeting and harassment alleged in the FAC.[7]

## V. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A *MONELL* CLAIM AGAINST DEFENDANT CITY OF MINNEAPOLIS

The City incorrectly suggests that Plaintiffs must identify an official City policy that Plaintiffs allege is unconstitutional in order to state a viable *Monell* claim. City's Mem. at 29. Yet there is no requirement that a plaintiff identify an unconstitutional

---

[6] Available at https://www.washingtonpost.com/opinions/2021/10/26/ugly-origins-qualified-immunity/

[7] Qualified immunity is not available to municipalities, which is why this discussion is limited to the Doe Defendants. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980).

official policy in the complaint. *See Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004) (noting that a plaintiff "need not [] specifically plead the existence of an unconstitutional policy . . . to survive a motion to dismiss"); *Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003) (same). "Liability for a constitutional violation will attach to a municipality . . . if the violation resulted from an official municipal policy, an unofficial custom, *or* a deliberately indifferent failure to train or supervise an official or employee." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016) (emphasis added). Thus, allegations of an unofficial custom and/or deliberate indifference are valid methods of establishing *Monell* liability.

Here, Plaintiffs' FAC alleges a continuing and widespread pattern or practice of discriminatory, race-based policing and COINTELPRO-style disruption of First Amendment activities whereby MPD officers used covert social media accounts to target and surveil Black organizations and individuals. FAC ¶¶ 7, 75, 81, 114; *see also Hobson v. Wilson*, 737 F.2d 1, 10–13 (D.C. Cir. 1984) (describing the FBI's "notorious COINTELPRO operation"). The allegations in the FAC establish a custom via multiple law enforcement officers pursuing shared objectives. *See Ware v. Jackson Cty.*, 150 F.3d 873, 880 (8th Cir. 1998). And the FAC alleges that this custom persisted for *as long as* eleven years. FAC ¶¶ 5, 31, 43, 71 (describing MDHR investigation spanning 2010–2021).

The opinions cited by the City are inapposite. Importantly, the following arose on summary judgment, and are therefore of limited value with regard to the City's motion to dismiss: *Graham v. Barnette*, 5 F.4th 872 (8th Cir. 2021); *Brewington*, 902 F.3d 796;

*Bolderson*, 840 F.3d 982; *Atkinson v. City of Mountain View*, 709 F.3d 1201 (8th Cir. 2013); *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825 (8th Cir. 2013); *Brockinton v. Sherwood*, 503 F.3d 667 (8th Cir. 2007); *Sanders v. City of Minneapolis*, 474 F.3d 523 (8th Cir. 2007); *Szabla v. City of Brooklyn Park*, 486 F.3d 385 (8th Cir. 2007); *Mettler v. Whitledge*, 165 F.3d 1197 (8th Cir. 1999); *Jane Doe A v. Special Sch. District*, 901 F.2d 642 (8th Cir. 1990); and *Slaven v. Engstrom*, 848 F. Supp. 2d 994 (D. Minn. 2012). In addition to being inapposite, these cases are distinguishable.

For example, in *Graham v. Barnette*, the policy at issue was "not facially unconstitutional because it [did] 'not affirmatively sanction' an unconstitutional action." *Graham*, 5 F.4th at 891. Here, however, the social media targeting and harassment of Plaintiffs was pursuant to an unofficial municipal custom, not a written policy. FAC ¶¶ 71–73.

In *Brewington*, "even assuming the existence of an unconstitutional custom, Brewington [could not] show that the policy was the 'moving force' behind" the brutality visited upon him. *Brewington*, 902 F.3d at 802. The *Slaven*, *Szabla* and *Mettler* cases are similar. *Slaven*, 848 F. Supp. 2d at 1008 (stating that there was "no evidence related to a policy or custom that would have caused the omission"); *Szabla*, 486 F.3d at 395 ("Even assuming that were so, it is conceded that in this case, Officer Baker never deployed the canine in the sense described."); *Mettler*, 165 F.3d at 1205 (stating that "Ms. Mettler has offered no evidence that any previous investigations were inadequate, or that such investigations were a moving force in the deputies' actions"). Plaintiffs, however, have more than sufficiently alleged causation, stating in the FAC that the custom at issue and a

failure to train, supervise, and discipline emboldened MPD officers to act without regard for the rights of Plaintiffs and their members and caused the violation of Plaintiffs' rights. FAC ¶¶ 76, 78.

