**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MINNEAPOLIS BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE and URBAN LEAGUE TWIN CITIES,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF MINNEAPOLIS and OFFICERS JOHN DOES 1–20,<br><br>Defendants. | Case No. 23-CV-1175 (NEB/DTS)<br><br>ORDER ON MOTION TO DISMISS |

Plaintiffs allege that the Minneapolis Police Department used social media to surveil Plaintiffs and Plaintiffs' members, in violation of the United States Constitution and federal and state law. Defendants move to dismiss. (ECF No. 22.) For the reasons below, the motion is granted in part and denied in part.

## BACKGROUND[1]

Plaintiffs are the Minneapolis Branch of the National Association of Colored People ("NAACP") and the Urban League Twin Cities, a local chapter of the National

[1] The Court will take all factual allegations in the complaint as true, as it must on a motion to dismiss. *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014).

Urban League ("ULTC"). (ECF No. 21 ("Am. Compl.") ¶¶ 12, 19.) Each organization seeks redress for alleged racial discrimination and selective enforcement by the Minneapolis Police Department against their members.[2]

This suit stems from a 2022 Minnesota Department of Human Rights ("MDHR") investigation and report about the Minneapolis Police Department ("MPD"). After the 2020 murder of George Floyd, the MDHR investigated allegations of MPD misconduct. In 2022, it issued a report on MPD practices (ECF No. 30-1 ("Report").) Among the Report's findings are the allegations at the heart of this lawsuit: that MPD officers surveilled Black individuals on social media, targeting Black people and organizations that support racial equality, including the NAACP and ULTC. (*Id.* at 4.[3]) It is not uncommon for law enforcement to use social media accounts as an investigative tool. Indeed, the MPD has a specific policy on officers' use of covert social media accounts.[4]

---

[2] In bringing this suit, the organizations assert that they are acting in accordance with their missions: The NAACP's mission is "to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination." (*Id.* ¶ 14.).) The ULTC's mission "is to provide platforms, pathways, and programs for African descendants to dismantle racist structures, overcome racial disparities, and achieve equitable outcomes." (*Id.* ¶ 20.)

[3] Page citations to the record reference ECF pagination unless otherwise noted.

[4] MPD policy on social media accounts requires: "(i) approval by a supervisor to create a covert account, (ii) mandated registration of covert social networking profiles with the commander of the Strategic Information Center; (iii) a prohibition of any post that promotes violence or criminal activity; and (iv) required deletion of the profile when it is no longer needed." (*Id.* at 6 n.57.)

(*Id.* at 3.) But the Report found that the MPD used the accounts in violation of the policy, without a public safety objective, and unrelated to criminal activity:

> A review of MPD's covert social media accounts from January 2010, through December 2020, demonstrates that MPD officers used covert, or fake, social media accounts to surveil and engage Black individuals, Black organizations, and elected officials unrelated to criminal activity, without a public safety objective. In contrast, MPD officers did not similarly track and surveil white people unrelated to criminal activity using MPD covert social media accounts.

(*Id.* at 4; *see* Am. Compl. ¶¶ 49–50, 54.)[5] According to the Plaintiffs, the surveillance included "sending friend requests, commenting on posts, sending private messages, and contributing to discussions using fake profiles." (Am. Compl. ¶ 51.) The complaint alleges several examples of officer activity, including posing as a Black person to send a message criticizing the NAACP, using language that furthered racial stereotypes associated with Black women, and posing as a community member to RSVP to attend the 2017 birthday party of Nekima Levy Armstrong, who at that time was a City of Minneapolis mayoral candidate "openly running on a police accountability platform." (*Id.* ¶¶ 52–53.) Armstrong "recalled several MPD officers showing up in uniform to the event and ultimately shutting down the party early as a result of the officers' presence." (*Id.* ¶ 53.)

---

[5] Plaintiffs do not allege that Defendants continue to use social media in a manner that violates the law. In fact, the covert accounts analyzed by the MDHR were deleted in the winter of 2021, and the City has since entered a consent decree regarding the use of covert social media. (Am. Compl. ¶¶ 54 n.47, 74.)