In *Bolderson*, the court held that a "single act could not show a continuing, widespread, and persistent pattern of unconstitutional misconduct." *Bolderson*, 840 F.3d at 986. The *Atkinson* case is similar. *Atkinson*, 709 F.3d at 1216 ("Other than the single incident at issue in this case, Atkinson has submitted no evidence of excessive force by Sanders or any other city police officer."). Plaintiffs, however, are not challenging a single act; they are challenging MPD officers' use of "covert social media to target and surveil Black community members" over a period of nearly 11 years, which the MDHR report concluded "demonstrates a pattern or practice of discriminatory, race-based policing." Zaragoza Decl. Ex A at 35.

In *Johnson*, the Eighth Circuit affirmed the denial of summary judgment where there was "no evidence to suggest" that policymaking officials would have learned and approved of jail guards' denial of medication to a single inmate for several hours. *Johnson*, 725 F.3d at 829. Yet here, Plaintiffs' allegations explain that the covert social media targeting at issue occurred over a course of time sufficiently long to permit notice of and/or deliberate indifference to a custom of misconduct. *See id.*; FAC ¶¶ 71, 80.

In *Brockinton*, the County could not be held liable under § 1983 because no County employee was individually liable for an underlying substantive claim. *Brockinton*, 503 F.3d at 674. The Sanders case is similar. *Sanders*, 474 F.3d at 527 ("Without a constitutional violation by the individual officers, there can be no § 1983 or

*Monell* failure to train municipal liability."). Here, however, MPD officers—currently all Doe Defendants—are liable for underlying substantive claims as explained in the FAC. FAC ¶¶ 58, 68–69, 84, 90–91, 100.

Unlike the plaintiffs in the summary judgment decisions discussed above, the NAACP and ULTC need not *prove* at this early stage the existence of a custom or that the City acted with deliberate indifference. At the motion to dismiss stage, a plaintiff is only required to show the existence of a "possible custom[.]" *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 844 (D. Minn. 2021); *see also Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 867 (D. Minn. 2015). Plaintiffs need only provide more than "sweeping legal conclusions cast in the form of factual allegations," *Wiles v. Capitol Indem. Corp.*, 280 F.3d 868, 870 (8th Cir. 2002). Plaintiffs have done so, by citing to the findings from the MDHR report and DOJ report. When evaluating these findings, which Plaintiffs have incorporated into the Complaint, the Court must assume that they and other "well-pleaded factual allegations in the complaint are true 'and construe[s] the complaint, and all reasonable inferences arising therefrom, most favorably to the pleader.'" *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). Accepted as true, Plaintiffs' allegations support a reasonable inference that MPD engaged in a pervasive pattern of constitutional violations via a custom and/or deliberate indifference.

### A. Plaintiffs Have Identified an Unlawful Custom Reflecting Deliberate Indifference to Constitutional Rights and Harm to Plaintiffs

A *Monell* claim based on custom has three elements: (1) a pattern of unconstitutional misconduct by municipal employees; (2) deliberate indifference to or

tacit authorization of that conduct by the municipality's policymaking officials; and (3) injury to the plaintiff pursuant to that municipal custom. *See Brewington v. Keener*, 902 F.3d 796, 801 (8th Cir. 2018) (citing *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016)). At this early juncture, a plaintiff "need not prove the facts that *establish* a *Monell* claim." *Brenner v. Asfeld*, No. 18-CV-2383 (NEB/ECW), 2019 WL 2358451, at *9 (D. Minn. June 4, 2019) (emphasis in original); *accord*, *e.g.*, *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 403 (4th Cir. 2014) ("Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier.").

Plaintiffs' allegations meet the above three-part test for the reasons below.

1. <u>The First Amended Complaint Includes Sufficient Facts to Establish a "Pattern" of Unconstitutional Conduct by Municipal Employees</u>

Plaintiffs have met the first element of a custom-based *Monell* claim: a pattern of unconstitutional misconduct by municipal employees.