The ULTC learned about the surveillance through the Report. (*Id.* ¶ 24.) The complaint alleges that the ULTC then expended significant resources addressing the findings of the Report and advising staff to "be cognizant of language used on social media and mindful that they are being watched." (*Id.*)

Plaintiffs sued Defendants alleging (1) John Doe officers violated Equal Protection and First Amendment rights, (2) the City violated Equal Protection rights and Title VI of the Civil Rights Act, (3) all Defendants violated the Minnesota Human Rights Act. Defendants now bring several challenges to the complaint: (1) that neither organization has standing; (2) that the substantive claims should be dismissed for failure to state a claim; and (3) that the constitutional claims should be dismissed on qualified immunity grounds. (ECF No. 22.) The Court agrees that the NAACP does not have standing and dismisses its claims. The ULTC, however, has demonstrated organizational standing, and its claims survive both Rule 12(b)(6) and qualified immunity analysis.

## ANALYSIS

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court must accept as true all

plausible factual allegations and draw all reasonable inferences in favor of the non-moving party. *Smithrud*, 746 F.3d at 397.

In ruling on a motion to dismiss, a court may consider documents embraced by the complaint and matters of public record. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). The Court considers the Report as embraced by the complaint.

## I. Standing

Article III limits the federal judicial power to "Cases" and "Controversies." U.S. Const. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quotation marks and citation omitted). To establish standing, a plaintiff must show (1) that they "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (2) "that the injury was likely caused by the defendant"; and (3) "that the injury would likely be redressed by judicial relief." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs, the parties invoking the Court's jurisdiction, bear the burden of establishing standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### *A. Associational Standing*

Both Plaintiffs assert associational standing, which allows an organization to sue on behalf of its members, even if the organization itself has not suffered an injury. To establish associational standing, the plaintiff must show: "(1) the individual members

would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011). Defendants argue that Plaintiffs do not satisfy the third requirement. Because the Court agrees as to the third prong, it declines to address whether Plaintiffs fall short on the first and second.

Crucial to the inquiry under the third prong of the associational standing test is the type of relief that Plaintiffs seek. While "'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members," it is typically "required in an action for damages to an association's members." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (citation omitted). Plaintiffs pursue damages and declaratory relief on behalf of their members, and each of these requests requires individualized proof.

The general rule defeating associational standing upon a claim for damages applies with particular force here, because Plaintiffs allege highly individualized claims. The complaint itself refers to "examples" of surveillance, each one presumably involving a different fact scenario. Thus, each individual alleging such surveillance would need to participate in the litigation for the Court to ascertain damages. Plaintiffs suggest that damages could be awarded via "a damages matrix whereby a dollar amount could attach to each private message, harassing post, or other interaction by an officer to or regarding

a member of one of the Plaintiff Organizations." (ECF No. 29 at 9.) But even this suggestion reveals why associational standing is a challenge here; it makes the point that any claim for damages is "peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof." *Warth v. Seldin*, 422 U.S. 490, 515–16 (1975). Because the damages claims require the involvement of individual members, Plaintiffs cannot rely on associational standing.[6]

### *B. Organizational Standing*

The NAACP concedes that it has no other form of standing, but the ULTC asserts it also has organizational standing. (ECF No. 29 at 11 n.1.) An organization may establish standing based on an injury to itself, as opposed to its members. To establish organizational standing, the ULTC must show "a concrete and demonstrable injury to an organization's activities which drains its resources and is more than simply a setback to its abstract social interests." *Nat'l Fed'n of Blind of Mo. v. Cross*, 184 F.3d 973, 979 (8th Cir. 1999)."[T]he deflection of an organization's monetary and human resources" is enough to establish an injury. *Ark. ACORN Fair Hous., Inc. v. Greystone Dev., Co.*, 160 F.3d 433, 434 (8th Cir. 1998).

---

[6] The declaratory judgment request fails as well. To establish standing for declaratory relief, Plaintiffs must allege they are suffering an "ongoing injury or face[] an immediate threat of injury." *Frost v. Sioux City, Iowa*, 920 F.3d 1158, 1162 (8th Cir. 2019). Past injuries cannot be redressed by a declaratory judgment. *Frost v. Sioux City*, 920 F.3d 1158, 1162 (8th Cir. 2019). Yet all Plaintiffs allege is past injuries. In fact, the social media accounts referenced in the Report have since been deleted and the City entered the consent decree. (Am. Compl. ¶¶ 54 n.47, 74.) Accordingly, the request for declaratory relief is dismissed.