The City argues that accusing it of using covert social media accounts to target Plaintiffs, a fact substantiated by the MDHR report, is a "conclusory legal assertion . . . insufficient to make out a custom claim." City's Mem. at 32. The City bases this argument in large part on its claim that the MDHR "report gives only three specific examples of purportedly improper use of covert social media accounts." *Id.* Yet the U.S. Supreme Court held in *Leatherman v. Tarrant Cnty. Narc. Intel. Coord. Unit* "that requiring a plaintiff to allege particular instances of similar constitutional violations in order to defeat a motion to dismiss for failure to state a claim is inconsistent with the

liberal system of notice pleading." *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir. 1993) (quoting *Leatherman,* 507 U.S. 163, 168 (1993)) (internal quotation marks omitted). Contrary to the City's argument, Plaintiffs were not required to list other incidents in order to adequately allege a *Monell* claim. A plaintiff is "not required to identify every other *or even one other individual*" who has been harmed due to the alleged unconstitutional conduct. *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (emphasis added); *see also Sagehorn*, 122 F. Supp. 3d at 867 (finding a plaintiff pleaded a *Monell* custom by alleging that there were "at least two other [incidents] and perhaps more").

Moreover, the Supreme Court cited *Leatherman* in *Twombly*, and specifically disavowed any intent to create a heightened pleading standard under Rule 8. 550 U.S. 544, 569 n.14 (2007); *see also Baribeau v. City of Minneapolis*, No. 06-4953, 2007 WL 2123307, at *2 n.5 (D. Minn. July 20, 2007) (noting that, in *Twombly*, "the Supreme Court did not retreat from its holdings in *Leatherman*"). In light of this, *Leatherman* was not overruled *sub silentio* by *Twombly* or *Iqbal*. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). Notably, a plaintiff must only plead facts from which one "could begin to draw an inference" that misconduct occurred due to an unconstitutional policy or custom. *Crumpley-Patterson*, 388 F.3d at 591.

Here, Plaintiffs' FAC includes sufficient allegations regarding a custom of singling out Plaintiffs and their members for covert social media targeting and harassment to sustain Plaintiffs' unlawful custom claim against the City. FAC ¶¶ 49–54. Even according to the City, Plaintiffs have asserted *at least three* instances of Defendants singling out Plaintiffs and their members. City's Mem. at 32. And additional allegations support the existence of a pattern of unconstitutional conduct, including, but not limited to, the length of time involved (up to eleven years), FAC ¶¶ 5, 31, 43, 71; and the involvement of multiple officers in the social media surveillance scheme, FAC ¶¶ 49–54; Zaragoza Decl. Ex. A at 4–5 (use of the plural "officers" and describing surveillance "in one case… [and] in another case…").

Thus, the FAC includes sufficient allegations regarding the custom of singling out Plaintiffs and their members for covert social media targeting and harassment to sustain Plaintiffs' unlawful custom claim against the City.

2. <u>The Complaint Includes Sufficient Discipline and "Code of Silence" Allegations to Establish "Deliberate Indifference" or "Tacit Authorization By" Municipal Officials</u>

Plaintiffs have also established the second element of a custom-based *Monell* claim: deliberate indifference to or tacit authorization of the misconduct by the municipality's policymaking officials. Constructive knowledge of constitutional violations sufficient to support "deliberate indifference" can be inferred from the widespread nature of police misconduct. *See Thelma D. ex rel. Delores A. v. Bd. of Educ. of St. Louis*, 934 F.2d 929, 933 (8th Cir. 1991). When an illegal practice persists even though policymakers knew or should have known about it, it is reasonable to infer that

the practice persists because policymakers have elected not to take corrective action. *See*, *e.g.*, *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997) ("Their continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability."). As the U.S. Supreme Court has explained, a "policy of inaction in light of notice that [the status quo] will cause constitutional violations is the functional equivalent of a decision . . . to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011); *see also Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ("*Monell*'s policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions."); *Brown v. City of Ft. Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (a "practice is deemed authorized by [municipal] policymaking officials [when] they must have known about it but failed to stop it").

Plaintiffs have alleged that a "code of silence" emboldened MPD officers to violate the rights of Black people, and that the City failed to discipline officers for violating people's rights to such an extent that it amounted to deliberate indifference or tacit authorization of the unconstitutional conduct alleged. FAC ¶¶ 77–80.