The ULTC alleges that:

> Defendants' conduct has required the ULTC to expend significant staff time and resources to addressing the findings in the MDHR report, including MPD's surveillance and harassment of the ULTC—time that could have been spent advocating for proactive public safety measures such as legislative policy advocacy, rather than responding to and addressing Defendants' conduct alleged herein.

(Am. Compl. ¶ 24.) Although sparse, these allegations meet the ULTC's burden on a motion to dismiss. *Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . ."); *see Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, 811 (8th Cir. 2022) ("'The standing inquiry is merely a threshold inquiry'; it does not present the 'higher hurdles' of pleading a claim to relief on the merits under Federal Rule of Civil Procedure 12(b)(6)." (citation omitted)). The ULTC has alleged a concrete and demonstrable injury to its activities, with a consequent drain on its resources. *See, e.g.*, *Rosebud Sioux Tribe v. Barnett*, 603 F. Supp. 3d 783, 790 (D.S.D. 2022) (finding sufficient pleading where organization "had to increase its activity and divert its efforts from other matters" because defendants allegedly violated the National Voter Registration Act); *Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 798 (W.D. Mo. 2020) (finding sufficient pleading where organization diverted resources "in order to educate the public and to dispel confusion relating to the 2020

remote ballot rules").[7] The Court finds that the ULTC has organizational standing to assert all counts.

As to the NAACP: As noted above, the NAACP does not have associational standing, and does not assert organizational standing. Thus, the NAACP's claims are dismissed in their entirety. (ECF No. 29 at 11 n.1.)

## II. Constitutional Claims

The ULTC brings two constitutional claims against MPD John Doe officers—Equal Protection and First Amendment retaliation.[8] The Defendants urge dismissal for failure to state a claim, and the Court concludes that the ULTC has plausibly pled both claims.

---

[7] In addition, a plaintiff alleging organizational standing must demonstrate the classic standing components of traceability and redressability. *Lujan*, 504 U.S. at 560. Defendants largely do not contest these requirements, save for one argument. They argue that the ULTC's allegations that it spent time addressing issues in the Report are not traceable to the alleged surveillance. This argument ignores the allegation in the complaint that the ULTC spent time and resources addressing the "surveillance and harassment of the ULTC" specifically. (Am. Compl. ¶ 24.) The Court accordingly finds both traceability and redressability met here. The drain of the ULTC's resources is alleged to be traceable to Defendants' surveillance, thus meeting the traceability requirement, and the injury would be redressed with damages.

[8] Defendants assert that the complaint's allegations that officers surveilled the ULTC without a public safety objective are similar to the allegations in *Iqbal* and should be rejected as conclusory. In *Iqbal*, plaintiff was detained on suspicions of terrorist connections after the September 11 attacks, and sued for discrimination based on race or ethnicity because most of the people detained were Arab Muslims. 556 U.S. at 681. The Supreme Court found that these allegations, "given more likely explanations, . . . do not plausibly establish this purpose." *Id.* The Court noted that the attack was perpetuated by al Qaeda, which is headed by an Arab Muslim, so it "should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of

### *A. Equal Protection*

"To prove an equal protection claim in the context of a police interaction, [plaintiff] must prove that the officer exercised his discretion to enforce a law solely on the basis of race." *Clark v. Clark*, 926 F.3d 972, 980 (8th Cir. 2019). "To prevail on an equal protection claim of selective enforcement, a plaintiff must show both that the enforcement had a discriminatory effect, and that the enforcement was motivated by a discriminatory purpose." *Saunders v. Thies*, 38 F.4th 701, 714 (8th Cir. 2022) (quotation marks and citation omitted). "[S]elective enforcement claims should be judged according to ordinary equal protection standards." *Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009) (quotation marks and citation omitted). The ULTC alleges that MPD officers singled out the ULTC for selective enforcement via surveillance and harassment because it is a Black

---

their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims." *Id.* at 682.