Here, before the MDHR report exposed the social media targeting and harassment at issue in this case, City officials apparently "acquiesce[d] in [this] longstanding practice or custom[.]" *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989). City

officials knew or should have known that the City's existing policies were "not prevent[ing] constitutional violations," and that a "new program [was] called for[.]" *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.*, 520 U.S. at 407. Despite this, the City failed to train, supervise, and discipline its officers to an extent that amounted to "deliberate indifference" to the rights of Black people targeted by officers using covert social media accounts, including Plaintiffs and their members. "Their continued adherence to an approach" that they knew or should have known "failed to prevent tortious conduct . . . establish[es] the conscious disregard for the consequences of their actions—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.*

Plaintiffs' allegations permit the reasonable inference that the custom of singling out Plaintiffs and their members for covert social media targeting was known at the highest levels of the MPD, and that a decision was made by MPD policymakers to do nothing about it. *See* FAC ¶¶ 71, 75; *see also* Zaragoza Decl. Ex. A at 9 ("Although the evidence in this investigation reflects a pattern of race-based policing with respect to MPD officers' . . . covert social media activity . . . MPD has not uniformly and consistently held officers accountable for these types of problematic behaviors.").

Moreover, the DOJ report incorporated into the Complaint shows that Plaintiffs' allegations as to this "code of silence" are indisputably plausible. The DOJ report states that even when MPD officers have seriously injured people, "supervisors often accept their accounts with little scrutiny, and associated complaints linger for years without resolution." Zaragoza Decl. Ex. C at 55. For example, when an MPD officer who violently pushed a peaceful protester made false claims about the incident, other "officers

who were present echoed this false account," and "the supervisor who reviewed the incident claimed that the officers' accounts 'appear[ed] to match' the footage," which was blatantly untrue. *Id.*

The above allegations support an inference of deliberate indifference.

3. The Complaint Sufficiently Alleges Constitutional Injuries Pursuant to the Alleged Municipal Custom

For the reasons stated *supra* at Sections II (addressing injury in fact requirements of Article III standing) and III (addressing Equal Protection and First Amendment retaliation claims), Plaintiffs have alleged sufficient facts support the third element of *Monell* liability—that they have been injured pursuant to the alleged municipal custom. *Brewington*, 902 F.3d at 801 (8th Cir. 2018) (quoting *Corwin,* 829 F.3d at 700). In short, Plaintiffs assert that they and their members have been subjected to race-based discrimination and First Amendment retaliation as a result of MPD's custom of social media surveillance against them. These allegations are sufficient to meet the third and final element establishing the existence of an unconstitutional municipal "custom." Accordingly, Plaintiffs have sufficiently alleged a *Monell* claim against the City.

## VI. PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT

Title VI of the Civil Rights Act of 1964 "prohibits discrimination on the basis of race in federally funded programs." *Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 355 (8th Cir. 2020) (citing 42 U.S.C. § 2000d). To prevail in a Title VI claim, a plaintiff "must show that [their] race, color, or national origin motivated the defendant's discriminatory conduct." *Rowles*, 983 F.3d at 355. A plaintiff may rely on direct evidence

of race discrimination or, in the absence of direct evidence, courts apply "the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green*." *Id.* (citing 411 U.S. 792 (1973)); *see also Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998).

The City is a frequent recipient of federal financial assistance for policing services. The City received funding from the DOJ "Community Oriented-Policing Services (COPS)" program in 2009, 2013, and 2017. Zaragoza Decl. Ex. D (Minneapolis COPS Grant Report). In 2021, Minneapolis also received American Rescue Plan Act funds for use in Fiscal Years 2022–24. Nearly $11 million of those funds have been allocated to public safety. *Id.* Ex. E (Minneapolis American Rescue Plan Act Summary), at 1, 5; Ex. F (Schedule 8 of American Rescue Plan Act Funds). All Minneapolis residents are intended beneficiaries of the City's law enforcement services and/or have the right under Title VI to not "be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Plaintiffs have sufficiently alleged a Title VI claim for substantially the same reasons that they have sufficiently alleged an Equal Protection Claim. Plaintiffs allege direct evidence of race discrimination, such as officers espousing pernicious race stereotypes in messages to Plaintiffs and their members, officers "posing" as Black individuals, comparator evidence that Black organizations were singled out while white individuals were not similarly tracked or harassed, and more. *See supra* Section III.A. Even if the Court views these allegations as indirect, rather than direct, evidence of race discrimination, the allegations in the FAC are plausible, sufficient at this early stage, and

would support a prima facie claim of race discrimination under the *McDonnell Douglas* burden-shifting framework.