In *Iqbal*, the attack provided an obvious alternative explanation for the alleged racially disparate treatment. Defendants do not provide similar justification here. Defendants assert that officers engaged in the alleged surveillance to establish credible undercover profiles. Although discovery might prove Defendants right, that theory strays from the complaint, which alleges that officers *targeted* Black people and organizations supporting racial equity. Nor is the need to establish outward credibility consistent with allegations that officers engaged in direct messaging. Even accepting Defendants' theory, it raises questions that go to the thrust of the ULTC's complaint—why would officers need to target Black people in establishing undercover profiles?

Additionally, the Report substantiates the allegations. The Report found that Black individuals and organizations were targeted and harassed on social media, while no similarly situated white individuals were disrupted in the same manner. (Am. Compl. ¶ 55; Report at 4.) The Court finds that these allegations are not conclusory and will evaluate whether they support the ULTC's claims.

organization. (*See* Report at 4.) The Court finds that the ULTC adequately pleads an equal protection claim.[9]

A plaintiff must ordinarily establish its claim of disparate treatment through allegations of similarly situated groups who are treated differently. *Gilani v. Matthews*, 843 F.3d 342, 348 (8th Cir. 2016). The ULTC does so by alleging that police officers did not similarly track and surveil white nationalist groups. (Am. Compl. ¶ 54.) Defendants argue that white nationalist groups are not similarly situated in all relevant respects, and there are certainly differences between white nationalist groups and the ULTC. White nationalist and white supremacist groups are considered domestic terrorism threats, while the ULTC's purpose is to promote equity and eliminate race-based discrimination. But if anything, these differences suggest that officers would be more likely to target white nationalist groups for surveillance, not less. And whether the difference in treatment of the groups is supported by relevant differences between the groups can be explored through discovery. *See Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994) ("[T]he similarly situated inquiry depends on what government action the plaintiffs are challenging . . . ."); *see also Hu v. City of New York*, 927 F.3d 81, 97 (2d Cir. 2019) ("[I]t is

---

[9] Associations can bring equal protection claims. *See Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist.*, 813 F.3d 1124, 1129 (8th Cir. 2016); *Ultimax Transp. v. Brit. Airways*, 231 F. Supp. 2d 1329, 1338 (N.D. Ga. 2002). And Defendants do not dispute that the ULTC is a member of a protected class.

precisely in light of the inquiry's fact-intensive nature that we have cautioned against deciding whether two comparators are similarly situated on a motion to dismiss.").

Additional factual allegations help the ULTC's claim cross the line into plausibility. The ULTC alleges that officers also targeted Black people in its surveillance, and officers did not similarly surveil white people. (Am. Compl. ¶¶ 3, 54.) Further, the ULTC alleges that racial discrimination is enmeshed in the MPD's culture. (*Id.* ¶ 48.) The Report explains that the "MPD maintains an organizational culture where officers consistently use racist . . . language," including racial slurs by officers and supervisors. (Report at 7.) While each of these facts in isolation might not support an equal protection claim, taking these factual allegations together, the ULTC has plausibly plead that it was treated differently based on its membership of a protected class. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) ("[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.").

Still, one difficulty arises: whether the alleged surveillance constitutes enforcement. Defendants argue that the alleged surveillance is not actually the sort of surveillance that the Eighth Circuit has found to constitute actionable enforcement. Typically, "surveillance" consists of law enforcement physically following and watching an individual or location with the goal of detecting criminal activity. *See, e.g.*, *United States v. Frazier*, 408 F.3d 1102, 1106 (8th Cir. 2005) (examining officers' decision to follow and

stop a U-Haul); *United States v. Woods*, 213 F.3d 1021, 1022 (8th Cir. 2000) (examining officers' decision to approach at an airport).

The Court declines to dismiss simply because Eighth Circuit precedent has typically addressed traditional surveillance, while this case deals with surveillance in the digital age. The ULTC alleges a modern version of "watching" and "following" that it experienced and others did not. Defendants do not explain why the modern iterations are any different. Nor, at this stage, does the Court find the differences persuasive. *See Commonwealth v. Dilworth*, No. 1884CR00453, 2019 WL 469356, *2 (Mass. Super. Ct. Jan. 18, 2019), ("[Police] use of Snapchat and other social media as an investigative tool . . . based on a suspect's membership in a protected class violates the equal protection principles of the Fourteenth Amendment . . . ."), *aff'd*, 147 N.E.3d 445 (Mass. 2020). Ultimately, on a motion to dismiss, the ULTC needs only to have alleged a plausible claim. *Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a probability requirement," and is satisfied by factual content that draws the reasonable inference that the defendant is liable for the alleged misconduct. (quotation marks and citation omitted)). It has met that standard.