Defendants argue that Title VI presents a heightened standard for municipalities and "the City can only be liable if it is 'deliberately indifferent to known acts' of discrimination or has an official policy that results in discrimination." City's Mem. at 38 (quoting *United States v. County of Maricopa*, 889 F.3d 648, 652 (9th Cir. 2018)). Even if the Court accepts this view, Plaintiffs allege with regard to their *Monell* claim that the City did have an unlawful custom and/or was deliberately indifferent, and thus Plaintiffs have sufficiently stated a Title VI claim. *See supra* Section V.

## VII. THE STATUTE OF LIMITATIONS PERIOD MUST BE EQUITABLY TOLLED AS TO PLAINTIFFS' MINNESOTA HUMAN RIGHTS ACT CLAIM

As Defendants fraudulently concealed the covert social media targeting and harassment described in the FAC, the one-year statute of limitations period must be equitably tolled as to Plaintiffs' Minnesota Human Rights Act ("MHRA") claim. Minn. Stat. Ann. § 363A.12 (2021). The Minnesota Supreme Court has repeatedly held that a defendant "should not benefit from the protection of a statute of limitations when he or she has fraudulently hidden a legal claim." *Minnesota Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d 509, 514 (Minn. 2014) (citing *Schmucking v. Mayo*, 183 Minn. 37, 40–41 (Minn. 1931)). Fraudulent concealment "tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect." *Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918 (Minn. 1990); *see also Wild v. Rarig*, 302 Minn. 419, 450 (Minn. 1975) ("Fraudulent concealment . . . will toll

the . . . statute of limitations until discovery or reasonable opportunity for discovery of the publication by the exercise of ordinary diligence.").

Here, there is no dispute that Defendants' use of covert social media accounts to target and harass Plaintiffs and their members was secret until it was revealed to the public via the MDHR report in April 2022. The FAC states that the one-year statute of limitations period must therefore be equitably tolled as to Plaintiffs' MHRA claim, either because a continuing violation exists and/or because of this concealment. FAC ¶ 114. The Court should therefore toll the statute of limitations as to Plaintiffs' MHRA claim until Plaintiffs discovered, or had a reasonable opportunity to discover, the violation of their rights. *Id.* Defendants should not benefit from the protection of a statute of limitations when they themselves fraudulently hid the legal claim. *Id.*

Moreover, Plaintiffs have sufficiently stated a claim under the MHRA. To establish a prima facie case of discrimination under Minnesota law, the claimant must demonstrate that "(1) [they are] a member of a protected class; (2) [they were] subjected to adverse and unreasonable treatment; and (3) the treatment was caused by a discriminatory consideration of race." *Minneapolis Police Dept. v. Kelly*, 776 N.W.2d 760, 766 (Minn. App. 2010); Minn. Stat. Ann. § 363A.12 (2021). Typically, "[c]laims of . . . race discrimination brought pursuant to the MHRA are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*[.]" *Lang v. City of Minneapolis, Minnesota*, No. CV 13-3008 (DWF/TNL), 2015 WL 13639434, at *10 (D. Minn. Aug. 6, 2015) (quoting 411 U.S. 792, 802 (1973)). Alternatively, race discrimination claims under the MHRA may be proven via proof of "treatment so at

variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation." *City of Minneapolis v. Richardson*, 239 N.W.2d 197, 202 (Minn. 1976). In applying the "so at variance" standard, a court examines "the totality of the circumstances surrounding the alleged discriminatory conduct …." *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 572 (Minn. 1994). The FAC's allegations here are sufficient for the reasons set forth in Sections III and VI *supra* (discussing Equal Protection and Title VI claims, respectively).

Accordingly, Plaintiffs MHRA claim must not be dismissed.

Dated: August 15, 2023

/s/ *Liliana Zaragoza*
Liliana Zaragoza (#402417)
*Associate Professor of Clinical Law & Director*
Brandon Redmon^
Evan Dale^
Lucy Chin^
Simon Earle^
Racial Justice Law Clinic
University of Minnesota Law School
229 19th Avenue South
Minneapolis, MN 55455
Phone: (612) 626-1007
Email: zaragoza@umn.edu

s/*Tim Phillips*
Tim Phillips (#390907)
Law Office of Tim Phillips
331 Second Avenue South, Suite 400
TriTech Center
Minneapolis, Minnesota 55401
Phone: (612) 470-7179
Email: tim@timphillipslaw.com

^ *Certified Student Attorney*

ATTORNEYS FOR PLAINTIFFS