Defendants' motion to dismiss the Equal Protection claim for failure to state a claim is denied.

### *B. First Amendment Retaliation*

To establish a First Amendment retaliation claim, a plaintiff must show "(1) that [plaintiff] engaged in a protected activity, (2) that the defendant's actions caused an injury to the plaintiffs that would chill a person of ordinary firmness from continuing to engage in the activity, and (3) that a causal connection exists between the retaliatory animus and the injury." *Scott v. Tempelmeyer*, 867 F.3d 1067, 1070 (8th Cir. 2017). Defendants do not dispute that the ULTC engaged in protected activity; they challenge the second and third elements.

Starting with the second element, the ultimate inquiry is an objective one: "What would a person of 'ordinary firmness' have done in reaction to the [adverse action]? Would he or she have simply ignored [it], or would he or she have been slowed down, at least to some degree?" *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). "The ordinary-firmness test is . . . designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." *Id.* The Court is mindful that the "effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Id.* at 729 (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).

The ULTC alleges that Defendants targeted the ULTC for surveillance and harassment because of its advocacy for racial equality, criticism of the police, and use of

social media. Defendants' electronic surveillance of the ULTC allegedly chilled the ULTC's speech—as the complaint alleges, the frequency and type of information provided by the ULTC changed because they knew police officers were watching. (Am. Compl. ¶ 24.) The ULTC's reaction to the surveillance establishes the ULTC's subjective chilling, and the test is objective. But the ULTC's claim passes the objective test as well. *See Anderson v. Davila*, 125 F.3d 148, 163 (3d Cir. 1997) (finding that the record demonstrated likelihood of success on the merits of a retaliation claim based on surveillance by police officers). *See generally United States v. Jones*, 565 U.S. 400, 416 (2012) ("Awareness that the government may be watching chills associational and expressive freedoms. And the government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse."). The ULTC's allegations that law enforcement targeted, surveilled, and harassed the ULTC because of protected speech is enough to plausibly plead objective chill.[10]

And finally, the third element: the ULTC has plausibly alleged a causal connection between the speech and adverse action. The ULTC alleges that the MPD *targeted* the ULTC and the NAACP—two organizations that use their voice to support racial equity. And the MPD used covert accounts to target police critics, pose as like-minded individuals, and criticize racial advocacy groups. (Report at 5.) The allegations discussed

[10] Defendants assert that the allegations are not enough to chill a person of ordinary firmness, relying on *Nuacke v. City of Park Hills*. 284 F.3d 923, 927 (8th Cir. 2002). However, *Nuacke* was a summary judgment decision; here, the standard is plausibility.

above regarding the MPD's culture of racist language lend further support to the claim that the MPD targeted the ULTC because the ULTC is vocal about racial equality. These allegations, taken together, support the inference "that the adverse action was motivated at least in part by the exercise of the protected activity." *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013). The First Amendment claim survives a motion to dismiss.

### *C. Qualified Immunity*

Defendants also seek dismissal of the constitutional claims on the grounds of qualified immunity. Qualified immunity shields government officials from liability for civil damages when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014) (citation omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation omitted). Defendants ask for qualified-immunity dismissal under Rule 12(b)(6), which is only appropriate "when the immunity is established on the face of the complaint." *Dornheim v. Sholes*, 430 F.3d 919, 926 (8th Cir. 2005) (citation omitted); *see Barton v. Taber*, 820 F.3d 958, 967 (8th Cir. 2016) (discussing the significance of the highly deferential motion to dismiss standard at this stage of the proceeding and affirming denial of qualified immunity). "The balance favors the plaintiffs when the test is based solely on the allegations in the complaint." *Whisman ex rel. Whisman v. Rinehart*, 119 F.3d

1303, 1309 (8th Cir. 1997). The Court takes a "broad view of what constitutes 'clearly established' under the qualified immunity analysis." *Id.*

The broad rights in question—to be free from racially selective law enforcement and retaliation for exercise of free speech—are of course clearly established. *Parada v. Anoka Cnty.*, 332 F. Supp. 3d 1229, 1245 (D. Minn. 2018) ("The law on selective enforcement based on race . . . is clearly established." (citing *Whren v. United States*, 517 U.S. 806, 813 (1996))); *Hartman v. Moore*, 547 U.S. 250, 254, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."). The right to equal protection of the laws "does not magically materialize when [individuals are] approached by the police." *United States v. Avery*, 137 F.3d 343, 353 (6th Cir. 1997). Instead, "[c]itizens are cloaked at all times with the right to have the laws applied to them in an equal fashion—undeniably, the right not to be exposed to the unfair application of the laws based on their race." *Id.*; *see Frazier*, 408 F.3d at 1108. And citizens have the right to speak without retaliation from government officials. *Hartman*, 547 U.S. at 254.

But this recitation of the law does not get us very far down the road. "For the right to be clearly established, case law need not be directly on point, but it must place the constitutional question beyond debate." *Lewis v. City of St. Louis*, 932 F.3d 646, 649 (8th Cir. 2019) "Courts must not define clearly established law at a high level of generality." *Ching as Tr. for Jordan v. City of Minneapolis*, 73 F.4th 617, 620 (8th Cir. 2023) (quotation

marks and citation omitted). The ULTC's allegations are indeed broadly worded: they state that officers "targeted and surveilled Black leaders, officials, and organizations" using social media. (Am. Compl. ¶ 56.) This allegation is somewhat conclusory and not particularly helpful in deciding whether the right alleged has been clearly established. The challenge with applying the straightforward application of the rule—no selective enforcement or retaliation—to this complaint is that the contours of the actions undertaken here will need to be determined through discovery. It is unclear whether the conduct engaged in by the Defendants is enforcement or retaliation clearly forbidden by the Constitution, and evidence may prove that they are not.[11]

Because discovery surrounding the facts alleged in this case will determine whether the right at issue has been clearly established, immunity is not established on the face of the complaint. Instead, "[q]ualified immunity is usually raised by a motion for

[11] Defendants rely on *Laird v. Tatum* for the proposition that officers could not have known that the alleged surveillance violated the Constitution. Contrary to the implication of Defendants' argument, *Laird* does not "stand for the proposition that public surveillance is . . . *per se* immune from constitutional attack." *Hassan v. City of N.Y.*, 804 F.3d 277, 292 (3d Cir. 2015). Rather, *Laird* involved the justiciability of a plaintiffs' "chilling effect" caused by "the mere existence, without more, of a [non-discriminatory] governmental investigative and data-gathering activity." *Laird v. Tatum*, 408 U.S. 1, 10 (1972). The ULTC has alleged more here. *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997) ("Under *Mt. Healthy* and its progeny, an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech."); *Hall v. Pa. State Police*, 570 F.2d 86, 91 (3d Cir. 1978) ("Although it may be assumed that the state may arrange for photographing all suspicious persons entering the bank, it does not follow that its criterion for selection may be racially based, in the absence of a proven compelling state interest." (citation omitted)).

summary judgment after a limited amount of discovery has been conducted." *Whisman*, 119 F.3d at 1309. This case falls within the mine-run of cases where qualified immunity should be considered on summary judgment. *See Clemmons v. Armontrout*, 477 F.3d 962, 965–67 (8th Cir. 2007) (addressing qualified immunity at the summary judgment stage); *Robinson v. White Cnty.*, 452 F.3d 706, 709–12 (8th Cir. 2006) (same), *vacated in part*, 459 F.3d 900 (8th Cir. 2006); *Murphy v. Arkansas*, 127 F.3d 750, 755 (8th Cir. 1997) (same); *Habiger v. City of Fargo*, 80 F.3d 289, 295–97 (8th Cir. 1996) (same).[12] Thus, at this stage, the Court will deny Defendants' motion to dismiss the officers on qualified-immunity grounds.

## III. *Monell* Claim Against the City

The ULTC also asserts a *Monell*[13] liability claim against the City. Under *Monell*, a city cannot be liable under Section 1983 just because it employs a tortfeasor. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013). Instead, a city can be liable only for a constitutional violation resulting from "(1) an official municipal policy, (2) an

---

[12] *See also Hill v. City of Minneapolis*, No. 12-CV-738 (MJD/AJB), 2012 WL 7761496, at *6 (D. Minn. Dec. 26, 2012) (citation omitted) ("Even though some predicate facts have been alleged in this matter, qualified immunity is typically considered on motion for summary judgment and generally involves consideration of facts elicited though at least some additional discovery."), *report and recommendation adopted*, 2013 WL 1104257 (D. Minn. Mar. 13, 2013).

[13] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Leftwich ex rel. Leftwich v. Cnty. of Dakota*, 9 F.4th 966, 972 (8th Cir. 2021) (citation omitted).

The Court starts with the ULTC's allegations of an unofficial custom. "When a complaint is filed, a plaintiff may not be privy to the facts necessary to accurately describe or identify any policies or customs which may have caused the deprivation of a constitutional right." *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003). At the pleading stage, the ULTC need only raise facts that "would support the existence of an unconstitutional . . . custom." *See Sagehorn v. Indep. Sch. Dist. No. 728*, 122 F. Supp. 3d 842, 867 (D. Minn. 2015) (explaining that a plaintiff need not identify "the full scope of an alleged custom or policy" to survive a motion to dismiss) (citing *Doe*, 340 F.3d at 614).

The ULTC alleges that the City had a custom of using covert social media accounts. (Am. Compl. ¶¶ 72, 77.) A *Monell* claim based on custom requires: "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014). The Court will analyze each element in turn.

***A. Pattern***

The ULTC alleges a pattern of discriminatory race-based policing whereby officers used covert social media accounts to target and surveil Black organizations and individuals over as long as 11 years. (Am. Compl. ¶¶ 5, 7, 31, 43, 71, 75, 81.) Defendants characterize the ULTC's allegations as bare legal conclusions. But the ULTC's allegations incorporate and are substantiated by the Report, which exhaustively studied the MPD's use of covert social media. The Report concluded that there was a pattern based on its studies, and pointed to three examples of MPD conduct of using covert social media surveillance targeting Black individuals or organizations.[14] The ULTC's allegations of a pattern are sufficient at this stage.

***B. Deliberate Indifference or Tacit Authorization***

To establish *Monell* liability, a plaintiff must also prove that the municipality showed deliberate indifference to, or tacitly authorized, the police officers' misconduct after having notice of that misconduct. *Johnson v. Douglas Cnty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013). Although "[n]otice is the touchstone of deliberate indifference in the

[14] Defendants argue that three instances are insufficient to establish a pattern. If this were a motion for summary judgment, and the ULTC had evidence of only three instances of unconstitutional conduct, then the Court would be more inclined to agree. But this is not a motion for summary judgment; this is a motion to dismiss. *See Sagehorn*, 122 F. Supp. 3d at 867 (explaining that a complaint can survive a motion to dismiss if it alleges facts supporting the existence of an unconstitutional custom). And the ULTC does more than provide only three instances; the Report exposes extensive social media surveillance. That the Report provides only three examples of such surveillance does not make the claim implausible.

context of § 1983 municipal liability," *Atkinson*, 709 F.3d at 1216, the complaint must also allege that the defendant "made a deliberate choice" to ignore the alleged violations. *Johnson*, 725 F.3d at 829. Constructive knowledge of the alleged constitutional violations may be inferred based on the widespread nature of the misconduct. *Thelma D. ex rel. Delores A. v. Bd. of Educ. of St. Louis*, 934 F.2d 929, 933 (8th Cir. 1991). "The city's policy of inaction in light of notice that [the status quo] will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (quotation marks and citation omitted).

The ULTC alleges a "code of silence" that emboldened officers to violate the rights of Black people, and claims that the City failed to discipline officers for violating those rights. (Am. Compl. ¶¶ 79–80.) The ULTC sufficiently alleges that the highest levels of the MPD knew about the surveillance, but they did nothing about it. (*Id.; see* Report at 9 ("Although the evidence in this investigation reflects a pattern of race-based policing with respect to MPD officers' . . . covert social media activity . . . MPD has not uniformly and consistently held officers accountable for these types of problematic behaviors.").) Although the allegations regarding the deliberate choice to ignore the officers' conduct are sparse, the Court will not dismiss the lawsuit on that basis at this stage. *Tirado v. City of Minneapolis*, 521 F. Supp. 3d 833, 844 (D. Minn. 2021) ("Although Tirado does not allege specific facts about the City's deliberation or decision to ignore such incidents, this is

likely too much to ask at the pleading stage, when all that is required is a 'possible custom.'" (citing *Sagehorn*, 122 F. Supp. 3d at 867)).

### *C. Injury Pursuant to Custom*

As analyzed above, the ULTC has plausibly alleged that the ULTC has been subject to race-based discrimination because of the MPD's custom of targeted social media surveillance. Accordingly, the ULTC's *Monell* claim survives the motion to dismiss.[15]

## IV. Title VI Claim Against the City

Title VI of the Civil Rights Act prohibits discrimination in federally funded programs and activities. *See* 42 U.S.C. § 2000d. To prevail, a plaintiff must show that their "race, color, or national origin motivated the defendant's discriminatory conduct." *Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 355 (8th Cir. 2020). Defendants merely refer to their Equal Protection and *Monell* analysis in asserting that the Title VI claim should be dismissed. As described above, the ULTC plausibly alleges discrimination and deliberate indifference. For the same reasons, the Court will not dismiss the Title VI claim.

## V. Minnesota Human Rights Act Claim Against All Defendants

Finally, Defendants seek to dismiss the ULTC's MHRA claims as barred by the statute of limitations. "A claim of an unfair discriminatory practice must be brought as a civil action . . . within one year after the occurrence of the practice." Minn. Stat. § 363A.28

[15] Because the ULTC successfully alleges an unofficial custom, the Court need not evaluate the ULTC's other theories of *Monell* liability.

subdiv. 3(a). The surveillance ended in the winter of 2021. (Am. Compl. ¶ 54 n.47; Report at 4 n.55.)

The ULTC claims an exception applies—fraudulent concealment. "[T]he statute of limitations does not run during the time that the defendant fraudulently conceals from the plaintiff the facts constituting the cause of action." *Minn. Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d 509, 514 (Minn. 2014) (citation omitted). Only "concealment by positive affirmative act and not mere silence is itself fraudulent so as to prevent the statute from running." *Id.* (citation omitted). "Fraudulent concealment tolls the statute of limitations until the party discovers, or has a reasonable opportunity to discover, the concealed defect." *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918 (Minn. 1990). "[N]ormally in a statute of limitations context fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment" or a motion to dismiss. *Hines v. A.O. Smith Harvestore Prods., Inc.*, 880 F.2d 995, 999 (8th Cir. 1989).

The ULTC asserts that Defendants have acted to keep them from discovering the actual identity of the people operating the social media profiles, which of course used fake names and identities. (Report at 4.) Even the existence of the accounts targeting the ULTC was secret until the Report. (Am. Compl. ¶ 4.) Such allegations are sufficient to establish fraudulent concealment at this stage.

Defendants argue that the ULTC has known about the fraud for years, citing Armstrong's statement that she has known of "Police officers engaging in surveillance of Black activist[s] and black leaders" since 2014 or 2015. (ECF 24-3[16] at 1:1–17 (native pagination).) But Armstrong is a member of the NAACP, not the ULTC, so the Court will not impute her knowledge to the ULTC. Regardless, in the statute-of-limitations context, "[a]s a general rule, 'the possible existence of a statute of limitations defense is not ordinarily a ground for Rule 12(b)(6) dismissal unless the complaint itself establishes the defense.'" *Joyce v. Armstrong Teasdale, LLP*, 635 F.3d 364, 367 (8th Cir. 2011) (citation omitted). Because this standard is not met, the Court will not dismiss the claim.

**CONCLUSION**

Based on the foregoing and on all the files, records, and proceedings herein, Defendants' motion to dismiss (ECF No. 22) is GRANTED IN PART and DENIED IN PART as follows:

1. The motion is GRANTED with respect to:

   a. All claims brought by the Minneapolis Branch of the National Association for the Advancement of Colored People;

   b. All claims for damages and declaratory relief on behalf of the Urban League–Twin Cities' members;

---

[16] The Court will take judicial notice of the video transcript as incorporated by the complaint. *Zean*, 858 F.3d at 526 (8th Cir. 2017).

2. The motion is DENIED as to all other claims.

Dated: March 29, 2024

BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge